**IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION**

Case No. 10-80883-CIV-Ryskamp

MAGALY PINARES AND MARCOS PINARES

          Plaintiffs,

v.

UNITED TECHNOLOGIES CORP.,
d/b/a PRATT & WHITNEY,

          Defendant,
_____/

**THIRD AMENDED COMPLAINT**

Plaintiffs, MAGALY PINARES AND MARCOS PINARES, sue the Defendant, UNITED TECHNOLOGIES CORPORATION, d/b/a PRATT & WHITNEY, and allege:

**Parties, Jurisdiction and Venue**

1.    Plaintiffs, MAGALY PINARES AND MARCOS PINARES, are residents and owners of real estate at 14193 82ND Street N., Loxahatchee, Palm Beach County, Florida.

2.    Plaintiffs' property listed above is located in a neighborhood of Palm Beach County commonly known as "The Acreage" that is delineated on the attached map, Exhibit A.

3.    The acts, events and omissions giving rise to the claim occurred in Palm Beach County, Florida where the property that is the subject of this action is situated.

4.    Defendant, UNITED TECHNOLOGIES CORPORATION d/b/a PRATT & WHITNEY ("P&W" or "Defendant") is a Delaware corporation with a principal place of business and address of 1 Financial Plaza, Hartford, Connecticut. At all times material hereto, Defendant owned and operated an industrial facility on property that it owns in northern Palm

Beach County, Florida. P&W's property is located close to the northern edge of The Acreage. The area between the southern border of P&W's property and the northern edge of The Acreage consists of undeveloped land known as the J.W. Corbett Wildlife Management Area.

5. Beginning in the late 1950's and continuing to the present, Defendant has operated testing and manufacturing facilities on the P&W property, including but not limited to those known as the Pratt and Whitney Government Engine Business Division, the Pratt & Whitney Aircraft Florida Research and Development Center, and Pratt & Whitney Rocketdyne. P&W's Operations at the site have included the design, manufacture, rebuilding, and testing of jet and rocket engines. For these operations P&W constructed a system of canals, ponds, above and below ground tanks, pipelines, cooling towers, and test stands.

6. P&W's operations at the subject property have utilized and generated significant quantities of toxins, contaminants, carcinogens and other hazardous wastes. These toxins, contaminants, carcinogens and other hazardous wastes, hereinafter collectively referred to as Chemicals or Contaminants of Concern or "CCOCs" include but are not limited to 1,1 Dichloroethane; 1,2 Dichloroethane; 1,1 Dichloroethylene; Trans−1,2 Dichlororethylene; CIS 1,2 Dichloroethylene; 1,1,1 Trichloroethane, 1,1,2 Trichloroethane; 1,1,2,2 Tetrachlorethane; Trichloroethylene; Tetrachloroethylene; Carbon Tetrachloride; Vinyl Chloride; Benzene; Toulene; Methylene Chloride; 2,3,7,8-Tetrachlorodibenzo-P-Dioxin; Ethyl Benzene; Chloroform; Bromodichloromethane; Bromoform; Chloroethane; Chlorobenzene; OCCD; TCDD; 1,2,3,4,6,7,8-HpCDD; Paradichlorobenzene; Chlorodibromomethane; 1,4 Dichlorobenzene; Hexavalent Chromium; Trichlorofluromethane, Xylene, Dioxins, Paradichlorotoulene, PCBs, Benzonitrite; 1,4 Dioxane; sodium cyanide; furans; dimethyl phthalate; n-propylbenzene; naphthalene; 1-methylnapthalene; 2-methylnapthalene; jet fuel;

2

rocket fuel; paints; mercury; heavy metals, pesticide and herbicide residue and their degeneration byproducts.[1]  The CCOCs were stored in barrels and tanks, spilled, sprayed, burned, discharged, dumped, collected in ponds and canals, and buried by P&W on its property and in the Corbett National Wildlife Refuge.

7.     P&W has caused numerous spills, releases and discharges of the CCOCs and has intentionally discharged CCOCs on its property and that of the Corbett National Wildlife Refuge since 1957. As of November 2008, the Florida Department of Environmental Protection found 24 contaminants in the soil and water on P&W's property including the CCOCs  which were confirmed by testing to be present in high concentrations in the soils, surface water, and groundwater in and around P&W's property. Testing performed for and on behalf of P&W has confirmed that the CCOCs were introduced by P&W into the groundwater and are present in high concentrations in the aquifer under its property which flows south and southeasterly from P&W, under the Corbett National wildlife Refuge, and then under The Acreage.   Operations conducted over the years at P&W's property have caused or allowed these CCOCs to be discharged or released into the environment, including into P & W's surface water and groundwater. Groundwater movement, surface water movement, seepage, percolation pond flooding, canal flooding, and wind have caused these CCOCs to escape or migrate from P&W's property and into and under The Acreage.

8.     Operations conducted since 1957 at P&W's property have caused or allowed the CCOCs to be discharged or released into the environment, including into P & W's surface water

---

[1]          At the time of filing this Third Amended Complaint Defendant has objected to Interrogatories and Request for Production claiming it should only have to produce documents or information concerning trihalomethanes (3 of the CCOCs) and not the multitude of other CCOCs that it is alleged to have contaminated the groundwater with at its facility in West Palm Beach, Florida. The Court has not ruled on Plaintiffs' Motion to Compel this Discovery. D.E. 111  Plaintiffs hereby incorporates by reference all of the chemicals listed in the documents that Defendant has not produced and which it has failed to disclose in answer to the Interrogatories.

and groundwater as well as that of the Corbett National Wildlife Refuge. CCOCs were also released into the air, settled, and were deposited on the ground, and surface water including canals and ponds.  Water contaminated with CCOCs was then used in manufacturing and testing thereby creating additional CCOCs. The CCOCs percolated through the porous and permeable soils and reached the aquifer underlying P&W and the Corbett National Wildlife Refuge.  That aquifer is part of a common aquifer that flows in a south and southeasterly direction under The Acreage from where Acreage residents have drawn the water containing the CCOCs for many years.  Different CCOCs, depending on their varying chemical attributes, are transported at different rates through the aquifer and arrive at different times beneath The Acreage.  Since all of the CCOCs are still present on P&W's property in soils, surface water, or groundwater, all of the CCOCs will continue to travel through the common aquifer and will arrive beneath the Acreage where they will be drawn into water wells that are used by The Acreage residents.   The rates at which the CCOCs migrate from P&W's property and into and under The Acreage vary depending upon the spill or discharge location, the wind, the fluctuating rate of surface water movement, seepage, percolation, pond flooding, canal flooding, and the individual chemical properties of the CCOCs.  Consequently, different CCOCs arrive at different times under The Acreage. Since water in the common aquifer is always moving the CCOCs may be present at different times in different locations within the aquifer.  As demonstrated by P&W's own testing, a CCOC may be present in a P&W well one day, not appear in the next sample taken a few days or weeks later, and reappear a week or more later.

9.     P&W's property lies generally north of The Acreage. Hydrologic studies have shown that P&W, the Wildlife Management Area, and The Acreage are underlain by, and share the same permeable and porous underground aquifer, and that groundwater generally moves

from the north to the south into and under The Acreage. In addition, groundwater is drawn from beneath the Corbett National Wildlife Refuge and P&W to the Acreage as a result of the thousands of wells in the Acreage drawing water.  At least one surface canal that drains P&W's property flows through and off P&W's property in a southerly direction. Because the groundwater in the contaminated aquifer flows to the south, the groundwater underlying The Acreage has been contaminated by the CCOCs dumped, spilled, discharged, burned, buried, and released by P&W on its property and that of the Corbett National Wildlife Refuge. These CCOCs continue to migrate beyond the boundaries of P&W's property and the Corbett National Wildlife Refuge into the Acreage and contaminate the water below The Acreage Neighborhood where it is drawn for consumption, cooking, bathing and activities of daily living.

10.     P&W has since the inception of its facility in 1957 failed to take adequate or reasonable measures to prevent the CCOCs from contaminating the common aquifer and warn The Acreage landowners that share and receive groundwater from the aquifer, that the aquifer has been contaminated with CCOCs.

11.     Plaintiffs have drilled test wells and verified the presence of CCOCs in the aquifer beneath The Acreage Neighborhood.  Laboratory testing has confirmed that CCOCs including but not limited to bromodichloromethane, methylene chloride, chloroform, hexavalent chromium, dioxins, furans, dimethyl phthalate, n-propylbenzene, naphthalene, 1-methylnapthalene, 2-methylnapthalene are present in the water beneath The Acreage, and have been drawn into the Plaintiffs well.  Groundwater contaminated by P&W with all the CCOCs listed in paragraph 6 above, continues to move south through the aquifer underlying The Acreage and will continue to contaminate the shared water of The Acreage Neighborhood which is dependent on groundwater and does not have municipal, city, or community water.  Plaintiffs'

actions are premised on P&W's contamination of the shared aquifer with all the CCOCs listed in paragraph 6 above.  Plaintiffs' actions are neither dependent upon, nor limited to, CCOCs that have tested positive in The Acreage as of the date of trial.

12.    On May 13, 2009, the Florida Department of Health received an e-mail from a parent in The Acreage stating that she had questions about cancer and asking how she could request a study. Her son, age 6, had been diagnosed with a brain tumor.  In June, 2009, initial cancer data collection specific to The Acreage began. On February 1, 2010, as a result of its investigation, the Palm Beach County Health Department designated the Acreage as a cancer cluster elevating even further the public concern and awareness that cancers at The Acreage might be attributable to the pollution and contamination emanating from P&W's property.

13.    Additional cases of children in The Acreage with brain tumors began to emerge, prompting a multi-agency investigation into the cause of these cancerous tumors.  This included limited drinking water testing at the homes of the pediatric brain cancer victims.  Many residents in The Acreage began to recognize that the likely source of contamination in the area was the P&W industrial facility to the north as it is the only large industrial complex in the area that handles toxic CCOCs.  The cancer concerns in The Acreage prompted widespread interest and awareness of P&W's historic environmental practices, contamination of its groundwater and the Corbett National Wildlife Refuge.

14.    Beginning as early as July 10, 2009, News Channel 5 (WPTV) in Palm Beach County ran a report stating that "[a]ccording to a 2003 Florida Fish and Wildlife Conservation Commission report, metal drums were found dumped on the Pratt & Whitney side of the property line."  The report stated that "[t]he drums were marked hazardous waste and were spotted by Corbett Wildlife Management workers," and that a plume containing 1,4-dioxane had

spread from the drums.

15.     The media also reported a 1988 inspection conducted by the Florida Department of Health and Rehabilitative Services resulting in a report that "expressed concern about deteriorating drums and their effects on the water supply." The report also "indicate[d] that sources of groundwater, surface water and wind blown contamination were a concern."

16.     As the concern regarding elevated numbers of cancer cases continued to escalate, the *Palm Beach Post* ran a series of articles discussing and showing maps of the close proximity of The Acreage to P&W's dumping and spilling of CCOCs and drawing attention to "a long list of toxic leaks and spills on Pratt & Whitney's 7,000 acres dating back to at least 1979 – including one that spread into the neighboring J.W. Corbett Wildlife Management area." On April 11, 2010, the *Palm Beach Post* published an article on its front page titled "Acreage cluster evokes memories of 1980s cancer mystery at Pratt."  The article detailed some of the chemical spills a few miles north of the Acreage at P&W which contaminated its groundwater along with a map showing the close proximity to The Acreage of the spills along the southern border of P&W's property. The article also discussed increased cancer death rates of P&W workers attributed to contamination of P&W's groundwater caused by a 1979 spill of TCE from a storage tank into the company's potable groundwater supply.

17.     Reports also revealed that in the early 1980's the P&W site was placed on the U.S. Environmental Protection Agency's National Priorities List (NPL). Later it was dropped from the NPL at P&W's request for the reason that P&W agreed to attempt some remediation. Unfortunately, P&W's remediation efforts were undertaken after the aquifer had already been heavily contaminated.  The remediation efforts did not halt the movement of groundwater contaminated with CCOCs from flowing from beneath P&W property to The Acreage. These

remediation efforts did not halt the movement of groundwater contaminated with CCOCs that had escaped from the P&W property and later traveled to and continue to travel to The Acreage. A subsequent 1988 Florida Department of Health report stated that the site remained a "potential public concern because of the risk to human health caused by the possibility of exposure to hazardous substances via CCOCs in groundwater and air."

18.     On or about February 17, 2010, the Realtors Association of Palm Beach (RAPB), emailed a model disclosure statement and disclaimer to its members that its members should use to advise potential buyers and renters of the cancer cluster designation at The Acreage. Although the situation in The Acreage was, by then, widely referred to as a "cancer cluster," the RAPB asked its members to:

> Please refer to the situation as the "Acreage Health concern" not as The "Cancer Cluster" which may be perceived as definitive.

The email also stated:

> As Realtors, we are concerned as anyone about the possibility of Specific health concerns in our area. We would also be advocates for government funded studies to determine the cause and to research possible solutions.
>
> In the meantime, however, we do have a duty to disclose the fact that these cases exist and that a potential purchaser or lessee of Property in the area should review for themselves the progress of these studies and findings.

The nation's largest realtor, Coldwell Banker, also prepared a similar disclosure form for its agents' use.

19.     As the scale and scope of the investigation and public concern continued to escalate, the issue began garnering national attention. The cancer cluster designation and P&W's chemical spills and groundwater contamination received widespread coverage from print and

television media. In August 2010 The Federal Housing Administration imposed a warning advising appraisers that the state-declared cancer cluster, which had the effect of calling attention to P&W's history of environmental contamination and proximity to The Acreage, may be harming home values in the central Palm Beach County community.

20. As a direct and proximate result of P&W's release and discharge of CCOCs into the air, surface water, and groundwater, property values within The Acreage including those of the Plaintiffs have plummeted and the Plaintiffs have been harmed. The Acreage as a whole has been stigmatized and its property values have been damaged by P&W's contamination of The Acreage's groundwater and by the public health concerns created by P&W's air, surface water, and groundwater contamination.

21. As a further direct and proximate result of P&W's contamination of the air, surface water, groundwater, and the aquifer which The Acreage Neighborhood shares, Plaintiffs have lost the full use and enjoyment of their properties. Plaintiffs depend on groundwater as a source of water for drinking, bathing, cooking and all other domestic uses. Plaintiffs now try to avoid ingestion of and contact with the contaminated groundwater. The CCOCs released and discharged by P&W continue to contaminate the aquifer that is shared with The Acreage Neighborhood and interfere with the use and enjoyment of The Acreage properties.

22. Venue in this District is proper pursuant to 28 U.S.C. § 1391(a) as a substantial part of the events and omissions giving rise to the claim occurred in this District.

23. The Acreage is defined as that geographic area in Palm Beach County depicted in the attached map, and – starting at the northeast corner of the map and working clockwise – is bounded by Grapeview Blvd., Hamlin Blvd., 120th Ave. North, Orange Blvd., 110th Ave. North, 40th Street North, E Road, North Road, G Road East, 25th Street North, Folsom Road,

Crestwood Blvd., Southern Blvd., the eastern and northern boundary of parcel 00404322000007020, the northern boundaries of parcels 00404322000007010, 00404322000005000, 00404322000007030, and 00404321000005010; the eastern boundaries of parcels 00404320000001020, 00404317000001020, 00404308000001000, and 00404309000001000; Little Gator Lane, Gator Lane, 60th St. N, the western boundary of parcel 00404235000006990, 180th Ave North, Hamlin Blvd, 190th St N, 94th St N, Seminole Pratt Whitney Rd., and 100th Lane N.

## Count I – Strict Liability
### (Hazardous Use of Land)

24.     Plaintiffs re-allege and incorporate by reference paragraphs 1-23 above as if set forth fully herein.

25.     P&W was engaged in the ultrahazardous activity of test firing rocket engines and jet engines on test stands utilizing chemicals in the process that create ultrahazardous CCOCs that pose a serious risk of  physical injury and death to those in the vicinity of the testing or who inhale, ingest, or consume the ultrahazardous CCOCs thus created. P&W's aforesaid activities were ultrahazardous and abnormally dangerous.

26.     The Acreage properties and property owners, including the Plaintiffs, faced a high degree of risk and the substantial likelihood of great harm because the CCOCs and the chemical byproducts created were released into the air, groundwater, and the common aquifer shared with the well water dependent Acreage Neighborhood.  P&W's activities posed a high degree of risk and the substantial likelihood of great harm to Plaintiffs and their property.

27.     P&W's aforesaid ultrahazardous activity on its property caused personal injury to the Plaintiffs and damaged their property values in that it created CCOCs that pose a high degree

of risk of harm not only to its workers, but to the Plaintiffs and their properties. The likelihood that harm would result from this activity was great. The manner and use of the CCOCs in the process of test firing the rocket and jet engines is not common. The use of the CCOCs in the testing process utilized by Pratt & Whitney was outweighed by the dangerous attributes of the CCOCs thus created and was inappropriate, reckless, and unreasonably dangerous.

28.     Plaintiffs have had the water in their well tested and the laboratory reported that their well water was contaminated with Bromodichloromethane, Methylene Chloride, and Chloroform. These contaminants are genotoxic; it does not require any specific concentration or amount of absorption for them individually or in combination to cause clear cell renal carcinoma. Magaly Pinares and Marcos Pinares used water from their well since May, 2001 for all purposes including drinking, cooking, showering and other activities of daily living. Their property does not have access to municipal, city, or community water; it is dependent on groundwater that has been drawn through their well since May, 2001. That groundwater has been contaminated with bromodichloromethane, methylene chloride, chloroform, hexavalent chromium, dioxins, furans, dimethyl phthalate, n-propylbenzene, naphthalene, 1-methylnapthalene, 2-methylnapthalene, and other CCOCs and their byproducts which were dumped, spilled, injected, and buried by P&W on its property and in the Corbett National Wildlife Refuge by P&W and which traveled into the water well of the Pinares from which it was consumed and absorbed by them through drinking, cooking, showering and other activities of daily living. Absorption of CCOCs and their byproducts, including but not limited to bromodichloromethane, methylene chloride, chloroform, hexavalent chromium, dioxins, furans, dimethyl phthalate, n-propylbenzene, naphthalene, 1-methylnapthalene, 2-methylnapthalene from the air and water since May, 2001, predisposed, initiated, had an additive or synergistic effect, and caused or contributed to Magaly Pinares

developing clear cell renal carcinoma, its spread, and metastasis to her femur and other parts of her body.

29.     As a direct and proximate result of P&W's ultrahazardous and abnormally dangerous activities, the Plaintiffs have suffered personal injuries and diminution in the value of their property.  P&W is strictly liable to Plaintiffs for these damages. As a direct and proximate result of Pratt & Whitney's release of CCOCs, the Plaintiff, MAGALY PINARES, has developed renal carcinoma from exposure and absorption to CCOCs including but not limited to bromodichloromethane, methylene chloride, chloroform, hexavalent chromium, dioxins, furans, dimethyl phthalate, n-propylbenzene, naphthalene, 1-methylnapthalene, 2-methylnapthalene through ingestion, inhalation, and dermal absorption.  The renal carcinoma has required the surgical removal of her left kidney.  The renal carcinoma metastasized to her right femur requiring surgical removal of approximately thirty-five percent of the proximal femur and the joint in her hip thereby necessitating an artificial replacement.  The renal carcinoma has also metastasized to her thyroid requiring chemotherapy and other medical care and treatment.

30.     P&W's failure to properly store, use, impound and dispose of the aforesaid CCOCs so as to prevent their escape into and onto the properties of Plaintiffs was either intentional or was so reckless and wanting in care that it constituted a conscious disregard or indifference to the rights, welfare and safety of Plaintiffs and their property.  Moreover, P&W intentionally dumped and with gross negligence spilled the aforesaid CCOCs not only onto its property but also that of the Corbett National Wildlife Refuge in such quantities that it was designated a Superfund site by the USEPA.  The aforesaid dumping and spillage of the CCOCs was a regular pattern and practice of P&W and was done with the knowledge and acquiescence of upper management of P&W and United Technologies knowing that it would contaminate the

environment, soils, and groundwater with toxic substances that were known to be hazardous to human health. Plaintiffs are accordingly entitled to punitive damages.

### Count II – Strict Liability
(Violation of §376.313(3), Fla. Stat.)

31. Plaintiffs re-allege and incorporate by reference paragraphs 1–23 and 25-28 above, as if set forth fully herein.

32. P&W improperly stored, released, discharged, burned, buried, and disposed of CCOCs on its property and at the Corbett National Wildlife Refuge which is underlain by a porous and permeable aquifer, and traversed by surface canals. These CCOCs and their chemical constituents and activities meet the definitions of "contaminant," "hazardous substances," "discharge," and "pollution," in §376.301, Fla. Stat.

33. P&W's activities violated §376.302(1)(a), Fla. Stat., which prohibits the discharge of pollutants or hazardous substances into or upon Florida's surface waters and groundwaters.

34. Violations of §376.302 are actionable under §376.313(3), Fla. Stat., which provides, in pertinent part:

> i. [N]othing contained in ss. 376.30-376.317 prohibits any person from bringing a cause of action in a court of competent jurisdiction for all damages resulting from a discharge or other condition of pollution covered by ss. 376.30-376.317. … [I]n any such suit, it is not necessary for such person to plead or prove negligence in any form or manner. Such person need only plead and prove the fact of the prohibited discharge or other pollutive condition and that it has occurred.

Under §376.313(3), P&W is strictly liable to Plaintiffs for all damages caused to their person and property by its violation of §373.302(1)(a).

35. As a direct and proximate result of P&W's violation of §376.302, which caused

the contamination of Plaintiffs' air, surface water, and groundwater, Plaintiffs have suffered personal injuries and diminution in the value of their property.   Plaintiffs have had the water in their well tested and the laboratory reported that their well water was contaminated with Bromodichloromethane, Methylene Chloride, and Chloroform.   These contaminants are genotoxic; it does not require any specific concentration or amount of absorption for them individually or in combination to cause clear cell renal carcinoma.  Magaly Pinares and Marcos Pinares used water from their well since May, 2001 for all purposes including drinking, cooking, showering and other activities of daily living.  Their property does not have access to municipal, city, or community water; it is dependent on groundwater that has been drawn through their well since May, 2001.   That groundwater has been contaminated with bromodichloromethane, methylene chloride, chloroform, hexavalent chromium, dioxins, furans, dimethyl phthalate, n-propylbenzene, naphthalene, 1-methylnapthalene, 2-methylnapthalene, and the other CCOCs and their byproducts which were dumped, spilled, injected, and buried by P&W on its property and in the Corbett National Wildlife Refuge by P&W and which traveled into the water well of the Pinares from which it was consumed and absorbed by them through drinking, cooking, showering and other activities of daily living.   Absorption of CCOCs and their byproducts, including but not limited to bromodichloromethane, methylene chloride, chloroform, hexavalent chromium, dioxins, furans, dimethyl phthalate, n-propylbenzene, naphthalene, 1-methylnapthalene, 2-methylnapthalene from the air, surface water, and groundwater, since May, 2001, predisposed, initiated, had an additive or synergistic effect, and caused or contributed to Magaly Pinares developing clear cell renal carcinoma, its spread, and metastasis to her femur and other parts of her body.

36.    P&W's release of CCOCs into the air, surface water, and groundwater has caused

the Plaintiff, MAGALY PINARES, to develop renal carcinoma from exposure and absorption through inhalation, ingestion, and dermal absorption.  The renal carcinoma has required the surgical removal of her left kidney.  The renal carcinoma metastasized to her right femur requiring surgical removal of approximately thirty-five percent of the proximal femur and the joint in her hip thereby necessitating an artificial replacement.  The renal carcinoma has also metastasized to her thyroid requiring chemotherapy and other medical care and treatment.

37.     P&W's failure to properly store, use, impound and dispose of the aforesaid CCOCs so as to prevent their escape into and onto the properties of Plaintiffs was either intentional or was so reckless and wanting in care that it constituted a conscious disregard or indifference to the rights, welfare and safety of Plaintiffs.  Moreover, P&W intentionally dumped and with gross negligence spilled the aforesaid CCOCs not only onto its property but also that of the Corbett National Wildlife Refuge in such quantities that it was designated a Superfund site by the USEPA.  The aforesaid dumping and spillage of the CCOCs was a regular pattern and practice of P&W and was done with the knowledge and acquiescence of upper management of P&W and United Technologies knowing that it would contaminate the environment, soils, and groundwater with toxic substances that were known to be hazardous to human health.  Plaintiffs are accordingly entitled to punitive damages.

**Count III – Negligence**

38.     Plaintiffs re-allege and incorporate by reference paragraphs 1 – 23, 25-28, and 32-34 above, as if set forth fully herein.

39.     P&W knew or should have known that its creation, storage, release, burning, burying, discharge, and disposal of CCOCs into the air, surface water, and groundwater, including the use of water contaminated with CCOCs on its property as aforesaid, and in the

Corbett National Wildlife Refuge which is underlain by a porous and permeable aquifer, and traversed by surface canals, created a zone of risk encompassing the properties and persons in The Acreage for contamination with toxic CCOCs.  For The Acreage shares the contaminated air, the contaminated surface waters, and the common aquifer that Pratt & Whitney contaminated with all of the toxic CCOCs.

40.     P&W owed a duty to Plaintiffs to take appropriate precautions and exercise that degree of reasonable or ordinary care in its activities that an ordinary prudent person or business would have exercised under the same or similar circumstances to avoid contamination of the air, surface water, groundwater, and aquifer on its property and also that of the Corbett National Wildlife Refuge, and The Acreage with the CCOCs listed in paragraph 6 above.

41.     P&W also owed a duty under the Florida Air and Water Pollution Control Act, §403.011, Fla. Stat., et seq., and Florida's Water Quality Assurance Act, §376.30, Fla. Stat., et seq., to avoid contamination of the air, surface water, groundwater, and the aquifer on its property, and also that of the Corbett National Wildlife Refuge, and The Acreage with the CCOCs listed in paragraph 6 above.

42.     P&W breached the aforesaid duties by negligently: (a) dumping, spilling, burning, burying, releasing, discharging, and disposing of the CCOCs; (b) failing to take appropriate or reasonable precautions in storing, impounding, using, and disposing of the CCOCs; (c) failing to prevent the contamination of groundwater and surface waters by the CCOCs; (d) using water contaminated with CCOCs in its testing and manufacturing process; (e) failing to prevent the escape of the CCOCs from its property, (f) failing to adequately train and supervise its employees in the storage, use, monitoring and disposal of the CCOCs;  and (f) failing to clean up or contain contaminated surface and groundwater created by its improper storing, impounding,

using, disposing, releasing and discharging of CCOCs on its property. A reasonable and prudent person or business entity would have taken precautions, testing, and monitoring of its activities involving the CCOCs listed in paragraph 6 above, and would have taken adequate and timely measures to avoid contaminating the air, surface water, and groundwater with them and their byproducts and avoided harming nearby landowners and damaging their property values. A reasonable and prudent person or business entity would have taken steps to identify the extent of any contamination and to find ways to prevent it from spreading and harming others and damaging their properties. P&W had a duty to act in a timely and adequate manner to avoid injury and damage to persons and property in the Corbett and The Acreage, as a reasonably prudent person or business entity would have under these circumstances, but failed to so act to the detriment of the Plaintiffs. Belatedly, P&W focused on cleaning up of its property which was inadequate. P&W failed to adequately test for contamination it was causing on adjacent properties and properties that were down gradient. P&W failed to warn or adequately warn of its contamination of the aquifer, groundwater, surface water, and air. As a direct and proximate result of the aforesaid contamination of the air, surface water, groundwater, and common aquifer, the nearby well water dependent Acreage Neighborhood, which shares the air, surface water, and groundwater, the Plaintiffs and their property were injured and damaged. Knowledge of P&W's contamination of the air, soil, surface water, and groundwater on its property and the Corbett National Wildlife Refuge, and that this groundwater is shared with the well water dependent Acreage Neighborhood became known by the general public, particularly in February 2010 and the months that followed. Plaintiffs thereby suffered a diminution of the value of their properties.

43.     Plaintiffs have had the water in their well tested and the laboratory reported that

their well water was contaminated with Bromodichloromethane, Methylene Chloride, and Chloroform. These contaminants are genotoxic; it does not require any specific concentration or amount of absorption for them individually or in combination to cause clear cell renal carcinoma. Magaly Pinares and Marcos Pinares used water from their well since May, 2001 for all purposes including drinking, cooking, showering and other activities of daily living. Their property does not have access to municipal, city, or community water; it is dependent on groundwater that has been drawn through their well since May, 2001. That groundwater has been contaminated with bromodichloromethane, methylene chloride, chloroform, hexavalent chromium, dioxins, furans, dimethyl phthalate, n-propylbenzene, naphthalene, 1-methylnapthalene, 2-methylnapthalene, and the aforesaid CCOCs and their byproducts which were dumped, spilled, burned, injected, and buried by P&W on its property and in the Corbett National Wildlife Refuge by P&W. That groundwater contaminated with the CCOCs listed in paragraph 6 above traveled into the water well of the Pinares from which it was consumed and absorbed by them through drinking, cooking, showering and other activities of daily living. The contaminated air and surface water also transported the CCOCs listed in paragraph 6 above, into The Acreage and onto the Plaintiffs' property. Absorption of CCOCs listed in paragraph 6 above, and their byproducts, including but not limited to bromodichloromethane, methylene chloride, chloroform, hexavalent chromium, dioxins, furans, dimethyl phthalate, n-propylbenzene, naphthalene, 1-methylnapthalene, 2-methylnapthalene, since May, 2001, predisposed, initiated, had an additive or synergistic effect, and caused or contributed to Magaly Pinares developing clear cell renal carcinoma, its spread, and metastasis to her femur and other parts of her body.

44.     As a direct and proximate result of Pratt & Whitney's aforesaid breaches of its duties, Plaintiff, MAGALY PINARES, was exposed to the CCOCs listed in paragraph 6 above,

and she has developed renal carcinoma.  The renal carcinoma has required the surgical removal of her left kidney.  The renal carcinoma metastasized to her right femur requiring surgical removal of approximately thirty-five percent of the proximal femur and the joint in her hip thereby necessitating an artificial replacement.  The renal carcinoma has also metastasized to her thyroid requiring chemotherapy and other medical care and treatment.

45.    P&W's failure to properly store, use, impound and dispose of the aforesaid CCOCs so as to prevent their escape into and onto the properties of Plaintiffs was either intentional or was so reckless and wanting in care that it constituted a conscious disregard or indifference to the rights, welfare and safety of Plaintiffs.  Moreover, P&W intentionally dumped and with gross negligence spilled the aforesaid CCOCs not only onto its property but also that of the Corbett National Wildlife Refuge in such quantities that it was designated a Superfund site by the USEPA.  The aforesaid dumping and spillage of the CCOCs was a regular pattern and practice of P&W and was done with the knowledge and acquiescence of upper management of P&W and United Technologies knowing that it would contaminate the environment soils, and groundwater with toxic substances that were known to be hazardous to human health.  Plaintiffs are accordingly entitled to punitive damages.

**Count IV – Nuisance**

46.    Plaintiffs re-allege and incorporate by reference paragraphs 1 – 23, 25-28,  32-34, and 39-43 above, as if set forth fully herein.

47.    P&W created and maintained a nuisance by improperly creating, storing, impounding, discharging, releasing, burning, reusing and disposing of CCOCs into the air, surface water, and groundwater, not only on its property, but that of the Corbett National Wildlife Refuge and The Acreage, all of which are underlain by a porous and permeable aquifer

and which is traversed by surface canals.   The aforesaid acts of P&W were unreasonable, unwarranted, and unlawful.

48.     Property owners in The Acreage, share P&W's aquifer and receive its surface waters and ground waters. The CCOCs that P&W improperly created, stored, impounded, discharged, released, burned, reused, and disposed of on its property entered the groundwater and surface water on its property and that of the Corbett National Wildlife Refuge and were carried into the groundwater of The Acreage Neighborhood which is shared by the Plaintiffs. The Acreage Neighborhood and the Plaintiffs' properties within it were known to be dependent on this groundwater for drinking, cooking, showering, and all activities of daily living as The Acreage Neighborhood does not have municipal, city, or community water.

49.     P&W's creation and contamination of the environment with CCOCs including the air, surface water, groundwater, and common aquifer beneath it that is shared with The Acreage Neighborhood and Plaintiffs' property became known to the Plaintiffs and the general public in February 2010 and the months that followed.    The Acreage Neighborhood and the Plaintiffs' property which share the common aquifer have been materially and substantially harmed. Plaintiffs' use and enjoyment of their properties have been interfered with and lost.  Plaintiffs' loss of use and enjoyment includes: (a) their inability to fully use the wells on their property which were their only sources of potable water; (b) fear and anxiety over illness that could be caused by exposure to CCOCs that originated at the P&W facility; (c) fear and anxiety over the consumption or incidental ingestion of Acreage water; (d) fear and anxiety over bodily contact with Acreage water; (e) having to limit, out of fear and anxiety, their water-related activities; (f) having to purchase and use bottled water and install water purification systems; and (g) being unable to exploit the full economic value of their properties by sale or rental or by using the

property as security for a loan.

50.     As a direct and proximate result of P&W's aforesaid contamination of the air, surface water, groundwater, and the common aquifer shared by the well water dependent Acreage Neighborhood and the Plaintiffs' property, and the knowledge of P&W's contamination of the air, surface water, groundwater, and aquifer, the Corbett National Wildlife Refuge, and that this groundwater is shared with The Acreage Neighborhood groundwater coming to be known by the general public, particularly in February 2010 and the months that followed, Plaintiffs have suffered a diminution of the value of their properties.

51.     P&W's failure to properly store, use, impound and dispose of the aforesaid CCOCs so as to prevent their escape into The Acreage and onto the property of Plaintiffs was either intentional or was so reckless and wanting in care that it constituted a conscious disregard or indifference to the rights, welfare and safety of Plaintiffs, and their property.  Moreover, P&W intentionally dumped and with gross negligence spilled the aforesaid CCOCs not only on its property but also that of Corbett Wildlife Refuge in such quantities that it was designated a Superfund site by the USEPA.  The aforesaid dumping and spillage of these CCOCs was a regular pattern and practice of P&W and was done with the knowledge and acquiescence of upper management of P&W and United Technologies Corporation.  Plaintiffs are accordingly entitled to punitive damages.

### Count V - Loss of Consortium

52.     Plaintiff, MARCOS PINARES, re-alleges and incorporates by reference paragraphs 1-23, 25-29, 32-36, 39-44, and 47-50 above as if set forth fully herein.

53.     The aforesaid, has caused or contributed to cause the Plaintiff, MARCOS PINARES, in the past, and will in the future, to be deprived of the support, protection, services,

and society of his wife, MAGALY PINARES, and the condition so complained of is permanent in nature.

54.     Furthermore, MARCOS PINARES, as the result of the significant injury resulting in MAGALY PINARES's permanent disability is entitled to recover for his past and future permanent loss of  consortium, including the loss of companionship, society, co-operation, aid, loss or impairment of sexual relations and solace of his injured wife.

55.     P&W's failure to properly store, use, impound and dispose of the aforesaid CCOCs so as to prevent their escape into and onto the property of Plaintiffs was either intentional or was so reckless and wanting in care that it constituted a conscious disregard or indifference to the rights, welfare and safety of Plaintiffs.  Moreover, P&W intentionally dumped and with gross negligence spilled the aforesaid CCOCs not only onto its property but also that of the Corbett National Wildlife Refuge in such quantities that it was designated a Superfund site by the USEPA.  The aforesaid dumping and spillage of the CCOCs was a regular pattern and practice of P&W and was done with the knowledge and acquiescence of upper management of P&W and United Technologies knowing that it would contaminate the environment, soils, and groundwater with toxic substances that were known to be hazardous to human health.  Plaintiffs are accordingly entitled to punitive damages.


**<u>Prayer for Relief</u>**

WHEREFORE, Plaintiffs pray that:

A.     MAGALY PINARES be awarded the full and fair measure of her damages for the severe permanent injuries that she has and will endure as a result of the foregoing.  That she

recover the full value of her past and future suffering, pain and mental anguish, and loss of capacity for the enjoyment of life;

B.      MAGALY PINARES be awarded the full and fair measure of her damages for her past and future surgeries, painful and extensive chemotherapy, medical care and treatment, medication, past and future medical support and home care needs, past and future medical bills and expenses attendant to the condition of the Plaintiff, MAGALY PINARES;

C.      MAGALY PINARES be awarded the full and fair measure of her damages for her past and future loss of earnings and earning capacity;

D.      MARCOS PINARES be awarded the full and fair measure of his damages for his past and future loss of earnings necessitated by caring for and seeking medical attention for his wife, Magaly Pinares, and his aforesaid loss of consortium damages;

E.      That MARCOS AND MAGALY PINARES recover as damages the value by which their real property was diminished;

F.      Plaintiffs recover the compensatory damages determined to have been sustained by them and that judgment for damages be entered herein against Defendant in an amount to be determined;

G.      Plaintiffs recover punitive damages from Defendant based on its aforesaid willful and wanton conduct and its conscious disregard for the rights, welfare and safety of the Plaintiffs and their property;

H.      The Court enter a judgment awarding counsel their reasonable attorney's fees and reimbursement of all expert fees, costs and expenses; and,

I.      The Court grant such other and further general and equitable relief as may be deemed just and proper and that judgment for same be entered against Defendant in an amount to be determined.

## Demand for Jury Trial

Plaintiffs hereby demand trial by jury on all issues so triable as a matter of right.

Respectfully submitted,

s/Craig Zobel_____
CRAIG R. ZOBEL, ESQUIRE                    SCOTT P. SCHLESINGER, ESQ.
Florida Bar Number:  056080                 Florida Bar Number: 444952
czobel@zobellawfirm.com                     scott@schlesingerlawoffices.com
CRAIG R. ZOBEL, P.A.                         SCHLESINGER LAW OFFICES, P.A.
3801 PGA Blvd., Suite 600                    1212 S.E. 3RD Ave
P.O. Drawer  32065                           Fort Lauderdale, FL 33316
Palm Beach Gardens, FL  33420               Telephone: (954) 467-8800
Telephone:  (561) 277-1819                   Facsimile (954) 523-4803
Facsimile:  (561) 630-9666                   Co-Counsel for Plaintiffs
Co-Counsel for Plaintiffs

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on April 14, 2015, I served the foregoing on all counsel of record identified on the below stated service list via transmission of the Notices of Electronic Filing generated by CM/ECF.

s/Craig Zobel_____
CRAIG R. ZOBEL, ESQUIRE                    SCOTT P. SCHLESINGER, ESQ.
Florida Bar Number:  056080                 Florida Bar Number: 444952
czobel@zobellawfirm.com                     scott@schlesingerlawoffices.com
CRAIG R. ZOBEL, P.A.                         SCHLESINGER LAW OFFICES, P.A.
3801 PGA Blvd., Suite 600                    1212 S.E. 3RD Ave
P.O. Drawer  32065                           Fort Lauderdale, FL 33316
Palm Beach Gardens, FL  33420               Telephone: (954) 467-8800
Telephone:  (561) 277-1819                   Facsimile (954) 523-4803
Facsimile:  (561) 630-9666                   Co-Counsel for Plaintiffs
Co-Counsel for Plaintiffs

**IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION**

Case No. 10-80840-CIV-Ryskamp

# SERVICE LIST

GREGOR J. SCHWINGHAMMER, JR., ESQ.
gschwinghammer@gunster.com
G. JOSEPH CURLEY, ESQ.
jcurley@gunster.com
GUNSTER, YOAKLEY & STEWART, P.A.
777 South Flagler Drive, Suite 500 East
West Palm Beach, FL 33401
Telephone: (561) 655-1980
Facsimile: (561) 855-4282
*Attorneys for Defendants*


SEAN W. GALLAGHER, ESQ.
sean.gallagher@bartlit-beck.com;
ANDREW C. MACNALLY, ESQ.
Andrew.macnally@bartlit-beck.com;
DANIEL MCELROY, ESQ.
Daniel.mcelroy@bartlit-beck.com
BARTLIT BECK HERMAN PALENCHAR & SCOTT, LLP
Courthouse Place
54 West Hubbard Street, Suite 300
Chicago, IL 60654
OFFICE: 312-494-4428 / 4448 / 4453
*Attorneys for Defendants*

Background

Figure 2. Street-Level View of Proposed Boundaries of The Acreage



