UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 10-8088 – CIV MARRA-HOPKINS
(CONSOLIDATED CASE:  LEAD ACTION)

MAGALY PINARES ET AL

        Plaintiffs,

vs.

UNITED TECHNOLOGIES CORPORATION
PRATT & WHITNEY GROUP, a Connecticut
Corporation

        Defendant.
_____/

JOSELYN SANTIAGO and STEVE SANTIAGO,      CASE NO:  14-CIV-81385
Co-Personal Representatives of the Estate of
CYNTHIA SANTIAGO,

        Plaintiffs,

vs.

UNITED TECHNOLOGIES CORPORATION
PRATT & WHITNEY GROUP, a Connecticut
Corporation.

        Defendant.
_____ _____/

## FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

      Plaintiffs, JOSELYN SANTIAGO and STEVE SANTIAGO, co-personal representatives
of the Estate of Cynthia Santiago, sue Defendant, UNITED TECHNOLOGIES CORPORATION
PRATT & WHITNEY GROUP, a Connecticut corporation for damages as prayed for
specifically below.

1

**JURISDICTION and VENUE**

1.      This action was originally filed by Cynthia Santiago on November 7, 2014, in this District Court pursuant to 42 USC 2210(n)(2) and 42 USC 2014(h)(h), claiming personal injuries (an ependymoma brain tumor) caused by exposure to a nuclear incident. The Court has pendant jurisdiction over the exposure allegations that do not stem from a nuclear incident.

2.      On October 14, 2016, Cynthia Aurora Santiago died as a result of her brain tumor; Plaintiff provided notice on November 22, 2016.  On January 10 2017, her parents, Steven and Jocelyn Santiago filed their Oaths of Personal Representatives in the Probate Division of the Circuit Court for Palm Beach County, Florida and await letters of administration noting the appointment of JOSELYN and STEVE SANTIAGO as the co-personal representatives of her estate.

3.      From the age of nearly four months until her recent death (from 1996 until 2016) Cynthia resided at the home owned by her parents in Palm Beach County, within the Acreage community.

4.      Cynthia's parents, co-personal representatives JOSELYN and STEVE SANTIAGO, still reside in that home, on 54th Lane North, West Palm Beach, Florida.

5.      Defendant UNITED TECHNOLOGIES CORPORATION d/b/a PRATT & WHITNEY (hereinafter "UTC") is a Delaware corporation with a principal place of business and address of 1 Financial Plaza, Hartford, Connecticut. At all times material hereto, Defendant owned and operated an industrial facility on property that it owns in northern Palm Beach County, Florida. UTC's property is located close to the northern edge of the Acreage. The area between the southern border of UTC's property and the northern edge of the Acreage consists of undeveloped land known as the J.W. Corbett Wildlife Management Area ("Corbett").

6.      In November 2009 at age 13, Cynthia was diagnosed with an ependymoma brain cancer which resulted from exposure to radioactive and other carcinogenic materials, including heavy metals and volatiles, including but not limited to benzopyrene and perchlorates, present in the Acreage at the time that she resided in the Acreage as a result either of ground and surface water movement from the property or as a result of "the big dig" wherein soils from the UTC property were incorporated in the Acreage as residential fill.

7.      Her tumor was one of a cluster of pediatric brain cancers occurring from 2001 through 2009 as a result of the massive soil transfers from the UTC property to the Acreage occurring at least from 1993 through 2000, or from water movement from the UTC property and through the Acreage, or due to both.

8.      Until 2016, in the midst of this and related litigation, no one in the Acreage was aware that any soil removed from the UTC campus during its decades of remediation processes was used for residential fill in the Acreage.

**BRAIN TUMORS OF CYNTHIA SANTIAGO AND OTHER ACREAGE RESIDENTS**
<u>**Cynthia Santiago's Diagnosis and Death**</u>

9.      In November 2009, Plaintiff was diagnosed with an ependymoma.  Because the pediatric brain tumor cluster described below had been identified by that time and confirmed over a month later, her case was reviewed by the Florida Department of Health (FDOH).

10.      Her family was told by the Palm Beach County Health Department that preliminary results suggested that reverse osmosis was needed to treat the aquifer relied upon by the Acreage but then, after stating that she would classify as a cluster member and that reverse osmosis was being explored, neither the state nor county departments ever contacted the family again.  The FDOH did not inform the family that another cluster victim resided only five homes away.

11.      One of the victims of the tort detailed below, Cynthia survived for a time against incredible odds, beating back recurrent tumors that moved from her brain to her spine. Battling those tumors caused considerable financial strain, as well as an emotional and physical toll:

   a.   The ependymoma spread down from her brain to her spine and then along her spine.

   b.   Then, the metastatic process of the disease caused the tumor to compress against her spinal cord, causing an immitigable, ascending nerve pain that was followed by ascending paralysis.

   c.   The treatments that extended her life became focused on near futile attempts to keep her comfortable.

d. In the end, it totaled hundreds of thousands of dollars in billed medical care. She died in hospice care at home on October 14, 2016.

e. She was 20 years old and by then, completely paralyzed.

f. She remained a loving and loved daughter, sister, and friend throughout and her estate and survivors are now damaged by the loss of her enormous potential, the loss of her companionship and the suffering endured in the memory of their daughter's agonizing disease.

12. The subtype of glioma termed ependymoma is an extremely rare disease. Cynthia was one of three diagnosed in the Acreage between 2005 and 2009. Another glioma brain tumor occurred in 2005 within five homes on her street.

13. The cluster in the Acreage is only rivaled by the fact that five out of the twelve engineers who worked with thorium (used in the J58 engine program activities that occurred at UTC's Florida Research & Development Center) in West Palm Beach also died of brain tumors.

**The Acreage Brain Tumor Cluster**

14. In 2009, the FDOH declared that the level of pediatric brain tumors diagnosed in the Acreage was significantly escalated for the years 2005-2007. In 2010, the Center for Disease Control (CDC) confirmed the escalation and the 2008 pediatric diagnoses were added to the cluster.

15. "The Acreage" area as designated by that report is a well-water reliant community in the center of the L8 basin, which is influenced by the surface and groundwater at the UTC campus from the North.

16. The report, attached as Exhibit A, compared the number of cancers diagnosed in the Acreage (the observed incidence) with the population-weighted number of cancers diagnosed in the County and the State (the expected cancer incidence.)

17. While observing that cancer elevated throughout the Acreage in general, the FDOH's 2009 report emphasized that pediatric brain tumors were particularly elevated, to more

than three times the expected rate of occurrence, and the FDOH based its cancer cluster designation the pediatric brain tumors alone.

18.　　Based on self-reported data and the full range of information the FDOH reported, however, the pediatric cancer cluster declared by the state for 2004–2008 should be expanded to a general brain cancer cluster from 2004–2010.

19.　　The 2009 FDOH study notes that ionizing radiation is the primary environmental contaminant associated with an increased incidence of brain tumors.

20.　　Other studies have detected the presence of heavy metals including lead and cadmium in brain tumor tissue.

21.　　The FDOH failed to find the cause of the cluster in part because of flaws in the phase II study's methodology and execution, which included:

　　　　a.　ignoring data;

　　　　b.　using incomplete data;

　　　　c.　applying incorrect statistical and other inferential theories and methods;

　　　　d.　failing to consider and address local industrial polluters;

　　　　e.　improper influence from UTC or UTC interests.

22.　　Since the April 2014 email to the Palm Beach County Commissioners, the DOH has not acted on resident inquiries and significant additional contamination data provided to it:

　　　　a.　　When the families asked DOH to explain how its 2014 numbers made sense, the DOH epidemiologist in Tallahassee emailed the director of Palm Beach County Health Department stating she would provide an answer by October 1, 2014. DOH has still not provided any answer.

　　　　b.　　In 2014, at the same time that the DOH reported the number of brain tumors to the County Commissioners, the DOH was informed of the ongoing detections of radionuclides in the plumbing infrastructure and back-flush areas where the systems flushed water. The DOH and its internal Bureau of Radiation Protection and Control failed to respond to this information even though the official policy of the Bureau is that it must respond with an investigation to every report of discovering radioactive materials.

In this instance, the only response from DOH has been through a lawyer who asked the families to no longer contact DOH bureau directors directly.

23.     These Acreage residents resided in homes on well water at the time the cluster was declared and have since continued to obtain their water from on-site wells.

## The Santiago Property's Proximity to Case Homes

24.     The Santiagos, like most Acreage residents, rely on the aquifer underneath their home for water—this is a well water community.

25.     While residing in the contaminated area, Cynthia was exposed to contaminants that were present then and are still found in the Acreage today.

26.     At the beginning of the elevated Acreage brain tumor incidence, tumors were reported primarily from case homes in the upper M1 basin and M2 basin regions of the Acreage. From 2001 through 2008 alone, these included the following female diagnoses, all of which are diagnoses whose location was published as case homes on the DEP sample map and whose diagnoses have been the subject of litigation or have been the subject of publication:

a.   A 2001 Glioblastoma Multiform (Case 9);

b.   A 2004 Glioblastoma of the optic chiasm (Case 3);

c.   A 2005 Pilocytic Astrocytoma (Case 14);

d.   A 2005 Ependymoma (Case 1);

e.   A 2008 Ependymoma (Case 11);

f.   A 2008 Ganglioglioma (Case 16).

27.     During this time, adults and male children were diagnosed in significant proximity to these diagnoses.   For example, a 2008 Pylocitic Astrocytoma was diagnosed in a 7 year old boy (Case 12) who lived less than 200 yards from an adult male who died of a glioma multiform in 2007.

28.     As time progressed, the incidence of pediatric and adult tumors became elevated in the lower M1 basin, where Cynthia lived:

a.       In 2005, on the same street as Cynthia and within five homes, one of the females who is included as case number 2 in the DOH study was diagnosed with a glioma.

6

b.	In 2008, just 500 yards north of Cynthia's home, along 57th Street just west of the 130th canal, resident Ronald Wise, a related Plaintiff (2014-cv-80655), was diagnosed with a sinus meningioma. In that same year, a neuroblastoma and a brain tumor were diagnosed among neighbors of Wise living one half mile and one mile west along 57th and 58th Streets.

c.	In 2009, Cynthia's ependymoma brain tumor was diagnosed.

d.	In 2010, less than a mile (1400 yards) west of the Santiagos, a related Plaintiff, Debora Craig (2013-cv-81258), was diagnosed with an astrocytoma which became a glioblastoma multiform.

e.	In 2011, within a mile west of the Santiagos, two residents under the age of forty were diagnosed with glioblastomas, Patrie and Lott.  Both died within the next two years.

f.	In 2012, another resident was diagnosed with a glioblastoma (Ekstrand). She too had been living in the Acreage for decades, and like Craig, she lived 600 southeast of a 2011 diagnosis at the time of her diagnosis.

29.	The FDOH and FDEP failed to find the cause of the cluster in part because of flaws in the phase II study's methodology and execution, which included:

a.	using incomplete data such as using proximate controls for the environmental study and significantly older controls for length of residency

b.	failing to assess local polluters

c.	bias evidenced by the agency's unwillingness to find an imminent hazard

d.	influence from the Defendant UTC

e.	ignoring its own data.


**CONTAMINANTS, CAUSATION, AND THE STATE'S FLAWED ASSESSMENTS**
**Specific Contaminants in the Acreage Case Homes**

30.	Testing in the Acreage where brain tumor victims resided revealed the following contaminants

a.	Numerous non-naturally occurring radioactive contaminants in the backflush soil or plumbing scale sediment soil including americium-241, cesium-137, tin-

126, and vanadium-48, plutonium-238, and strontium-109. ("Backflush soil" samples come from the area of each victim's yard where their residential water filtration system deposits the water used to flush the system's filters).

b.     Iridium 192 and Cadmium 109 were detected in initial testing but as testing data increases, the results seem to be linearly connected to certain naturally occurring radionuclides that are not associated with these radionuclides and it appears at this time that these results are artifacts of those naturally occurring materials.

c.     At several of these homes where radionuclides remain present at above background levels, significant detections of copper, lead, niobium and chromium are also present.

d.     In dust samples removed from bathroom and utility vents, both radioactive and non-radioactive particles such as vanadium, zirconium, and other rare earth metals in pure particle form, materials that do not normally exist in residential dust.

e.     Perchlorate has been detected in the backflush soil at the home of one adult who died of his brain tumor; that home is two miles due north of the former Royal Palm Beach well field, which was sourced by the Village of Royal Palm Beach until 2005 when it switched to County water.  The home used to be owned by a UTC engineer.

f.     According to a Palm Beach County water quality report for the "water quality year" 2005, published in 2006, Royal Palm Beach's treated water included perchlorate in the year 2003 before the Village elected to sell its water market and provision rights to the County, the County declined the option to purchase the well field.

g.     At several of the Acreage pediatric brain tumor cluster homes tested by the DOH, benzopyrene in the backflush soils at levels above residential clean-up target levels—at one home ten times that level.

31.     The DOH also found cesium-137, a fission product, in the soil of every case home that it studied but one. In several homes, it found it in several locations. At DeCarlo's home, it was found in all five of the five samples analyzed.  Although the DOH expert admitted he never reviewed the data to see trends at the case homes, the DOH and DEP issued a report stating the

8

levels were not above the background. The backgrounds were vacant lots proximate to the case homes. The levels found at the case homes coupled with the fact that Cesium-137 was present in the majority of non-native soil samples (landscape fill) taken from case homes, all of which were built decades after any atmospheric testing resulting a certain background for undisturbed top soil around the globe.

32.     The DOH never tested Cynthia Santiago's home but confirmed her diagnosis in emails to the Acreage Focus Group. Plaintiff's counsel has detected strontium-90 and cesium-137 in the backflush soil of her home.

33.     Samples collected from the homes of several of the related brain tumor victims also showed an increased presence of other radionuclides, such as thorium-230, and lead-214 or lead-210. While those radionuclides may arise from either a man-made process or by natural occurrence, the specific circumstances in which they were found here suggest non-natural production: (i) these products are present in the same samples that include fission products that are not naturally occurring, and (ii) these products are subject to decay however the proportion of the decay products in relationship to one another represents a state of disequilibrium.

### Contaminants at Defendant's Palm Beach County (PBC) Campus

34.     The rare contaminants listed in paragraphs 30 through 33 above are uniquely associated with the sort of business engaged in by Defendant at its Palm Beach County (PBC) Campus, created by improving what was previously vacant land in 1955. From then to today, Defendant is the only industry within the L8 basin to use or to have reason to use the constellation of various contaminants found in the L8 basin.

35.     Benzopyrene has been present on the UTC PBC Campus and subject to water egress for decades prior to the Acreage cancer cluster and probably for decades prior to the mid 1980's, when the first real development in the Acreage began. And despite reported remediation, the PBC Campus today still has levels of benzopyrene well in excess, hundreds of times in excess, of industrial and residential clean up levels. Benzopyrene is significantly elevated in the Acreage.

36.     Contaminated soil and water at the UTC PBC Campus moved into the Acreage either by water from the PBC Campus traveling into the L8 basin or by a dumping operation

including the use of PBC Campus soil as fill for road and residential development in the Acreage. Remediation at the PBC Campus began after Acreage development started.

37.     Results of soil samples already taken at the UTC PBC Campus link the Acreage contamination to Defendant's property:

     a.     The samples include the same constellation of radioactive materials identified in the Acreage: cesium-137, lead-210, lead-214, radium 226/228, and uranium 234-236. Samples taken in 2016 show the presence of Strontium 90 throughout the western portion of the campus and at the scales in the scrap yard area where the soil removed from these areas was allegedly weighed before leaving.

     b.     Several metals are present in soil well above clean target levels—demonstrating that the 47 known sites which were allegedly remediated did not capture the extent of the campus contamination that needed to be remediated.

     c.     Soil samples have been assessed using gamma and alpha spectroscopy, which determines the identity and measures the quantity of gamma- or alpha-emitting radionuclides from the energy spectra of the sample. The spectrographs produced from the samples confirm the presence of the radionuclides stated above and several additional non-naturally occurring materials.

     d.     Not all of the transporters admit that the soil was weighed—which is just one of the many inconsistencies in the testimony already provided by the UTC personnel who oversaw the trucking operation, the transporters who admit to transporting materials, and the transporter listed on the majority of UTC manifests.

**Contaminants found on the Powerline Road**

38.     There is a navigable road that connects the western edge of the UTC campus, near a point indicated by its reports filed to with the Department of Environmental Protection as SWMU 39, Laser Range, to the northern area of the Acreage known as Powerline road, which is a fortified gravel road runs underneath the power lines through Corbett Wildlife Management area.

39.     Trucks reportedly moved soil from the UTC campus at night—although it is not known what route they took.

40.     Contaminants on the powerline road and at points along the Corbett side of the Corbett-UTC fence line include levels of Plutonium-239 as well as Cesium-137 at well above background.

41.     At the UTC fence-line in Corbett, plutonium-239 was present at a significant level.

42.     An aggregate rock was sampled from the location due west of the Pratt Whitney.

43.     The sample was split into a rock-like aggregate material that appeared anthropogenic, a coarse fraction, and a fine fraction.

44.     The aggregate contains imbedded particles of iron, phosphorous, and most numerously, silver.  This is not particularly typical of "rocks" available in the area or even mined aggregates and is instead typical of an industrial product, rather than a natural mineral.

45.     The fine fraction of the same power line sample had many examples of particles that contained the radionuclides thorium and uranium.  Other suspect radionuclides found in the fine fractions include percent levels of cesium and thulium.

46.     Thulium is an extremely rare material and its principal industrial use includes major laser operations.

### General Causation

47.     The Acreage exhibits the following two linked, non-naturally-occurring phenomena:

a.     First, while brain tumors do occur independent of identifiable toxic exposure, they do not occur spontaneously and without an exposure-based explanation at either the rate or within the geo-proximity that has occurred in the Acreage from at least 2004 through 2015.

b.     Second, while radioactive materials exist in soil, water, and even in food products naturally; nature does not produce the type, manner, or amount of radionuclides present in the back flush and sediments of water systems used by the people living in the Acreage who not only have those rare tumors but rely on that shared aquifer.

48.     The causal chain linking those two non-naturally-occurring phenomena is recognized by medical providers, public health professionals, and heath physicists around the

world—the primary environmental contaminant associated with an increased risk of brain tumors is ionizing radiation:

      a.      External doses of radiation to the scalp of no greater than 1.5 Gy in total have resulted in an increased risk of schwannoma and meningioma of over ten fold. The increased risk for glial tumors, the type diagnosed in Acreage children, and many adults, is over threefold.

      b.      The risk appreciation for the development of a glial brain tumor following a dose of radiation to the scalp is in fact nearly the same as the increased risk that the DOH Acreage Cancer Review found occurred in Acreage children.

49.      The Acreage lies south/southeast of Defendant—which has worked on projects using "source" and "by-product" nuclear materials as defined in 42 USC § 2014 (z) and (e), respectively (Price-Anderson defines the nuclear materials it regulates as either source, byproduct, or special source material), as well as several of these rare Earth metals.

50.      In addition to being a community afflicted with a significant increase of brain tumors and a significant presence of radioactive material, the homes of several Acreage brain tumor victims include dust or soil deposits of the same metals used by and often required to have been remediated by Defendant in the past. Several of those metals—cadmium, lead, and mercury—can pass the blood–brain barrier and are also associated with brain tumors. And, recent studies have detected cadmium and mercury in brain tumor tissue.

51.      Defendant has attempted to remediate several sites at its property for these same materials found in the Acreage; they have been present in various combinations at 47 sites subject to corrective action in the past.

52.      Defendant is the lone local industry that is now known

      (i)      to have had its engineers who worked with its materials to experience a disproportionate number of brain tumors,

      (ii)      to have been required to unearth thorium-inclusive nickel from burial sites, a burial which violated its own protocol and the memoranda it provided the regulators in order to have a license to use radiation materials,

      (iii)      to have discarded radioactive materials in the water table,

(iv)     to have learned that radioactive materials were buried in its landfill and to determine to treat those as an unknown in reports issued to the regulators at the time that its site was being considered for listing on the National Priorities List (superfund)

(v)     to have disposed of "thorium nickel" that included a greater exposure dose rate than it was licensed to have,

(vi)     to have maps of a salvage area reporting that radioactive materials were buried there as early as 1965 and yet failed to investigate the salvage area for radioactive materials.

(vii)     to have corralled a 6000 acre campus replete with groundwater, surface water, and soil contamination sites into a self-reported clean-up campaign under the Resource Conservation Recovery Act (RCRA) and successfully removing it from Superfund listing.

53.     It is improbable that CYNTHIA'S diagnosis was sporadic and isolated when she developed the tumor as she was living in an area where so many other brain tumors (tumors associated with the same risks) were being diagnosed at such a significantly increased level and the shared environment includes an aquifer and soil base contaminated with the same heavy metals, radioactive materials, and other carcinogens such as perchlorate and benzopyrene that increase that risk.

54.     CYNTHIA was one of the victims of the exposure to the materials found throughout the Acreage, and her tumor has caused considerable loss to her estate and its survivors, including but not limited to financial loss, as well as an emotional and physical toll.

**The Acreage Exposure Mechanisms**

55.     The aquifer underneath the Acreage moves southeast away from the western edge of the UTC PBC Campus and into the Acreage.

56.     UTC's contamination moved to the Acreage

a.     via a trucking operation that removed contaminated materials from Defendant to various Acreage lots.  See "Big Dig" explained below.

b.     via surface and ground water flow from the PBC Campus through Corbett into the Acreage surface water, which recharges the surficial aquifer;

13

c.    via the 2003 draw-down of the ITID impoundment (which collected runoff for Corbett) to the L8 reservoir, which was then directed to the Acreage.

57.    In fact, there is little to no distinction between the surface and ground water in the L8 Basin which includes both the Acreage and the Defendant's business operations.

58.    The fact that tumors seem to appear as early as 2001 in temporal and geo-proximate cluster suggests that these cyclical flood events (which occurred prior to the L8 reservoir project) influence exposure.

## ADDITIONAL COMPONENTS OF DEFENDANT'S LIABILITY
### Defendant's Operations

59.    Defendant has used the previously referenced radionuclides; metals including lead, cadmium, and barium as well as semi-volatiles; and oil-based fuels that generate benzopyrene contamination in its operations at the PBC Campus.

60.    Its testing operations cause emissions of perchlorate to water and air.

61.    Because of the nature and location of its property, Defendant's practices in handling those materials provided the mechanisms of Acreage contamination:

a.    The PBC Campus has numerous canals and swamps adjacent to Corbett wetlands, which were the headwaters of the wetlands upon which the Acreage was developed;

b.    The wetlands in and around the PBC Campus drain into the Acreage surface waters at varying rates each year but particularly during extremely heavy rains such as have been documented to occur at least once every decade from the time Defendant began working with these materials (circa 1958);

c.    Defendant's disposal practices included burn pits, which transmit contaminants though wind and water, and burial, both conduits for contamination of the water table and potential source for the later transfer of contaminated soil.

62.    UTC employees and contractors transported UTC soil to sites where it was eventually sold as fill for the residential development that occurred in the Acreage from 1993 through 2000.

63.     Defendant used either the specific radionuclides or the parent radionuclide of every naturally occurring radionuclide found in the Acreage in its operations at the PBC Campus.

64.     In the course of its activities, and as demonstrated either by its records or by the presence of radioactive materials at its campus, Defendant has used radioactive by-product materials and source materials at its PBC Campus, as follows:

   a.   The licensed use of americium-241/strontium-90, cadmium-109, cesium-137, cobalt-56, cobalt-57, cobalt-60, gadolinium, hydrogen-3, iridium-192, krypton-85, lead-210, manganese-54/cobalt-58, nickel-63, promethium-147, strontium-90, radium D&E, rhodium-106, and thallium-204;

   b.   Source material including the licensed and unlicensed use of thorium dioxide as 2% of thorium-inclusive nickel alloy;

   c.   Source materials including the non-licensed use of thorium-dioxide and other species of concentrated thorium;

   d.   Source materials including the non-licensed use of uranium dioxide and other species of enriched uranium and depleted uranium;

   e.   Unlicensed use of strontium-90 or the use source materials sufficient to create a strontium-90 contamination.

65.     Nuclear materials were provided for Defendant's use at the PBC Campus either

   a.   via the United States government either by entrustment for a particular project or via the deed and sale of formerly utilized sites such as the Naval Weapons Reserve Area, also known as the former Air Force Plant 74; or

   b.   internally by subdivisions or partners of Defendant.

66.     Use of by-product materials and nuclear materials including but not limited to Strontium-90 and Uranium in an unofficial capacity is prohibited by 18 USC § 831 and injuries caused thereby are remediable under 18 USC 1961 as well as Chapter 772 of Florida Statutes.

67.     Some of the present-day nuclear contamination in and around the UTC PBC Campus is not explained by UTC's Florida licenses, as most of those permits allowed the

possession and use of only "sealed sources" and none allowed on-site burial, UTC also had access to nuclear materials for programs exempt from AEC licensure:

    a. Such exempt projects had little to no restrictions on transfer and included (i) any project for use of nuclear material on a government site or transfer therefrom and (ii) contracts to work on nuclear material to be used in government owned vehicles or vessels.

    b. One of UTC's exempt-site projects was Suntan, a liquid hydrogen project housed at Air Force Plant 74 located on UTC's PBC Campus which saw explosives caused by liquid hydrogen and fluorine, as well as other accompanying materials.

    c. The government vehicle or vessel exemption applied to the formerly-classified Fox Project, incorporating Pratt and Whitney's Aircraft Nuclear Propulsion work, including the Nuclear JT-11 Turbojet Power-Plant Project that designed a nuclear power plant containing a lithium-cooled solid-fuel-element type reactor coupled to six modified Pratt & Whitney Aircraft J-58 Mod. 1A turbojet engines.

    d. Those two projects, designed to use exempt nuclear fuels, were reportedly the two projects for which the isolated location of the Palm Beach Campus (the Florida Research Development Center) was first intended.

68. However, in conjunction with those projects, UTC worked on its own version of the Nuclear Jet engine (government name NJ-58) for commercial use, the "FRDC version JTN-11" which was not subject to government exceptions of direction.

69. Furthermore, UTC has demonstrated that it did not comply with the Florida licenses that it did have when it buried materials in its scrapyard, salvage area, and landfill, even though its own internal memoranda, submitted with its permit application, stated it would not.

70. Regulations clearly never allowed for Defendant, a manufacturer, to bury such materials.

71. Limited testing at the UTC PBC Campus has already revealed significant contamination that is the likely source of Acreage contamination:

    a. Strontium 90 is elevated at various test areas.

b. Limited testing of even the remediated areas revealed several industrial by-product and source contaminants such as cesium-137 as well as several instances of unsupported and non-uniform lead, uranium, and thorium radioisotopes. (An "unsupported" radioisotope is a decay product present in the absence of its parent radioisotope, some of which would also still be present if the unsupported radioisotope were the product of natural decay as opposed to industrial sources.);

c. Testing also revealed several hazardous materials including most notably the markedly-continued presence of benzopyrene. Like the radionuclides, the materials are present at higher magnitudes at Defendant than at the case homes;

d. In soils sampled in the adjacent Corbett area, levels of plutonium-239 as high as 0.4 picocuries/gram (pCi/g) were detected—levels well above established background levels;

e. The background rate for plutonium-239 is generally 0.04 pCi/g and no higher than 0.08 pCi/g.

72.     Defendant's employees have worked on projects designed to use or to test mixed fuels including uranium compounds at the UTC PBC Campus in furtherance of both Defendant (and Defendant subdivision) proprietary projects and government contract projects.

**UTC's Actions to Avoid Open and Complete Remediation**

73.     Based on contaminant reporting in the 1980's, the UTC PBC Campus merited designation as, and was at various times slated to be, an EPA Superfund site on the first National Priorities List that was to be published by the EPA, which would have entailed "a record of decision" and clean-up plan that was authored by, executed by, and performed by EPA. (A Record of Decision (ROD) is a public document that explains which cleanup alternatives will be used to clean up a Superfund site. The ROD for sites listed on the NPL (NPL Site Listing Process) is created from information generated during an EPA-conducted Remedial Investigation/Feasibility Study (RI/FS). )

74.     Instead, Defendant exercised influence through the state agency, the DER, to avoid the sort of government investigation that should have accompanied the preparation of an

agency-authored record of decision and instead all clean-up of the property was performed under RCRA, which the state agency, the Florida Department of Environmental Protection (DEP), had just been authorized to monitor:

    a. In order to avoid exposure for the full extent of its clean-up liability and to avoid the disclosure of its use of several hazardous and radioactive products, Defendant exercised influence on the DER through then DER employee Rick Reis to have the clean-up, and more importantly investigation, performed by Defendant with limited EPA oversight;

    b. While still working for the DER and coordinating the second of Defendant's consent agreements, Rick Reis received a memo from the U.S. Air Force requesting that he provide the Air Force an Enforcement Log so that it could be aware of the actions of its contractor. Reis informed the Air Force that the regulatory agency lacked the manpower to provide such a log. Defendant then sent Reis a memorandum advising that Defendant lacked the manpower to ensure compliance with the consent orders he had negotiated on behalf of the agency. Within weeks, Reis stopped working for the agency and began work with Defendant, leaving what he admits was a considerable knowledge gap behind him.

75. Shortly after securing its ability to maintain control over the site, Defendant first reported the presence of some nuclear material on site at the scrapyard to DOH and to DEP.

76. UTC did not report the documents and employee statements indicating that radioactive materials were buried in both the salvage area and the landfill.

**Reckless Disregard and Intentional Acts**

77. Rather than dispose of source and by-product material responsibly, Defendant has

    a. buried that material in unlined shallow burial pits together with other hazardous materials, many of those burial sites flooding prior to clean-up and contaminating the L8 surface and ground water that accumulated and continuing to leach into the Acreage surficial aquifer in times of heavy persistent rains;

18

b. burned that material in unlined shallow burn pits together with other hazardous materials, many of those burn pits flooding prior to clean-up and contaminating the L8 surface and ground water that accumulated and continuing to leach into the Acreage surficial aquifer during persistent rains;

c. repeatedly failed to maintain and dispose of material in the manner required by federal and state regulations, thus mishandling the source material it was licensed to use, thus, violating regulations designed to limit public exposure;

d. since possessing that material, failed to use and maintain them safely, emitting them into the surface and ground waters in Corbett and into the Acreage by routine misuse, dumping and neglect.

78. A significant and disproportionate number of the employees at the facility, including those who worked with the buried material, have died of brain tumors that their coworkers associated with working on the thorium nickel J58 research—a fact UTC failed to disclose at any time before, during or in light of the FDOH's investigation into the Acreage pediatric brain cancer rate.

79. UTC employees, officers, and contractors were all aware that UTC soil was recycled for fill in the Acreage area-—a fact UTC failed to disclose at any time before, during or in light of the FDOH's investigation into the Acreage pediatric brain cancer rate, an investigation determined not to look into UTC because it was "five miles away."

**Nuclear Incident**

80. The releases caused by the Defendant's mishandling of radioactive materials violated the applicable standard of care set forth in the regulations found at 10 C.F.R. § 20.1301–2 because they included unlicensed materials used in an unlicensed operation, a per se violation of the entire regulatory regime, constituting a "nuclear incident."

81. Those releases violated the applicable standard of care set forth in the regulations in 10 C.F.R. § 20.1302 because they resulted from the improper storage, use, and disposal of such material.

82. Those releases violated the applicable standard of care established by 10 C.F.R. § 20.1301 because they resulted in doses exceeding limits for members of the public prescribed by those regulations.

83.     Emissions of licensed materials included violations of the standard set forth at 10 C.F.R. § 20.1301, dose limits for individual members of the public, because the dose received by the brain tumor victims within the cluster described above exceeded those regulations as a result of exposure to these materials.

84.     The doses exceeded regulation because they were ingested through the water and were absorbed dermally through direct contact with the water or because they occurred as the result of ingestion or continued exposure to residential fill in areas like backyard play areas.

85.     Upon information and belief the doses set forth by 10 CFR § 20.1301 were exceeded as follows:

          a.     The dose equivalent to individual members of the public from the licensed operation exceeded 0.1 rem, that is, 1 millisievert (mSv), in a year because the materials escape any sediment filters customarily used by the families residing in the Acreage, causing an accumulation of such material in the piping of the residential water supply, causing an ambient dose exceeding 0.1 rem per year; and

          b.     Upon certain flood events as described above, the dose exceeded .002 rem in an hour; and,

          c.     Any appreciable dose exceeded the regulations because Defendant did not have a permit to release the radioactive materials into the air, into its on-site sewer system, into its deep injection well, and into the waters of the L8 basin.

86.     Those emissions which occurred or continued to accrue in measurable dose after December 3, 1991, included violations of both 10 C.F.R. § 20.1301 and 20.1302 because Defendant failed to perform any surveys as required in § 20.1301(a) or to measure or reduce the rate as required in § 20.1302(b) or (c).

87.     Those emissions which occurred after December 3, 1991, also included violations of the "As Low as is Reasonably Achievable" (ALARA) standard set forth in the "Offsite Dose Calculation Manual" published by the Nuclear Regulatory Commission, because the Defendant failed to make any reasonable attempts to keep such doses from occurring for several years while the contaminants were leaching into the L8 surface and ground water.

88.     All exposure caused as a result of the big dig exceeded regulations because the release and the exposure it occurred after 1991 and completely failed to comply with ALARA.

## Negligence and Chapter 376

89.     To the extent the release of radionuclides into the water by disposal or by dumping does not constitute a "nuclear incident" under the federal Price-Anderson Act, the release violated Chapter 376 of Florida Statutes and the Defendant is liable for damages for breaching the duties enveloped by the statute.

90.     Regarding hazardous materials and metals only, Defendant, since the mid-1980s, has been subject to certain requirements pursuant to its RCRA licenses as defined above and has failed to meet its obligations because it delayed clean-up, failed to conduct reasonable risk assessments, and failed to post notice in the library located within the Acreage as required.

91.     The discovery of Defendant's responsibility for contamination of the Acreage has been hindered by intentional, negligent, inconsistent and inaccurate reporting to the state regulatory agencies by Defendant.

## "The Big Dig" Trespass, criminal activity, and prohibited activity

92.     Plaintiff discovered the existence of cesium-137 and strontium-90 at various western test stands.

93.     Strontium-90  and cesium-137 are not a naturally occurring radioactive materials and have been found at the UTC campus at levels that do not occur as the result of global fall out from nuclear testing.

94.     This contamination is not explained by the official use of such materials that is described in government reports; thus the rogue use violated 18 USC § 831, which prohibits the use of uranium materials or by product materials outside of an official capacity.

95.     By 1986, UTC was aware that three of the areas at the UTC site had radioactive materials buried in the ground: the Landfill, the Scrapyard, and the Salvage area.

96.     By 1991, UTC was aware of the possibility that radioactive materials were present in the soils being excavated from the UTC campus' Air Force Plant 74.

97.     Shortly after securing its removal from the National Priorities list, or Superfund, UTC began to remove soil from its property.

98.     UTC never checked any soils other than those removed during the TD nickel clean up at the Scrap Yard for the presence of radioactive materials.

99.     By 1994, UTC soils were leaving the campus at night and being delivered either to the Acreage fill or to an intermediary site where they would be mixed with other soils and sold as fill.

100.    This operation occurred for nearly a decade and included off-site dumping of un-remediated and partially remediated soils in the Acreage.

101.    From 1991 through 1998, a company known as TPS owned mobile soil incineration units that were used to recycle fuel laden soil.

102.    From 1993 through 1998, TPS performed soil recycling at a permanent location located on Fairgrounds Road in West Palm Beach Florida.

103.    UTC records include manifests reporting that its employees delivered soil from the campus to TPS in 1993.  The soil is falsely described as "clean fill" but likely came from Test Area A locations requiring remediation at that same time.

104.    Soil from a depth of over two feet at the home owned by the parents of Case 14, DeCarlo, was recently tested and has strontium 90 in soil at the same level as the soil at test area A.

105.    The home was being built and the pad was being constructed at the same time that the UTC employees removed soil.

106.    Upon information and belief, UTC was using Almazon Trucking to remove fill from the campus at night via manifests for TPS, but was concerned that the fill was not going to TPS and was instead used as fill in Loxahatchee.

107.    This concern was reported to an Environmental Crimes investigator at the Palm Beach County Sherriff's Office who reported it to Joe Lurix of the Florida Department of Environmental Protection and to his superiors.

108.    The deputy was told to cease all investigations into any UTC fill concerns.

109.     From 1996 through 1998, UTC recorded the removal of soil from its property by manifests that alleged to have delivered the soil to TPS.  Homes of other case victims, such as Santiago, were built in the same time frames as the soil was removed.

110.     UTC never reported the use of a local soil recycling company to the regulators or to the community.

111.     The transporters UTC listed on the manifests for 1992-1996 were not licensed transporters, did not in fact act as transporters, and have denied having the capacity to actually transport soil from UTC to TPS—a denial corroborated by UTC recent corporate representative testimony.

112.     The permits and infrastructure for the mobile and permanent thermal remediation were then acquired by IPC (International Petroleum Company/Magnum Environmental Services), which was a doing business under the name EarthCare.

113.     From 1999 through 2000, a UTC Hartford Connecticut officer entered into a contract with Magnum to use Magnum services—the contract is inconsistent as to whether UTC or Magnum was responsible for the truck drivers and the ultimate location of soil disposal.

114.     The only driver who admits that he hauled soil offsite, Frank Trujillo of Tru-Trucking, testified that he delivered as many as five loads a day to Magnum and that such deliveries were achievable but his testimony contains the following inconsistencies:

   a. He testified under oath that he used the turnpike entrance at Jog road in order to get to Magnum during the times he drove from UTC to TPS and Magnum (1995-2000); however, that route did not exist until several years after Mr. Trujillo moved out of the County and he never could have taken the route;

   b. He testified that he was routinely hired by Magnum to get soil from UTC and was paid by Magnum upon presentation of manifests but his mother and bookkeeper testified that no such work was ever done;

   c. He testified that he did not speak with **anyone** about the subpoena or the UTC soil removal campaign but one of the persons he denied speaking with had already testified to having had such conversations;

   d. He testified that it was routine to take five trips but only his company did so.

e. He testified that the turn-around for loading at soil at UTC was rapid and that there was no weigh-process at the site which is contradicted by all other witnesses and by DOT policy;

115. At no time did Magnum or TPS ever disclose that it was processing soils from the UTC site to the regulatory entities.

116. Furthermore, UTC never informed regulators that it was using the Fairgrounds road site or that it was allowing its recycled soils to be sold for fill. Instead, UTC submitted an Interim Measures report that claimed the soil was sent to a Magnum facility in Pompano Beach, Florida.

117. UTC was aware of the possibility that its soil would be sold as residential fill and knew that the material was to be recycled.

118. In fact, fill was sold next to Pratt Whitney during October 2000 on the same days that UTC's manifests report that it used the services of Magnum and on the same days that Trujillo's company removed tens of thousands of tons of soil from the site.

119. Some of the soil removal and treatment was paid for by the federal and state government.

120. UTC never corrected the false manifests or invoices submitted for reimbursement.

121. Until 2016, the fact that UTC had determined to send its soil to a recycling center in West Palm Beach, Florida and that it would be sold as fill in the Acreage was generally unknown.

122. Until 2016, the fact that truckloads of soil would be diverted from the UTC campus and sold as fill in the Acreage without treatment as generally unknown.

123. UTC knew or should have known that the manifests it submitted for repayment were false for the following reasons:

a. In 1993, the drivers were employees of the grounds and facilities department, including at least one security guard.

b. The manifests for the 1994-1996 time period contain numerous indicia of fraud or "re-manifesting" wherein the same manifest was used repeatedly but the dates and weights were changed.

24

  c. Treatment of soil by Magnum cost $ 27.00 per ton.

  d. UTC's contract with Magnum did not include that scope of material and was limited to $ 100,000.00.

  e. UTC's policy was to weigh and tarp trucks onsite that would be leaving and using public roads because of Department of Transportation regulations.

  f. Neither UTC nor any contract transporter could have weighed and tarped as many trips per truck as are reported on several days and taken them to the Fairgrounds facility in the time periods stated on the manifests.

124. Plaintiff is continuing to investigate the fill soil at Cynthia's home, other case homes and nearby homes.

125. Thus far, the DeCarlo home is a perfect match for the Strontium-90 detections at UTC's Test Area A—where it is likely that the FRDC version of the J58 engine was to have been tested.

126. As explained above, the UTC employees removed tons of soil from that area in the same month and year that the DeCarlo property would have received fill.

127. The facts above constitute a presumption pursuant to Florida law that UTC trespassed the DeCarlo property and likely others in the Acreage.

## COUNT I
## WRONGFUL DEATH CLAIM AGAINST DEFENDANT UTC FOR NEGLIGENCE

Plaintiff re-alleges all facts and matters set forth in the allegations above including

- Jurisdiction & Venue (par. 1-8),
- Cynthia Santiago's Diagnosis and Death (par. 9-13),
- The Acreage Brain Tumor Cluster (par. 14-23),
- The Santiago Property's Proximity to Case Homes (par. 24-29),
- Specific Contaminants in the Acreage Case Homes (par. 30-36),
- Contaminants at UTC's Palm Beach County (PBC) Campus (par. 34-37),
- Contaminants found on the Powerline Road (par. 38-53),
- General Causation (par. 47-54),
- The Acreage Exposure Mechanisms (par. 55-58),
- Defendant's Operations (par. 59-72),
- UTC's Actions to Avoid Open and Complete Remediation, Reckless Disregard and Intentional Acts (par. 73-76),
- Reckless Disregard and Intentional Acts (par. 77-79)

- Nuclear Incident (par. 80-90),
- Negligence and Chapter 376 (89-91),
- "The Big Dig: "Trespass, criminal and prohibited activity (par. 92-127)

128.    Cynthia's home was built in 1996 when soil was removed from the UTC property.

129.    Results from soil sampling at the backflush spot include cesium 137 and strontium 109 in addition to detections of lead 210, elemental chromium, nickel, lithium and fluoride.

130.    There is no other explanation for the similarity between the UTC contaminations and the Acreage contaminations as described above other than that UTC was the source of the Acreage contamination through exposure mechanisms referenced in paragraphs 55-58.

131.    These similarities, compounded with additional evidence of fission related waste in the adjacent wildlife area indicate that the Defendant was misusing nuclear and other hazardous materials and mishandling the waste related to those acts.

132.    UTC had a duty to the surrounding community including those who would come to rely on the environment impacted by its operations use and to maintain its hazardous and non-hazardous materials such as jet fuel in a safe manner.

133.    Pursuant to Florida law, Defendant is required to keep its property from trespassing the property of another.

134.    At times, as alleged in Paragraphs 59-79 and 89-91, Defendant UTC has failed to maintain the contaminants caused by its operations, has at times realized a portion of the releases caused by its neglect but instead of remediating the problem, it allowed its property to continue such emissions by failing to remediate contamination safely.

135.    UTC was aware of the substantial risk that its property, including but not limited to the Air Force area and Test Areas A and C and the Salvage Yard had hazardous material but failed to consider that risk when allowing its soil to leave its property for use as residential fill.

136.    It knew that its materials had leached into surface water for decades and were likely to have migrated in ground or surface water to the Acreage,

137.    Defendant's failures caused the materials to be leached or emitted into the ground water and surface waters adjacent to their properties (resulting in the contaminations described in paragraphs 37 through 46) and eventually into the Acreage community (resulting in the

contaminations described in paragraphs 37 through 46), directly causing the presence of the contaminants in the Acreage.

138. These acts violated the duties to the public described in Chapter 317 of Fla. Stat.

139. UTC is liable for punitive damages as a result of any damages caused by its negligence, trespass, or nuclear incident public liability for any acts committed prior to 1988 or for the resulting damages of any nuclear incident which is not subject to government indemnity.

140. These breaches, particularly including the acts described in par. 77 through 79 and 92-127 include reckless, knowing disregard of the safety of the neighboring communities and as further evidenced by the fact that in 1964 UTC acknowledged the danger related to these materials, the need to use and dispose of them with paramount caution and within the year buried them instead.

141. The acts and breaches described above proximately caused the death of Cynthia Santiago who was exposed to the materials and developed an ependymoma as described in paragraphs 9 through 13.

142. As a proximate result of the breaches described above in this Count and supported by the allegations of the incorporated par. 9-126, Plaintiffs claim the following damages on behalf of the Estate and each survivor for the wrongful death of Cynthia Santiago:

    i. Funeral expenses;
    ii. Medical and hospital expenses;
    iii. Loss of net accumulations;
    iv. Loss of support and services in the past and in the future;
    v. The loss suffered by Steven Santiago of his daughter's companionship and protection and the mental pain and suffering sustained by him as a result of his daughter's death and dying;
    vi. The loss suffered by Joselyn Santiago of her daughter's companionship and protection and the mental pain and suffering sustained by her as a result of her daughter's death and dying;
    vii. All other damages permitted under Florida's Wrongful Death Act and 42 USC 2011 *et seq.*

WHEREFORE, Plaintiffs, as co-personal representatives of the Estate of Cynthia Santiago, demand judgment for all compensatory damages listed above in paragraph 142, punitive damages,

and any other remedy the Court deems just and appropriate. The Plaintiffs further demand trial by jury of all issues so triable.

## COUNT II

### WRONGFUL DEATH CLAIM AGAINST DEFENDANT UTC FOR TRESPASS

Plaintiff re-alleges all facts and matters set forth in the allegations above including

- Jurisdiction & Venue (par. 1-8),
- Cynthia Santiago's Diagnosis and Death (par. 9-13),
- The Acreage Brain Tumor Cluster (par. 14-23),
- The Santiago Property's Proximity to Case Homes (par. 24-29),
- Specific Contaminants in the Acreage Case Homes (par. 30-36),
- Contaminants at UTC's Palm Beach County (PBC) Campus (par. 34-37),
- Contaminants found on the Powerline Road (par. 38-53),
- General Causation (par. 47-54),
- The Acreage Exposure Mechanisms (par. 55-58),
- Defendant's Operations (par. 59-72),
- UTC's Actions to Avoid Open and Complete Remediation, Reckless Disregard and Intentional Acts (par. 73-76),
- Reckless Disregard and Intentional Acts (par. 77-79)
- Nuclear Incident (par. 80-90),
- Negligence and Chapter 376 (89-91),
- "The Big Dig: "Trespass, criminal and prohibited activity (par. 92-127)

143. Cynthia's home was built in 1996 when soil was removed from the UTC property.

144. Results from soil sampling at the backflush spot include cesium 137 and strontium 109 in addition to detections of lead 210, elemental chromium, nickel, lithium and fluoride.

145. There is no other explanation for the similarity between the UTC contaminations and the Acreage contaminations as described above other than that UTC was the source of the Acreage contamination through exposure mechanisms referenced in paragraphs 55-58.

146. These similarities, compounded with additional evidence of fission related waste in the adjacent wildlife area indicate that the Defendant was misusing nuclear and other hazardous materials and mishandling the waste related to those acts.

147.    UTC had a duty to the surrounding community including those who would come to rely on the environment impacted by its operations use and to maintain its hazardous and non-hazardous materials such as jet fuel in a safe manner.

148.    Pursuant to Florida law, Defendant is required to keep its property from trespassing the property of another.

149.    At times, as alleged in Paragraphs 59-79 and 89-91, Defendant UTC has failed to maintain the contaminants caused by its operations, has at times realized a portion of the releases caused by its neglect but instead of remediating the problem, it allowed its property to continue such emissions by failing to remediate contamination safely.

150.    UTC was aware of the substantial risk that its property, including but not limited to the Air Force area and Test Areas A and C and the Salvage Yard had hazardous material but failed to consider that risk when allowing its soil to leave its property for use as fill in residential areas.

151.    It knew that its materials had leached into surface water for decades and were likely to have migrated in ground or surface water to the Acreage,

152.    Defendant's failures caused the materials to be leached or emitted into the ground water and surface waters adjacent to their properties (resulting in the contaminations described in paragraphs 37 through 46) and eventually into the Acreage community (resulting in the contaminations described in paragraphs 37 through 46), directly causing the presence of the contaminants in the Acreage.

153.    These acts violated the duties to the public described in Chapter 317 of Fla. Stat. and further constitute trespass upon the person of Cynthia Santiago and the property wherein she resided.

154.    UTC is liable for punitive damages as a result of any damages caused by its negligence, trespass, or nuclear incident public liability for any acts committed prior to 1988 or for the resulting damages of any nuclear incident which is not subject to government indemnity.

155.    These breaches, particularly including the acts described in par. 77 through 79 and 92-127 include reckless, knowing disregard of the safety of the neighboring communities and as further evidenced by the fact that in 1964 UTC acknowledged the danger related to these

materials, the need to use and dispose of them with paramount caution and within the year buried them instead.

156.     The acts and breaches described above proximately caused the death of Cynthia Santiago who was exposed to the materials and developed an ependymoma as described in paragraphs 9 through 13.

157.     As a proximate result of the breaches described above in this Count and supported by the allegations of the incorporated par. 9-127, Plaintiffs claim the following damages on behalf of the Estate and each survivor for the wrongful death of Cynthia Santiago:

     i.  Funeral expenses;
    ii.  Medical and hospital expenses;
   iii.  Loss of net accumulations;
   iv.  Loss of support and services in the past and in the future;
    v.  The loss suffered by Steven Santiago of his daughter's companionship and protection and the mental pain and suffering sustained by him as a result of his daughter's death and dying;
   vi.  The loss suffered by Joselyn Santiago of her daughter's companionship and protection and the mental pain and suffering sustained by her as a result of her daughter's death and dying;
  vii.  All other damages permitted under Florida's Wrongful Death Act and 42 USC 2011 *et seq.*

WHEREFORE, Plaintiffs, as co-personal representatives of the Estate of Cynthia Santiago, demand judgment for all compensatory damages listed above in paragraph 157, punitive damages, and any other remedy the Court deems just and appropriate.  The Plaintiffs further demand trial by jury of all issues so triable.

**COUNT III**
**WRONGFUL DEATH CLAIM AGAINST DEFENDANT UTC FOR NUCLEAR**
**INCIDENT**

Plaintiff re-alleges all facts and matters set forth in the allegations above including

- Jurisdiction & Venue (par. 1-8),
- Cynthia Santiago's Diagnosis and Death (par. 9-13),
- The Acreage Brain Tumor Cluster (par. 14-23),
- The Santiago Property's Proximity to Case Homes (par. 24-29),
- Specific Contaminants in the Acreage Case Homes (par. 30-36),
- Contaminants at UTC's Palm Beach County (PBC) Campus (par. 34-37),
- Contaminants found on the Powerline Road (par. 38-53),
- General Causation (par. 47-54),
- The Acreage Exposure Mechanisms (par. 55-58),
- Defendant's Operations (par. 59-72),
- UTC's Actions to Avoid Open and Complete Remediation, Reckless Disregard and Intentional Acts (par. 73-76),
- Reckless Disregard and Intentional Acts (par. 77-79),
- Nuclear Incident (par. 80-90),
- "The Big Dig: "Trespass, criminal and prohibited activity (par. 92-127)

158.    UTC owed a duty of care to the surrounding neighborhoods to exercise caution and to follow the dictates of Price-Anderson and all applicable regulations promulgated under that statute including but not limited to 10 CFR §20.1301 in its use of source and by-product materials.

159.    Defendant UTC owed a duty of care to the surrounding neighborhoods and to its inhabitants such as the Plaintiff to exercise caution and to be licensed to use any source or by-product materials.

160.    As described in the paragraphs 89 through 79, Defendant breached those duties as described above by acts including but not limited to the unpermitted use of, burial of, burning of, and dumping of source and by-product material.

161.    As described in paragraphs 80 through 90, these breaches caused the Plaintiff to be significantly exposed to radioactive materials in an amount exceeding the levels set by 10 CFR §20.1301 as set forth in paragraph 181.

162.    These breaches included violations of applicable federal regulations.

163.    As described in paragraphs 92 through 127, UTC was aware of the substantial risk that its property, including but not limited to the Air Force area and Test Areas A and C and the

Salvage Yard had nuclear material but failed to consider that risk when allowing its soil to leave its property for use as fill in residential areas.

164.    UTC is liable for punitive damages as a result of any damages caused by its negligence, trespass, or nuclear incident public liability for any acts committed prior to 1988 or for the resulting damages of any nuclear incident which is not subject to government indemnity.

165.    These breaches, particularly including the acts described in par. 77 through 79 and 92-127 include reckless, knowing disregard of the safety of the neighboring communities and as further evidenced by the fact that in 1964 UTC acknowledged the danger related to these materials, the need to use and dispose of them with paramount caution and within the year buried them instead.

166.    The acts and breaches described above proximately caused the death of Cynthia Santiago who was exposed to the materials and developed an ependymoma as described in paragraphs 9 through 13.

167.    As a proximate result of the breaches described above in this Count and supported by the allegations of the incorporated par. 9-112, Plaintiffs claim the following damages on behalf of the Estate and each survivor for the wrongful death of Cynthia Santiago:

    i. Funeral expenses;
    ii. Medical and hospital expenses;
    iii. Loss of net accumulations;
    iv. Loss of support and services in the past and in the future;
    v. The loss suffered by Steven Santiago of his daughter's companionship and protection and the mental pain and suffering sustained by him as a result of his daughter's death and dying;
    vi. The loss suffered by Joselyn Santiago of her daughter's companionship and protection and the mental pain and suffering sustained by her as a result of her daughter's death and dying;
    vii. All other damages permitted under Florida's Wrongful Death Act and 42 USC 2011 *et seq.*

WHEREFORE, Plaintiffs, as co-personal representatives of the Estate of Cynthia Santiago, demand judgment for all compensatory damages listed above in paragraph 167, punitive damages, and any other remedy the Court deems just and appropriate. The Plaintiffs further demand trial by jury of all issues so triable.

**COUNT IV**
**WRONGFUL DEATH CLAIM AGAINST DEFENDANT UTC**
**AS A RESULT OF CRIMINAL ACTIVITY**
Plaintiff re-alleges all facts and matters set forth in the allegations above including

- Jurisdiction & Venue (par. 1-8),
- Cynthia Santiago's Diagnosis and Death (par. 9-13),
- The Acreage Brain Tumor Cluster (par. 14-23),
- The Santiago Property's Proximity to Case Homes(par. 24-29),
- Specific Contaminants in the Acreage Case Homes (par. 30-36),
- Contaminants at UTC's Palm Beach County (PBC) Campus (par. 34-37),
- Contaminants found on the Powerline Road (par. 38-53),
- General Causation (par. 47-54),
- The Acreage Exposure Mechanisms (par. 55-58),
- Defendant's Operations (par. 59-72),
- UTC's Actions to Avoid Open and Complete Remediation, Reckless Disregard and Intentional Acts (par. 73-76),
- Reckless Disregard and Intentional Acts (par. 77-79)
- Negligence and Chapter 376 (89-91),
- "The Big Dig: "Trespass, criminal and prohibited activity (par. 92-127)

168. UTC systematically engaged in the following criminal acts

a. Violations of 18 USC § 831 including the use of nuclear and byproduct materials and not as an official capacity causing a contamination of Strontium 90 at several locations on its property.

b. Violations of Sections 837.06 and 812.017 of Fla. Stat. because the manifests of soil falsely reported that all the soil was treated and were submitted for reimbursement to government agencies.

c. Violations of Sections 837.06 and 817.115 of Fla. Stat. because UTC falsely reported that the soil removed in 1999 and 2000 was delivered to an Magnum Pompano Beach facility when it was not, which would have included a different transport process and would not have resulted in the same of residential fill for partially remediated soils.

d. Violations of Sections 837.06 and 817.115 of Fla. Stat. because UTC certified that the soil contained only fuel contamination when it was never in fact tested for radioactive materials.

e. Violations of Section 831.01 of Fla. Stat. because the manifests for soil delivery to TPS and Magnum include forged bills of lading and included false evidence of transportation by a common carrier;

f. Violations of Section 784.05 of Fla. Stat. because UTC, through culpable negligence, exposed the Acreage residents including Cynthia Santiago to personal injury by allowing the soils from its property to be used for residential fill in the Acreage;

g. In alternative to section (e) above, Violations of Section 784.05 of Fla. Stat. because UTC, through culpable negligence, exposed the Acreage residents including Cynthia Santiago to personal injury by allowing the soils it learned were used for residential fill in the Acreage to remain there unreported;

h. Violations of Section 784.05 because UTC through culpable negligence caused the death of Cynthia Santiago and others

169.    The course of conduct described above includes "criminal acts" as defined by F.S. §772.102 (2) and was conducted in a pattern because the conduct involved more than one underlying contract and more than one residential lot.

170.    The transport and manifest fraud included a pattern of similar conduct involving at least two or more contracts (including but not limited to contracts with TPS and with Magnum).

171.    The manifest fraud affected several victims including but not limited to any governmental entity that reimbursed UTC for soil that was not treated and the residents who received tainted fill.

172.    Defendant's engagement in this pattern of activity has caused it to be liable for three-fold the damages of any resulting injuries to the Estate of Cynthia Santiago.

173.    Pursuant to Fla. Stat. 772.104, UTC is also liable for the attorney fees and appellate costs of any claims made for relief of these injuries.

174.    Such systematic criminal activity directly and proximately caused damages to the Plaintiff including the loss of the property and the lost opportunities alleged in par. 10-16, as well as any prejudgment interest awardable from the date of loss.

175.    The acts and breaches described above proximately caused the death of Cynthia Santiago who was exposed to the materials and developed an ependymoma as described in paragraphs 9 through 13.

176.    As a proximate result of the breaches described above in this Count and supported by the allegations of the incorporated par. 9-127, Plaintiffs claim the following damages on behalf of the Estate and each survivor for the wrongful death of Cynthia Santiago:

  i.    Funeral expenses;
  ii.   Medical and hospital expenses;
  iii.  Loss of net accumulations;
  iv.   Loss of support and services in the past and in the future;
  v.    The loss suffered by Steven Santiago of his daughter's companionship and protection and the mental pain and suffering sustained by him as a result of his daughter's death and dying;
  vi.   The loss suffered by Joselyn Santiago of her daughter's companionship and protection and the mental pain and suffering sustained by her as a result of her daughter's death and dying;
  vii.  All other damages permitted under Florida's Wrongful Death Act and 42 USC 2011 *et seq.*

WHEREFORE, Plaintiffs, as co-personal representatives of the Estate of Cynthia Santiago, demand judgment for all actual damages listed above in paragraph 176, treble damages as allowed under Fla. Stat, 772.104, attorney's fees and costs as allowed under Fla. Stat, 772.104, and any other remedy the Court deems just and appropriate.

The Plaintiffs further demand trial by jury of all issues so triable.

Filed and served via CM ECF as directed by Court Order Granting Plaintiff's Motion to Substitute Personal Representatives and to Amend the Complaint to add claims for Wrongful Death and for Civil Remedy for Prohibited Criminal Activity this 14th day of February 2017.

/s Mara R. P. Hatfield
JACK SCAROLA
Florida Bar No: 169440
Email:jsx@searcylaw.com;
mep@searcylaw.com
MARA RITCHIE PONCY HATFIELD
Florida Bar No. 37053

Searcy Denney Scarola Barnhart & Shipley, P.A.
2139 Palm Beach Lakes Boulevard
West Palm Beach, FL 33409
Phone: (561) 686-6300
Fax: (561) 383-9539

**COUNSEL LIST**
Alexander L. Groden, Esquire
alex.groden@bartlit-beck.com
Andrew C. MacNally, Esquire
Andrew.macnally@bartlit-beck.com
Daniel R. McElroy, Esquire
Daniel.mcelroy@bartlit-beck.com
Sean W. Gallagher, Esquire
sean.gallagher@bartlit-beck.com
Bartlit Beck Herman Palenchar & Scott, LLP
54 W Hubbard Street, Suite 300
Chicago, IL  60654
Phone: (312)-494-4408
Fax: (312)-494-4440
Attorneys for United Technologies Corporation Pratt & Whitney Group, a Connecticut
Corporation

Gregor J. Schwinghammer, Jr., Esquire
gschwinghammer@gunster.com; jhoppel@gunster.com
Heather Carney Costanzo, Esquire
HCostanzo@gunster.com
Gerard Joseph Curley, Jr., Esquire
jcurley@gunster.com
Fabienne E. Fahnestock, Esquire
Ffahnestock@gunster.com; Ivanegas@gunster.com
Gunster Yoakley & Stewart, P.A.
777 S Flagler Drive, Suite 500 E
West Palm Beach, FL  33401
Phone: (561)-655-1980
Fax: (561)-655-5677
Attorneys for United Technologies Corporation Pratt & Whitney Group, a Connecticut
Corporation