**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

Case No.: 10-80883-CIV-MARRA
Consolidated Case: Lead Action

MAGALY PINARES, et al.,

     Plaintiffs,

vs.

UNITED TECHNOLOGIES CORPORATION,
Pratt & Whitney Group, a Connecticut Corporation,

     Defendant.

_____/


CASE No.: 14-CV-81385-MARRA

JOSELYN SANTIAGO and STEVE SANTIAGO,
Co-Personal Representatives of the Estate of
CYNTHIA SANTIAGO,

     Plaintiffs,

vs.

UNITED TECHNOLOGIES CORPORATION
Pratt & Whitney Group, a Connecticut corporation,

     Defendant.

_____/


**PRATT & WHITNEY'S *DAUBERT* MOTION TO**
**EXCLUDE THE TESTIMONY OF RICHARD L. SMITH**
**AND INCORPORATED MEMORANDUM OF LAW**

## **TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................ 1

BACKGROUND ................................................................................................................. 1

ARGUMENT ...................................................................................................................... 8

I.     THERE IS NO "FIT" BETWEEN SMITH'S OPINIONS AND ANY MATTER
IN DISPUTE ...........................................................................................................8

II.    SMITH'S OPINIONS CONCERNING THE SCOPE OF THE CANCER
CLUSTER SHOULD BE EXCLUDED ..................................................................9

III.   SMITH'S "BONFERRONI CORRECTION" ANALYSIS IS UNRELIABLE
AND IRRELEVANT .............................................................................................13

IV.   SMITH'S "BAYESIAN" ANALYSIS RESTS ON DEMONSTRABLY FALSE
ASSUMPTIONS....................................................................................................14

V.    SMITH'S SELECTIVE COMPARISON OF ENVIRONMENTAL DATA FROM
CASE AND CONTROL HOMES IS METHODOLOGICALLY UNSOUND.................16

CONCLUSION................................................................................................................. 19

## TABLE OF AUTHORITIES

**Cases**

*Cotromano v. United Tech. Corp.*,
    Case No. 13-80928-CIV-MARRA, 2018 WL 2047468 (S.D. Fla. May 2, 2018) ..................... 8

*Daubert v. Merrell Dow Pharms., Inc.*,
    509 U.S. 579 (1993)................................................................................................... 8, 9

*Finestone v. Fla. Power & Light Co.*,
    03-14040-CIV, 2006 WL 267330 (S.D. Fla. Jan. 6, 2006)
    (*aff'd*, 272 F. App'x 761 (11th Cir. 2008) ............................................................. 14

*Hendrix v. Evenflo Co.*,
    609 F.3d 1183 (11th Cir. 2010) ............................................................................. 14

*Kumho Tire Co. v. Carmichael*,
    526 U.S. 137 (1999)................................................................................................. 8

*McClain v. Metabolife Int'l, Inc.*,
    401 F.3d 1233 (11th Cir. 2005) ............................................................................ 8, 9

*Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.*,
    326 F.3d 1333 (11th Cir. 2003) ............................................................................. 8

*Rink v. Cheminova, Inc.*,
    400 F.3d 1286 (11th Cir. 2005) ........................................................................ 8, 14

*United States v. Frazier*,
    387 F.3d 1244 (11th Cir. 2004) ........................................................................... 8, 9

**Rules**

Fed. R. Evid. 702 ............................................................................................... 8, 9, 14

## INTRODUCTION

Plaintiffs' expert Richard Smith opines that the "cancer cluster" associated with the Acreage community is in fact broader than suggested by the Florida Department of Health (FDOH), that the case-control study performed by the FDOH is flawed, and that a comparison of test data collected by the Florida Department of Environmental Protection (FDEP) showed "higher" levels of benzopyrene and cesium-137 at case homes as compared to control homes.

As an initial matter, Smith's opinions should be excluded because they do not "fit" the disputed issues in this case. The central question in this case is what (if anything) caused Cynthia Santiago's brain cancer. Yet Smith admits that his analyses cannot establish the cause of the cancer cluster generally or Santiago's brain cancer specifically. Regardless whether his opinions are methodologically sound (they are not), Smith's analyses should be excluded based on "fit."

In addition, Smith's opinions all suffer from fundamental flaws. His cancer cluster analyses rely on cherry-picked and unreliable data. The conclusions he reaches from these calculations suffer from a well-known statistical error called the multiple comparison's problem that Smith fails to address through a reliable methodology. Smith's comparison of test data from case and control homes is also premised on the manipulation of cherry-picked data. He fails to account for the fact that the supposedly "higher" levels of contamination at case homes were within expected background levels and close enough for practical purposes that the FDEP declared them to be both "similar" to the control home readings and "safe."

For these reasons, stated more fully below, the Court should exclude Smith's testimony.

## BACKGROUND

***The Cancer Cluster Investigation***. In 2009, federal and state authorities investigated a potential cancer cluster in an area of Palm Beach County that is sometimes loosely called "the Acreage." Ex. 1, 2009 FDOH Report at 1, 23-24. On February 1, 2010, the Florida Department of Health (FDOH) confirmed a statistically elevated rate of pediatric brain cancers in the area from 2005 to 2007. Ex. 2, 2010 FDOH Press Release. The FDOH acknowledged that there were limits to the utility of its statistical analysis, for example because the analysis relied on a grouping of different types of brain cancer that "have different risk factors" and it is "unlikely different types of brain cancers share the same cause." Ex. 1 at 15. The FDOH also acknowledged that its statistical analysis "cannot be used to link an [environmental] exposure to a health outcome such as cancer. In other words, causality cannot be established." *Id.* at 7.

1

The Florida Department of Environmental Protection (FDEP) conducted extensive environmental testing in the Acreage to "investigate the possibility of industrial or agricultural hazards in the community." Ex. 3, 2010 FDEP Report, cover letter at 2. The FDEP took water and soil samples from homes of pediatric cancer patients and control samples throughout the community. *Id.* at 1. The FDEP compared the results to established regulatory standards (like Florida's Ground Water Quality Standards and Soil Cleanup Target Levels), as well as known background levels for environmental contaminants. *Id.* The FDEP found "no indication" of "industrial or agricultural hazards" in the Acreage, concluded that water quality in the Acreage is "generally good," and declared that the area was "safe." *Id.* at 2.

The FDOH also performed a "case control" study to investigate whether there was any "association between potential risk factors" for brain cancer and "pediatric brain tumors" among residents of the Acreage. Ex. 4, 2010 FDOH Report at 3 (executive summary). The FDOH surveyed families that lived in case homes in the Acreage and several controls about their length of residence in the area and other relevant characteristics. *Id.* The FDOH found no association between the pediatric brain cancer cases and any common cause of cancer. *Id.* at 1. To the contrary, the FDOH found a negative association between length of residence in the Acreage and the incidence of cancer; the longer someone lived in the Acreage the *less* likely they were to have cancer. *Id.* at 3, 7.

The U.S. Environmental Protection Agency and the Center for Disease Control reviewed the work done by the FDOH and FDEP and endorsed both their methodology and their findings. Ex. 5, 2010 CDC Letter; Ex. 6, 2010 EPA Letter.

***Pratt & Whitney's Expert's Report***. Pratt &Whitney initially submitted an expert report from Dr. Laurentius Marais in the companion *Cotromano* class action cases to analyze the Plaintiffs' allegations related to the FDOH's cancer cluster findings. Ex. 7, Marais 2016 *Cotromano* Report. Pratt & Whitney submitted a report from Marais, despite the *Cotromano* Plaintiffs' failure to submit any affirmative expert report addressing their reliance on the FDOH's cancer cluster claims. Case No. 13-CV-80928, DE 172. Pratt & Whitey subsequently submitted reports from Marais in response to the *Adinolfe* class action case and these combined personal injury claims.  Ex. 8, Marais 2016 *Adinolfe* Report; Ex. 9, Marais 2018 Report.

Marais explained that the FDOH's analysis suffers from what statisticians call a "multiple comparisons" problem. When you analyze the incidence of cancer in a community, you typically

compare the observed rate to what you would expect to find and report the resulting incidence ratio at a "95% confidence interval." Ex. 9 at 11-12. This confidence interval means there is a 5% chance of reporting a "false positive" even if there is no true, statistically significant effect. *Id*.

While the 95% confidence interval provides a reasonable measure of certainty for a single statistical test, the issue is more complicated when you conduct a system of statistical analyses like the FDOH (and Smith) performed. In that situation you must account for the probability of identifying a false positive result across the entire spectrum of comparisons you could perform. For example, suppose you broke the population of the State of Florida down into 460 Acreage-sized groups to conduct a statistical analysis for an increase in brain cancer. Even after attaining 95% confidence for each test and assuming there is no true cancer cluster anywhere in Florida, you would wind up with 25 statistically significant *false positive* results. *Id*. As demonstrated by Marais's coin-flipping example in his report, the multiple comparisons problem drives up the probability that any given apparently significant result across a system of statistical tests is nothing more than a false positive. *Id*. at 16-22.

As such, consistent with the ultimate conclusion of the FDOH itself, Marais concluded that the FDOH's findings do not support the inference that there is a common, environmental cause of cancer in the Acreage. Rather, he concluded that based on the structure of the FDOH's (and Smith's) analyses "the probability of finding a disease cluster [] far exceeds the nominal 5% safeguard against false positives, and any seemingly statistically significant result cannot be relied upon as statistically reliable evidence of a systematic common cause" of the cancers studied. *Id*. at 22.

***Smith's "Rebuttal" Reports***. Plaintiffs have filed a total of four reports from Smith in these personal injury cases. His first report was filed as a "rebuttal" report to Marais in August 2016 in the *Cotromano* class case. He subsequently issued a report in the personal injury cases in December 2016, an affidavit in the class cases in December 2017, and a rebuttal report in the personal injury cases in March 2018. Ex. 10, August 2016 Report; Ex. 11, December 2016 Report; Ex. 12, December 2017 Affidavit; Ex. 13, March 2018 Report. Plaintiffs are relying on all four reports here.

Smith has acknowledged in his various reports and testimony that the FDOH's cancer cluster analyses, as well as his own, suffer from the multiple comparisons problem identified by Marais. Ex. 14, 1/12/18 Hr'g Tr. at 44:2-20. As Smith explains, "[i]t is accepted by every

statistician that in such cases, to report the p-value of a significance test without any consideration of [the multiple comparisons] issue would lead to many statistically significant results being reported that do not represent real casual effects." Ex. 12 ¶ 12. With that admission, Smith offers four types of opinions in his reports.

*First*, Smith performs a series of shifting cancer cluster recalculations across his reports that examine different time periods, population groups, and disease definitions. Ex. 14 at 52:20-53:23. He purports to extend the FDOH's cancer cluster analysis in two ways—(1) adding additional years to the FDOH's pediatric cluster analysis and (2) asserting the presence of an adult cancer cluster. Relying on cancer incidence data from admittedly unreliable sources, Smith contends that the pediatric cancer cluster extended from 2004-2009 and that there was an adult cancer cluster in the Acreage from 2004-2011. Ex. 12 at Table 1; Ex. 11 at Table 1.

*Second*, Smith performed a "Bonferroni correction" analysis in an attempt to address the multiple comparisons problem. The analysis involves multiplying the p-value of a given statistical test by the number of analyses that were (or could have been) performed. Ex. 14 at 68:9-19, 69:1-7. You then assess the p-value again to determine if it remains statistically significant. *Id*. The validity of this analysis turns on establishing the right "Bonferroni factor" to multiply against the p-value. While Smith uses 460 as an exemplar Bonferroni factor in his analysis, he acknowledges that he has not identified a single, definitive correction as part of his analysis. *Compare* Ex. 12 ¶¶ 13-17 *with* Ex. 14 at 74:17-21.

*Third,* Smith performs what he calls a "Bayesian" analysis as a second effort to address the multiple comparisons problem. Ex. 12 ¶¶ 18-21. With his Bayesian analysis, Smith purports to assess the odds that the Acreage is "contaminated" with a brain-cancer-causing agent based on the observation that there was an increased incidence of brain cancer in the area. Ex. 14 at 76:15-19. Smith concludes that "a Bayesian argument shows that even with a prior 'contamination probability' of 0.01 or lower, the posterior probability is large enough to prove the case [that the 'site is contaminated'] under a balance of probabilities argument." Ex. 10 at 14.

*Fourth*, Smith criticized the FDOH's case control study, calling it "fatally flawed" for relying on a comparison between case homes and controls that are also located within the Acreage. Ex. 10 at 4. Selecting just two possible comparisons out of the many that could be made from the data (and ignoring the comprehensive analysis of the test data that was provided by the FDEP), Smith then purports to compare environmental test results for cesium-137 and

benzopyrene at case and control homes. *Id.* at 4-11. Smith concludes that the test results are "higher" at case homes, but unlike the FDEP he does not compare the results to any expected background level of these materials in the environment, nor does he offer any evidence that the levels at case homes (whether they are "higher" or not) pose any health risk. *Id.*

**Marais's Response**

Marais has identified the following flaws in Smith's analyses:

Cancer cluster recalculations

Smith's repeated recalculations of the cancer incidence rates in the Acreage exacerbate the multiple comparisons problem for several reasons. First, Smith continually changes the years, population age, and tumor type under study, which creates "the appearance of an opportunistic *post-hoc* change of scope in mid-analysis in search of a superficially significant—but spurious—result." Ex. 9 at 27-28. Second, Smith uses unreliable data from sources that he misinterprets. Rather than obtain data from the Florida Cancer Data System (as the FDOH did), Smith relies on various correspondence and other materials to cobble together additional alleged cancers for his analysis. *Id.* at 28-31. In doing so, Smith misinterprets his data sources and cherry-picks data—ignoring years that show no brain tumor diagnoses. *Id.* at 26-31. Third, Smith introduces an important source of error by comparing observed and expected cancer counts drawn from different sources with potentially different inclusion criteria. *Id.* at 28-31.

Bonferroni correction

Marais explains that Smith's use of 460 as a "Bonferroni factor . . . is both arbitrary and inadequate, in this instance, to correct for the multiple comparisons problem." Ex. 9 at 32. A proper Bonferroni correction would need to consider all of the different dimensions of comparison that Smith and the FDOH took (or could have taken) into account in conducting their analyses—such as geography, disease definition, gender, age, and time periods. *Id.* None of the recalculations performed by Smith or the FDOH remain significant under even a modest Bonferroni correct that addresses just some of the dimensions of comparison. *Id.*

Bayesian analysis

Marais explained that Smith's "Bayesian model is a mathematical toy rather than a reliable analysis of the incidence of brain cancer in the Acreage community." Ex. 9 at 33. Smith's model ignores the complexities introduced by the range of plausible levels of contamination, dose-response relationships, and plausible exposure profiles in the Acreage. *Id.* In

addition, rather than rooting his analysis to empirical facts, Smith relies on "speculative assumptions essentially plucked out of thin air" for his "critical numerical inputs to the model." *Id*. This includes Smith's failure to offer an empirical basis for his "prior probability" of 1% that a given site in Florida has the presence of a brain-cancer-causing contaminant or his 20% probability that a cancer cluster will arise in the presence of an unidentified brain-cancer-causing agent. *Id*. at 34. Marais ultimately concludes that Smith's Bayesian analysis is nothing more than the "germ of an idea" that is "so lacking in actual content" that "it is incapable of supporting the conclusion that Dr. Smith purports to draw from it." Ex. 15, 8/18/16 Marais Dep. at 328:8-23.

Case control analyses

Marais explained that Smith's comparison of cesium-137 and benzopyrene results at case and control homes is "essentially unsupported," "unreliable," and "fundamentally and fatally flawed." Ex. 15 at 282:7-288:11; 307:2-309:18; 310:3-314:1. He concluded that these analyses "provide[] no statistically reliable basis for any conclusion about the causation of brain cancer in this case." Ex. 9 at 41. Marais noted many methodological problems with Smith's analysis:

- Multiple comparisons: The FDEP tested for close to 200 environmental contaminants but Smith chose only to analyze the results for cesium-137 and benzopyrene. This is a classic multiple comparisons problem: given the number of potential comparisons (close to 200), one would expect just as a matter of chance to find a significant number where there was a difference between case and control homes. Ex. 15 at 314:9-315:7. Smith's analysis also has the appearance of improper "data mining," as he does not explain why he chose to look at just these two comparisons out of the many that were available. *Id.* at 316:2-318:13.

- Data mining: Smith expressly engaged in "data mining" to arrive at his opinion regarding benzopyrene. Ex. 15 at 310:3-311:1, 313:8-314:1. Smith conducted two analyses where he looks at whether the measured results at case and control homes exceed known benchmarks and found no statistically significant difference. It is only when Smith sliced the data a different way—the clinical relevance of which is never explained—that he found a statistically significant difference. "Dr. Smith ends up having to look at the data in three different ways to come up with one that yields a statistically significant result." *Id.* at 313:8-15. Smith's cesium-137 analysis is similarly suspect because he inexplicably chooses one selection of data (the "max" value for a mix of different case and control homes) that yields a statistically significant difference when other potential comparisons show no real differences. *Id.* at 307:2-309:18.

6

- <u>Biased and inappropriate data selection – cesium-137</u>: Smith made dubious choices in selecting control homes and manipulating the data he compared on cesium-137. For reasons that he never explains, Smith chooses to examine data from less than all of the "control" homes, and in this reduced control set he mixes and matches different types of control homes. Ex. 15 at 282:7-284:16; Ex. 9 at 37-38. Smith then inappropriately includes "U" results in his analysis (these are results that are in fact below the detection limit of the test) and treats results that have a range of uncertainty as if they were concrete data points. Ex. 15 at 284:17-286:18. This is indefensible as a matter of basic statistical analysis, as there are ways (which Smith ignores) to properly account for data that in fact represents a range of potential results. *Id.* Finally, and most problematically, Smith chooses to compare the "max" value for case and control home results even though the number and type of samples taken from case and control homes is different. Ex. 15 at 286:19-287:15; Ex. 9 at 38-39. The FDEP took 4 samples from case homes but only 2 samples from control homes. It is a "well known statistical phenomenon" that taking the maximum value over a larger sample set will systematically bias the result, as you will get higher values from the larger data set than you get from the smaller one. Ex. 15 at 287:16-288:11; Ex. 9 at 38. Smith's approach of taking the "max" from case and control data sets therefore biases the results in favor of his conclusion that case homes have higher readings. *Id.* Comparisons that are free of this bias show no significant difference between case and control homes. Ex. 15 at 307:2-309:9; Ex. 9 at 39.

- <u>Biased and inappropriate data selection – benzopyrene</u>: Smith's data selection for his benzopyrene analysis is flawed for the same reasons. Ex. 15 at 310:3-314:1. It also suffers from further defects because Smith chose to treat "non-detect" values as if they were a "0" data point when as a matter of statistical analysis the "non-detects" really represent a range of potential values from the detection limit down to zero. *Id.*; Ex. 9 at 40-41.

## ARGUMENT

The Court must act as a "gatekeeper" to ensure that the admission of expert testimony is consistent with the requirements of the Federal Rules of Evidence. *See Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 n.7 (1993); *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004). The court's gatekeeping function requires an exacting analysis of the reliability, relevancy, and "intellectual rigor" required by Fed. R. Evid. 702. *Frazier*, 387 F.3d at 1260 (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999)). Because "expert testimony may be assigned talismanic significance in the eyes of lay jurors," the significance of the court's role under *Daubert* "cannot be overstated." *Id.* at 1260, 1263. Plaintiffs bear the burden of establishing the admissibility of Dr. Smith's testimony under Rule 702. *Id.*

The Eleventh Circuit has distilled this exacting analysis into a "rigorous three-part inquiry." *Id.* at 1260. *First*, the proffered expert must be qualified to offer his opinions. *Id.* *Second*, the expert's opinions must be based on a sufficiently reliable and discernible methodology. *Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1292 (11th Cir. 2005); *Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333, 1346 (11th Cir. 2003). *Third*, the proffered expert's testimony must "fit" the facts of the case such that the testimony is helpful to the trier of fact. *Daubert*, 509 U.S. at 591; *Frazier*, 387 F.3d at 1260. Importantly, "*any* step that renders the analysis unreliable under the *Daubert factors renders the expert's testimony inadmissible.*" *McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1245 (11th Cir. 2005) (citation omitted).

The Court should exclude Smith's testimony because there is no "fit" between his analysis and any issue to be resolved at trial. In addition, Smith's opinions are also excludable because he performs an analysis that he concedes is "fundamentally flawed," and because he bases his conclusions on data and assumptions that are variously cherry-picked, unsupported, and contrary to established medical science.

## I.  THERE IS NO "FIT" BETWEEN SMITH'S OPINIONS AND ANY MATTER IN DISPUTE

"Fit requires a connection between the scientific research or test result to be presented and particular disputed factual issues in the case." *Cotromano v. United Tech. Corp.*, Case No. 13-80928-CIV-MARRA, 2018 WL 2047468, at *14 (S.D. Fla. May 2, 2018) (internal citation and quotation omitted). Here, Smith does not offer an opinion regarding the purported cause of the alleged cancer cluster in the Acreage, much less an opinion regarding the likely cause of any individual plaintiff's tumor. As such, his opinions are not helpful to the jury in resolving any

8

matter that remains in dispute on the Plaintiffs' claims. They therefore fail the baseline requirement of "fit" under Rule 702. *See Daubert*, 509 U.S. at 591; *Frazier*, 387 F.3d at 1260.

The core issue in dispute on the Plaintiffs' claims is whether their individual cancers were caused by any conduct of Pratt & Whitney. Despite issuing multiple reports in support of Plaintiffs' claims, Smith offers no opinion about any individual plaintiff's cancer. Ex. 16, 4/25/18 Smith Dep. at 379:9-17. For instance, he does not opine as to the likely cause of any individual plaintiff's cancer or even suggest that any individual plaintiff's cancer shares a common cause with other cancers identified in the Acreage. *Id*. His opinions do not advance any individual plaintiff in satisfying her burden of proof on the central questions in dispute between the parties.

Moreover, in addition to his failure to address individual plaintiffs' claims, Smith admits that his statistical analyses of an alleged cancer cluster do not establish causation. Ex. 14 at 51:13-16. While he claims his analyses provide evidence that the rate of cancer in the Acreage is allegedly "inconsistent with background rates," Smith acknowledges that he has "not stated that there was a common cause" to those cancers. *Id*. at 51:3-12. Nor could he. Both Smith and the FDOH grouped together a diverse set of brain tumors for analysis. And "it is unlikely different types of brain cancers share the same cause." Ex. 1 at 15. The fact that Smith purports to identify a statistically significant increase in brain cancers in the Acreage does not mean that it is medically or biologically plausible that the tumors share a common cause. Ex. 14 at 48:25-49:3 (admitting lacks expertise to justify grouping tumors); *see also* Ex. 17, 8/25/16 Smith Dep. at 92:2-93:18 (recognizing the grouping of tumors as a limitation in his analysis). The presence or absence of a cancer cluster has no relevance to the Plaintiffs' individual claims; this is especially true where it is conceded that there is no common cause linking those cancers together.

Given his failure to identify a common cause to the alleged cancer cluster or a cause to any individual plaintiff's cancer, Smith's opinion that the cancer cluster is broader than was found by the FDOH, his Bonferroni and "Bayesian" analyses, and his criticism of the FDOH's case control study have no bearing on any matter in dispute.

## II.   SMITH'S OPINIONS CONCERNING THE SCOPE OF THE CANCER CLUSTER SHOULD BE EXCLUDED

Expert testimony is only reliable when it is grounded in a "rigorous methodology," *Frazier*, 387 F.3d at 1262, and is "based upon sufficient facts or data," *McClain*, 401 F.3d at 1237 (quoting Fed. R. Evid. 702). Smith's opinions regarding the presence of adult and pediatric brain "cancer clusters" in the Acreage are the product of unreliable data and flawed

methodologies. His repeated recalculations over the course of his four reports embody the statistical error known as the multiple comparisons problem.

**Smith's Adult "Cancer Cluster" Analysis.** Smith purports to calculate an adult brain cancer cluster in the Acreage for 2008-2011 and 2004-2011. Ex. 16 at 273:11-274:6; Ex. 11 at Table 1. He alleges that this cluster includes adults in the Acreage (age 20 and older) that were diagnosed with brain tumors (as opposed to central nervous system tumors) during the relevant period. He compares what he contends are observed counts of adult brain tumor cases to an expected count of adult brain tumor cases. The reality, however, is that his opinion rests entirely on misinterpreting data sources to dramatically overstate the number of observed adult brain cancers in the Acreage during the relevant period.

First, Smith improperly includes *both* pediatric *and* adult brain tumors in his calculation of observed cancers for 2004 to 2007. Smith admits that the only source of brain tumor data he relies on for 2004 to 2007 is Table 9 from the FDOH's report. Ex. 16 at 278:19-279:10. He acknowledges that there is nothing in Table 9 indicating that the data is limited to reporting adult brain tumors, which contrasts to other tables that specify age restrictions. *Id*. at 280:11-20. In fact, the title of Table 9 unambiguously indicates it includes data for "the Acreage residents" without regard to age. Ex. 1 at 30. Assuming (as is clear) that Table 9 includes both adult and pediatric cancers, Smith admits that the number of observed cancers included in his adult analysis is overstated.  Ex. 16 at 281:20-282:1. He included 15 cancers, when he should have only included 10.  *Id*. at 283:8-21.

Second, Smith improperly includes *both* brain *and* central nervous system tumors in his calculation of observed cancers for 2008 to 2011, which is supposed to be limited to brain tumors. Smith includes 23 adult cancers in his calculation for 2008 to 2011. In his December 2016 Report, Smith cites to an email from Dr. Sharon Watkins as the source for the 23 cancers. Ex. 11 at 3. Dr. Watkins's email clarifies that only 7 of the 23 adult cancers are brain tumors, while the remainder are central nervous system tumors. Ex. 18, Watkins Apr. 11, 2014 Email; Ex. 16 at 291:8-21. Accepting Dr. Watkins's description of the Acreage cancer cluster data, Smith admits that he overstated the number of adult brain cancers observed between 2008 and 2011— what he reports as 23, should be 7. Ex. 16 at 291:22-292:18.

The only way for Smith to make the remarkable (and baseless) claim that there was an adult cancer cluster in the Acreage is to misinterpret the documents underlying his analysis. He

admits that correcting his errors eliminates any basis for arguing that there is an adult brain cancer cluster in the Acreage from 2004-2011 or 2008-2011. Ex. 16 at 319:21-320:4. While Smith disputes that he has misinterpreted the data sources he relies on, he admits there is "ambiguity" regarding the actual observed adult brain tumors in the Acreage. *Id.* at 317:2-12. This admission alone demonstrates that Smith's adult cancer cluster analysis is fundamentally unreliable and must be excluded. Plaintiffs bear the burden of establishing Smith's analysis is reliable, and Smith himself admits that he does "not have certainty" regarding the actual number of adult brain cancers observed in the Acreage. *Id.*

*Smith's Pediatric "Cancer Cluster" Analysis.* Smith attempts to recalculate the FDOH's pediatric cancer cluster by adding alleged pediatric cancers from 2008-2009 to the analysis. *See* Ex. 12 at Table 1. Smith derives the pediatric cancer data used in his recalculations in part from the same FDOH correspondence about which he "expressed legitimate doubt about the accuracy" of the adult cancer counts. Ex. 16 at 323:20-324:15. While Smith purports to verify the pediatric cancer counts from other sources, he never confirmed this data with the Florida Cancer Data System (FCDS) that the FDOH used in its analyses. *Id.* at 323:20-324:1. Smith's failure to confirm the pediatric cancer with the FCDS introduces a critical source of error—namely he is left comparing observed cancer counts (drawn from various sources) to expected cancer counts (derived from the FCDS). Comparing observed and expected data from distinct sources creates the risk of obtaining spurious results. Ex. 17 at 49:25-52:25. Smith's failure to verify the alleged additional pediatric cancers with the FCDS renders his analyses fundamentally unreliable.

*Smith's Cancer Cluster Calculations Suffer from the Multiple Comparisons Problem.* In addition to utilizing unreliable data and suspect methodologies, Smith's analysis of the incidence of cancer suffers from the "multiple comparisons" problem that Dr. Marais explains at length. Ex. 19, Marais 2017 Affidavit at 9-19; Ex. 9 at 11-22; Ex. 15 at 297:10-301:9. The premise behind the multiple comparisons problem is that any time you perform multiple statistical tests you substantially increase the chance that any apparently statistically significant finding observed is actually a false positive. Ex. 14 at 44:2-20. The multiple comparisons problem is particularly prevalent in situations like cancer cluster investigations that are triggered by community complaints, involve *post hoc* calculations about past events, and offer a wide range of dimensions (*e.g.*, age, gender, disease definition, time period, geography) on which to slice and dice data. Ex. 9 at 6-8, 11-22.

The multiple comparisons problem is sometimes termed the "Texas sharpshooter" phenomenon. Ex. 14 at 36:8-20. The story goes that a sharpshooter fires multiple shots into the wall of a barn, and then *after-the-fact* paints a target on the barn around the bullet holes. *Id*. at 42:5-13. Obviously if you paint the target after the holes are in the barn it is a lot easier to hit the target. *Id*. Just like you cannot accept a target painted after-the-fact as evidence of a sharpshooter's skill, you cannot accept *post hoc* statistical analyses that scan data for anomalies as evidence of a truly statistically significant result.

Smith's recalculations embody the Texas sharpshooter phenomenon. For example, take Smith's analysis of a malignant pediatric female brain cancer cluster from 2004 to 2009. Ex. 12 at Table 1. In order create this recalculation, Smith examined data that ranged from 2002 to 2011. He cut 2002-2003 from his analysis to lower the p-value of his calculation because those years contained no incidences of malignant pediatric brain tumors. Ex. 14 at 66:11-67:6. Likewise, Smith ignored data from 2010-2011 for the same reason. *Id*. at 63:15-65:1. In essence, he "looked at the data, [] isolated a time period, narrowed it down, excluded years with no analysis, and then tested that for statistical significance." *Id*. at 67:11-15. He admits that this highly contrived, data-fishing exercise "introduced selection bias into [his] analysis," thereby substantially raising the risk that his results are nothing more than a false positive. *Id*. at 67:16-24. Despite the obvious statistical flaws to this 2004-2009 analysis, Smith points to it as "extremely strong evidence in favor of a cancer cluster." Ex. 12 at 7-8.

The problem is not isolated to Smith's 2004-2009 analysis. Smith admits that all his recalculations (as well as the FDOH's original analysis) are subject to the multiple comparisons problem. Ex. 14 at 44:2-20. Across his four reports, he recounts just a handful of the thousands of statistical tests "that were done, or might have been done." Ex. 12 at 8. As Smith acknowledges, "[i]t is accepted by every statistician that in such cases, to report the p-value of a significance test without any consideration of this issue would lead to many statistically significant results being reported that do not represent real causal effects." *Id*. Yet that is exactly what Smith does in his four reports—opine on allegedly statistically significant results drawn from a pool of potentially thousands of statistical analyses without meaningfully addressing the substantial risk of reporting a false positive. The Court should exclude his recalculations entirely.

## III.   SMITH'S "BONFERRONI CORRECTION" ANALYSIS IS UNRELIABLE AND IRRELEVANT

Smith fails to proffer a "Bonferroni correction" sufficient to address the multiple comparisons problem that plagues both his and the FDOH's cancer cluster analyses. Instead, Smith puts forward an exemplar Bonferroni factor to illustrate how one *might* evaluate whether his cancer cluster recalculations are sufficiently robust to withstand the risk of error introduced by performing repeated statistical analyses. Ex. 12 at 8-9. Ultimately, he never offers an opinion on "correct" Bonferroni factor for this case and, in fact, admits doubt that "there is any single number that represents the right Bonferroni correction factor." Ex. 14 at 74:17-21.

A "Bonferroni correction" is a well-known means to assess whether an apparently statistically significant finding can withstand the multiple comparisons problem. It is relatively simple to apply. Assume you perform 10 statistical tests, one of which has a p-value of .05. To evaluate whether that test is robust to the multiple comparisons problem, you would multiple the p-value by 10 (the "Bonferroni factor"). Ex. 14 at 68:14-19. The new "corrected" p-value is .5, indicating that the statistical test is no longer significant. *Id*. at 69:1-7.

The critical element of the "Bonferroni correction" is to identify the right correction factor. The proper factor must consider two things: (1) the number of statistical tests one actually performed as part of the analysis and (2) the number of "other tests that might have been conducted but were not." Ex. 12 at 8. Smith's (and the FDOH's) analysis involve a wide range of comparisons including geography, age, disease definition, gender, and time periods. Ex. 14 at 47:1-8. Given the range of comparisons at issue in Smith's analysis, the proper Bonferroni correction is well-into the thousands and would render all his recalculation results statistically *insignificant*. Ex. 9 at 31-32.

Smith does not attempt to identify the proper Bonferroni factor. Instead, he discusses a Bonferroni factor of 460, which comes from an example used by Marais based on the population of Florida. Ex. 12 at 8-9. He uses this exemplar Bonferroni factor in an effort to make his calculation appear of a pediatric female brain cancer cluster from 2004-2009 appear significant. *Id*. The significance of this result, however, disappears when considered in light of a Bonferroni factor that accounts for even a portion of the comparisons inherent in Smith's analysis. Ex. 14 at 73:21-74:16; Ex. 9 at 32.

The Court should exclude Smith's "Bonferroni correction" opinions. He admits that he has not actually undertaken the analysis to determine the correct Bonferroni factor to apply in

13

this case, rendering his opinions unreliable and irrelevant. Allowing him to testify about his exemplar Bonferroni correction would only serve to confuse and mislead the jury.

## IV.     SMITH'S "BAYESIAN" ANALYSIS RESTS ON DEMONSTRABLY FALSE ASSUMPTIONS

Expert testimony that is untethered to the facts of the case and depends on demonstrably false assumptions is inadmissible under the exacting standard set by Rule 702. *Rink*, 400 F.3d at 1292 (affirming exclusion of expert testimony that is based on demonstrably unreliable data and a "scientifically unsupported 'leap of faith'"); *Finestone v. Fla. Power & Light Co.*, 03-14040-CIV, 2006 WL 267330, at *13 (S.D. Fla. Jan. 6, 2006) (*aff'd*, 272 F. App'x 761, 768 (11th Cir. 2008)) (excluding expert testimony that is based on unsupported and "false assumptions"). Smith admits that the critical variables that drive his Bayesian analysis are "pure assumptions" for which he offers no empirical basis. Ex. 14 at 80:6-11; Ex. 16 at 360:3-9, 374:16-21. Instead, his Bayesian argument is the product of expert *ipse dixit* untethered from the facts of this case and should be excluded. *See Hendrix v. Evenflo Co.*, 609 F.3d 1183, 1194-95, 1203 (11th Cir. 2010).

The point of Smith's Bayesian argument in this case is to determine the probability that a site is contaminated with a brain-cancer-causing agent if you observe a cancer cluster in the area. Ex. 14 at 76:15-19.[1] He endeavors to calculate this probability (called the "posterior probability") using the Bayes theorem. Ex. 17 at 110:9-113:19. You start with a "prior probability" (your assumed probability of the event going in) and then "update" that prior probability based on observed events. *Id.* at 113:20-23. The classic example is a rigged coin—if you have a two-headed coin and a regular coin and draw one from a bag at random, there is a 50% chance you have drawn the rigged one. But if you flip the coin and it comes up *heads* (the observed event), the odds actually change (to 66%). The Bayes theorem provides a mathematical formula for showing how the additional information you have added (the result of the coin flip) changes the "prior probability" of 50% to the "posterior probability" of 66%.

---

[1] Even if Smith's Bayesian calculation were reliable (it is not), the result is meaningless in the context of this case. His analysis does not identify the "brain-cancer-causing agent" or establish that the agent is an environmental contaminant (versus a lifestyle or behavioral issue). Ex. 14 at 77:8-78:22. And his calculation "certainly doesn't tell us whether the unidentified cancer-causing agent has anything to do with Pratt & Whitney." *Id.* at 78:20-22. As such, Smith's Bayesian analysis does not aid the jury in deciding any issue in dispute in the personal injury cases and should be excluded on that basis as well.

Smith's Bayesian argument is driven by the assumptions he inputs for two critical variables in his calculation. First, Smith assumes that the "prior probability" that a given site in Florida is contaminated with a brain-cancer-causing agent is 1%.  Ex. 12 at 9; Ex. 16 at 354:5-11. Second, Smith assumes that the probability of a cancer cluster developing if a brain-cancer-causing agent is present in the environment is 20%. Ex. 16 at 373:17-374:5. Both assumptions are critical to Smith's Bayesian argument. Neither is tied to any empirical evidence from the literature or the facts of the case. *Id.* at 360:3-9, 374:16-21.

**Smith's "Prior Probability."** There is absolutely no basis to support Smith's assertion of a 1% prior probability a given site in Florida has the presence of a brain-cancer-causing agent. Smith acknowledges that "a lot depends on how realistic [] the assumption" is underlying his "prior probability." Ex. 10 at 13. Yet he cannot cite any (1) literature describing the prevalence of brain-cancer-causing agents in Florida or anywhere in the world, Ex. 14 at 87:20-88:4, (2) data supporting his "prior probability," Ex. 16 at 359:19-360:1, or (3) expert opinion establishing a basis for his "prior probability," *id*. When pressed during the class certification hearing, Smith was forced to admit that his "prior probability of 1 percent [was] just made up." Ex. 14 at 88:5-10. The consequence of making up his "prior probability" is significant. If the "prior probability" is closer to 1 in 10,000, Smith's Bayesian calculation falls apart. *Id*. at 88:11-16. And there "nothing [Smith] can point to that tells [him] whether the right number is 1 percent, 1 in 10,000, 1 in a million or 1 in a billion." *Id*. at 88:19-22.

Smith initially tried to bolster his "prior probability" by citing to an article written by Dr. Christopher Teaf discussing the prevalence of benzopyrene in the environment. Ex. 12 at 9. However, as set forth in the attached declaration of Teaf, there is no scientific basis for suggesting that benzopyrene causes brain cancer. Ex. 20, Teaf 2016 Affidavit. Teaf is the Associate Director of Center for Biomedical & Toxicological Research and Waste Management at Florida State University. He has extensively studied and published on Polycyclic Aromatic Hydrocarbons (including benzopyrene). Teaf explains based on a review of the relevant literature that there is no known association between benzopyrene and brain cancer. *Id.* ¶ 20. Smith admits he has no basis to dispute Teaf's conclusions about benzopyrene and that he cannot point to any expert opinion to the contrary. Ex. 14 at 84:21-24, 85:25-86:3. Therefore, prevalence of benzopyrene in the environment is irrelevant to Smith's "prior probability," which is focused only on *brain-cancer*-causing agents. Ex. 16 at 355:3-13.

Subsequently, Smith has cited evidence related to the link between ionizing radiation and brain tumors. None of the literature he cites relates to the alleged circumstances of this case—purported exposure to ambient, environmental radiation. Regardless, Smith admits that none of the sources he cites inform his "prior probability" or even address the prevalence of environmental radiation contamination in Florida. Ex. 16 at 359:10-17, 368:16-25, 369:19-371:2. Despite issuing four reports in this case, Smith is unable to identify even a single, objective source to support the assumed "prior probability" that is critical to his Bayesian argument.

**_Smith's Probability of a Cancer Cluster Given Contamination_.** Smith similarly offers nothing more than his "subjective judgment" to justify his assumption that there is a 20% probability of a cancer cluster developing if a brain-cancer-causing agent is present. Ex. 16 at 378:23-379:3. He is unable to identify any (1) literature, _id_. at 374:23-375:3, (2) data, _id_. at 375:5-8, or (3) other expert opinion supporting his assumed probability, _id_. at 375:11-16. Nor is Smith able to identify any specific brain-cancer-causing agent he claims is capable of causing a cancer cluster 20% of the time when it is present. _Id_. at 375:18-23.

The fundamental inputs to Smith's Bayesian argument have no empirical basis or foundation in the facts of the case. Smith's calculation is driven by "pure assumptions" that are the product of his own, unqualified say-so. His opinion should be excluded.

## V.   SMITH'S SELECTIVE COMPARISON OF ENVIRONMENTAL DATA FROM CASE AND CONTROL HOMES IS METHODOLOGICALLY UNSOUND

Smith purports to compare FDEP's test results and reaches the conclusion that levels of cesium-137 and benzopyrene are "higher" at case homes than at controls. Ex. 10 at 11, 13. Smith's opinion on this "statistically significant" difference should be excluded for three reasons.

_First,_ Smith's comparison of environmental testing results from case and control homes is methodologically unsound for reasons articulated in his report. Smith claims the FDOH's "case control" study is "fatally flawed" because it compares "case" homes to "control" locations selected from within the Acreage itself, instead of controls from a "matched community" that was "not likely to be affected by the same environmental contaminants from the same source." Ex. 10 at 4-5. In offering this critique, Smith ignores the analysis done by the FDEP, which compared the results of environmental testing throughout the Acreage area to both regulatory limits and expected "background" levels in Florida and concluded that the results showed the Acreage to be "safe." _Id_.; Exs. 3, 5, 6. By comparing the Acreage results to environmental standards and "background" results that would be expected in areas not alleged to be

contaminated (and for which there were no elevated instances of cancer), the FDEP performed exactly the comparison the Smith claims was necessary. Smith acknowledged the FDEP's findings at his deposition, and did not dispute them. Ex. 17 at 24:24-25:7, 82:4-86:2.

Smith's critique of the FDOH case control study thus misses the mark because it criticizes the study for failing to address a comparison that was done elsewhere by the FDEP. However, Smith's critique does demonstrate the methodological flaws in his *own* analysis— Smith purports to do nothing more than compare case homes to control homes within the Acreage, exactly the comparison (when performed by the FDOH) that Smith dismisses as "seriously flawed." Ex. 17 at 56:23-58:5, 145:24-147:25.

*Second*, Smith's opinion about the apparent difference in the levels of cesium-137 and benzopyrene at case and control homes is highly misleading and should be excluded because he makes no effort to determine whether the "statistically significant" differences he notes have any *clinical* or *medical* significance. In fact, the supposed differences in levels of these contaminants, which Smith found only by manipulating the data (*see infra*), are both very small and clinically insignificant because the overall amounts detected at both case and control homes were found by the FDEP to be within safe background levels. Ex. 3, cover letter at 2, report at 19-21; Exs. 5, 6; *see* Ex. 17 at 16:16-17:5, 61:4-62:2 (Smith admitting lack of expertise to assess whether overall levels found by FDEP posed a risk to human health).

For cesium-137, Smith reports that the average of all the "maximum" values found at case homes is higher than the "maximum" values found at control homes,[2] but this "maximum" value at case homes is below what Plaintiffs' own expert considers to be the "background" level in the environment. Smith found the average "max" value for cesium-137 at case homes to be 0.115 pCi/g, which is below even the low level of 0.16 pCi/g that Plaintiffs' expert Kaltofen says is the expected "background" level from global fallout. Ex. 10 at 7; Ex. 21, Kaltofen 2016 Report at 26; Ex. 17 at 74:11-79:7; *see* Ex. 3, report at 20 (FDEP finding levels to be below "background"); Ex. 6 (EPA concurring that radionuclide readings are below "background").

---

[2] Smith purports to find that the average "maximum" value for cesium-137 at case homes is .053 higher than the average "maximum" for control homes of "0.062." Ex. 10 at 7. To put this in perspective, there are limits to the accuracy of the tests that produce these numbers and the results Smith cites have a range of uncertainty around them that is often larger than the 0.053 "difference" Smith claims to have found between case and control homes.

Smith's conclusion that the levels are "higher" at case homes is therefore irrelevant, and further misleading, because the overall level is within background levels present throughout the state.

Smith does not cite to any evidence that "background" levels of cesium-137 in the environment create a risk of brain cancer, and he admitted that he is not aware of any literature showing that. Ex. 17 at 18:17-25, 78:24-80:12. Nor could the existence of "background" levels of cesium-137 in case homes explain the increased incidence of cancer in the Acreage because the same "background" levels exist elsewhere in Florida—the area to which the Acreage is being compared where no increased incidence of cancer has been found.

Smith's analysis of benzopyrene is equally unreliable. He admits that case and control homes have no significant differences when you consider only the limited number of findings for benzopyrene that exceed Florida's Soil Cleanup Target Levels; in fact, the vast majority of case and control homes were non-detects or values below this health-protective regulatory limit. Ex. 10 at 9-10; Ex. 17 at 64:9-21, 69:14-70:16; *see* Ex. 3, report at 19, 21 (FDEP report noting the small and roughly equal number of case and control homes with results that exceed the SCTL and concluded that benzopyrene levels at case and control homes are "similar"). It is only when Smith massages the data to look at results below the SCTL that he can find any difference between case and control homes. Ex. 10 at 9-10. As with cesium-137, Smith calls this a "statistically significant" difference, omitting the fact that the "difference" he finds is clinically immaterial. There is no connection between benzopyrene and brain cancer (at the low levels found by the FDEP, or at all),[3] Ex. 20 ¶ 20, the FDEP concluded that the results for case and control homes are "similar," and the overall results are within the range of what regulatory authorities consider safe. Ex. 3, cover letter at 2, report at 19 & 21.

*Third*, Smith's comparison of cesium-137 and benzopyrene test results at case and control homes is "fundamentally and fatally flawed" for the reasons set forth by Marais in his deposition and report. Smith engages in inappropriate "data mining," trying different analyses and different ways of slicing up the data to find calculations that suggest a "statistically significant" result while ignoring (and failing to report) the numerous iterations that reach the opposite result. His

---

[3] Smith cites no evidence of any causal connection between benzopyrene and brain cancer. He was not aware of any literature showing that benzopyrene causes brain cancer. Ex. 17 at 72:13-25, 144:1-10. Smith admits that he lacks the expertise even to opine on whether "there is a connection between benzopyrene and brain cancer." *Id.* at 18:1-7; *see also id.* at 16:16-17:5, 61:4-62:2 ("outside my personal area of expertise"); 144:1-10 ("outside my area of expertise").

entire analysis is invalid because of this data mining, and the "multiple comparisons" problem. Moreover, for reasons that Marais explains in great detail, Smith's approach to the data is statistically invalid because he chooses a reduced control set, mixes and matches different controls, relies on qualified results, treats "ranges" of data and "censored data" as if they were discrete data points, and systematically biases his analysis in favor of the result he wants (higher values at the case homes) by using the "max" value from case homes where twice as many samples were taken. *See supra* at 6-8.

Smith has never provided a defense to any of these methodological flaws. To the contrary, Smith admitted that they were real. For example, Smith agreed that he looked only at cesium-137 and benzopyrene—out of the 200 or so things he could have looked at—because those were the things counsel specifically directed him to review. Ex. 17 at 157:25-161:20. Smith also agreed that there are substantial and important differences in the number and type of samples taken from case and control homes, *id.* at 155:4-157:24, 175:17-176:10, 180:21-182:19, that as a matter of "statistics 101" taking the "max" value from the larger set of samples taken from "case" homes systematically biased the results in favor of higher values for case homes, *id.* at 182:20-184:9, 184:10-185:11, and that he did not even include all of the control homes in his analysis (for reasons he just could not explain), *id.* at 31:22-34:22, 161:21-162:7. Smith also admitted that he incorrectly included "non-detect" values as actual results in his cesium-137 calculations and that he did not "understand" the uncertainty ranges and the "minimum detection" criteria for the data he was relying upon well enough to implement the corrective measures (which he acknowledged knowing) for the use of "ranged" and "censored" data." *Id.* at 162:16-163:24 (inclusion of non-detects); 167:9-168:20 (did not understand "U" results); 168:21-170:14 (did not understand "uncertainty range"); 170:15-173:7 (did not understand non-detect values). In sum, Smith acknowledged practically all of the methodological problems that Dr. Marais identified in his analysis. Dr. Smith issued three subsequent expert reports, after admitting these flaws, and made no effort to update or modify his analysis to address them.

## CONCLUSION

For the foregoing reasons, Smith's opinions should be excluded in their entirety.

**REQUEST FOR HEARING**

Pratt & Whitney respectfully requests a hearing on this motion. This motion concerns expert testimony regarding complex statistical issues, and is therefore more complex than a typical motion. Pratt & Whitney believes that oral argument will aid this Court in understanding the facts and issues presented in the parties' briefing. Pratt & Whitney estimates that this motion requires 30 minutes of oral argument.

Dated:  May 14, 2018                    Respectfully submitted,

GUNSTER, YOAKLEY & STEWART, P.A.
777 South Flagler Drive, Suite 500 East
West Palm Beach, FL 33401
Telephone: 561-655-1980
Facsimile: 561-655-5677
*Attorneys for Defendant United Technologies*
*Corporation (Pratt & Whitney)*

By: /s/ *Gregor J. Schwinghammer, Jr.*
GREGOR J. SCHWINGHAMMER, JR.
Florida Bar No. 090158
gschwinghammer@gunster.com
HEATHER C. COSTANZO
Florida Bar No. 37378
hcostanzo@gunster.com

BARTLIT BECK HERMAN PALENCHAR
& SCOTT, LLP
54W Hubbard Street, Suite 300
Chicago, IL 60654
Phone: (312)-494-4448
Fax: (312)-494-4440
SEAN W. GALLAGHER
*Pro Hac Vice*
sean.gallagher@bartlit-beck.com
ANDREW C. MACNALLY
*Pro Hac Vice*
andrew.macnally@bartlit-beck.com
DANIEL R. MCELROY
*Pro Hac Vice*
daniel.mcelroy@bartlit-beck.com
ALEX GRODEN
*Pro Hac Vice*
alex.groden@bartlit-beck.com

Pratt & Whitney's Daubert Motion to Exclude the Testimony of Richard L. Smith
And Incorporated Memorandum of Law

Index to Exhibits

| | |
|---|---|
| Exhibit 1 | FDOH, Acreage Cancer Review Palm Beach County, August 2009 |
| Exhibit 2 | FDOH Release, CDC Validates DOH Population Recalculation Pediatric Brain and CNS Cancers Remain Elevated, February 1, 2010 |
| Exhibit 3 | FDEP Letter and Report, The Acreage Drinking Water & Soil Sampling February, March & April 2010, Issued August 2010 |
| Exhibit 4 | FDOH, Acreage Community Case-Control Data Analysis, September 2010 |
| Exhibit 5 | CDC Letter to FDOH, October 27, 2010 |
| Exhibit 6 | EPA Letter to FDEP, October 5, 2010 |
| Exhibit 7 | Expert Report of M. Laurentius Marais, May 3, 2016 |
| Exhibit 8 | Expert Report of M. Laurentius Marais, July 7, 2016 |
| Exhibit 9 | Expert Report of M. Laurentius Marais, February 13, 2018 |
| Exhibit 10 | Expert Report of Richard Smith, August 8, 2016 |
| Exhibit 11 | Expert Report of Richard Smith, December 23, 2016 |
| Exhibit 12 | Affidavit of Richard Smith, December 1, 2017 |
| Exhibit 13 | Rebuttal Expert Report of Richard Smith, March 13, 2018 |
| Exhibit 14 | Transcript of Hearing on Class Certification, January 12, 2018 |
| Exhibit 15 | Deposition of M. Laurentius Marais, August 18, 2016 |
| Exhibit 16 | Deposition of Richard Smith, April 25, 2018 |
| Exhibit 17 | Deposition of Richard Smith, August 25, 2016 |
| Exhibit 18 | Watkins Email, April 11, 2014 |
| Exhibit 19 | Affidavit of M. Laurentius Marais, December 8, 2017 |
| Exhibit 20 | Declaration of Christopher M. Teaf, September 6, 2016 |
| Exhibit 21 | Summary of Findings of Pre-Inspection and in Support of thorough On-Site Inspection by Marco Kaltofen, March 28, 2016 |

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on May 14, 2018, I electronically filed the foregoing with the Clerk of Court using CM/ECF. I also certify that the foregoing document is being served on all counsel of record identified on the below Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to electronically receive Notices of Electronic Filing.

/s/ *Gregor J. Schwinghammer, Jr.*
GREGOR J. SCHWINGHAMMER, JR.

## SERVICE LIST

**Jack Scarola, Esq.**
**Mara Hatfield, Esq.**
Searcy Denney Scarola Barnhart
& Shipley, P.A.
2139 Palm Beach Lakes Boulevard
West Palm Beach, Florida 33409
Telephone: 561-686-6300
Facsimile: 561-383-9451
E-mail: jsx@searcylaw.com,
mrh@searcylaw.com, dtm@searcylaw.com

**Jeffrey Louis Haberman, Esq.**
**Scott P. Schlesinger, Esq.**
Schlesinger Law Offices, P.A.
1212 SE 3rd Avenue
Fort Lauderdale, FL 33316
Telephone: 954-467-8800
Facsimile: 954-523-4803
Email:
JHaberman@schlesingerlaw.com,
scott@schlesingerlaw.com

**Craig Randall Zobel, Esq.**
Law Offices of Craig R. Zobel, P.A.
Post Office Drawer 32065
Palm Beach Gardens, FL 33420
Telephone: 561-277-1819
Facsimile: 561- 630-9666
Email: czobel@zobellawfirm.com

**Bryan S. Gowdy, Esq.**
Creed & Gowdy, P.A.
865 May Street
Jacksonville, FL 32204
Telephone: 904-350-0075
Facsimile: 904-503-0441
Email: bgowdy@appellate-firm.com