

1       UNITED STATES DISTRICT COURT
       SOUTHERN DISTRICT OF FLORIDA
2
       CASE NO.:  10-CIV-80883-MARRA/HOPKINS
3       (Consolidated Case: Lead Action)

4

5  -------------------------------x

6  MAGALY PINARES, ET AL.,

7       Plaintiffs,

8

9  vs.

10

11  UNITED TECHNOLOGIES CORPORATION,

12       Defendant.

13  -------------------------------x

14

15    VIDEOTAPED DEPOSITION OF FRANCESCA

16    DOMINICI, a witness called by the

17    Defendant, taken pursuant to the

18    applicable provisions of the Federal

19    Rules of Civil Procedure, before James A.

20    Scally, RMR, CRR, a Notary Public in and

21    for the Commonwealth of Massachusetts, at

22    Regus Office Space, 8 Faneuil Hall

23    Marketplace, Boston, Massachusetts, on

24    Friday, May 4, 2018, commencing at 10:08

25    a.m.

## Page 2

```
 1        A P P E A R A N C E S

 2

 3   SEARCY DENNEY SCAROLA BARNHART & SHIPLEY PA

 4   2139 Palm Beach Lakes Boulevard

 5   West Palm Beach, Florida  33409-6601

 6   561-686-6300

 7   By: Darren Latham, Esq.

 8      Counsel for the Plaintiff

 9

10   BARTLIT BECK HERMAN PALENCHAR & SCOTT LLP

11   Courthouse Place

12   54 West Hubbard Street, Suite 300

13   Chicago, Illinois  60654

14   312-494-4400

15   By: Mark L. Levine, Esq.

16      Counsel for the Defendant

17

18   Also Present:

19   Couirey Eckmayer, Videographer

20

21

22

23

24

25
```

## Page 4

|     | E X H I B I T S | |
| --- | --- | --- |
| NO. | | PAGE |
| 1 | Curriculum vitae | 7 |
| 2 | Article entitled "The role of epidemiology in the law: a toxic tort litigation case" | 13 |
| 3 | Defendant's amended notice of taking videotaped deposition duces tecum of Francesco Dominici | 21 |
| 4 | Initial expert report of Francesco Dominici, PhD | 23 |
| 5 | Rebuttal expert report of Francesca Dominici, PhD | 23 |
| 6 | August 2009 report entitled "Acreage Cancer Review, Palm Beach County" | 30 |
| 7 | 8/8/16 statistical analysis report | 80 |
| 8 | 12/23/16 statistical analysis report | 80 |
| 9 | Affidavit of Richard L. Smith, PhD | 81 |
| 10 | 3/13/18 rebuttal report of Richard L. Smith | 81 |
| 11 | SharePoint screenshots | 125 |

(Exhibits were given to the court reporter to attach to the transcript.)

## Page 3

```
         I N D E X

WITNESS              EXAMINATION

FRANCESCA DOMINICI

  (By Mr. Levine)         6

  (By Mr. Latham)       120

  (By Mr. Levine)       142
```

## Page 5

```
 1       THE VIDEOGRAPHER:  Good morning.

 2   We are now on the video record.  Today

 3   is Friday the 4th day of May 2018.  The

 4   time is 10:08 a.m.

 5       We are here at Regus Office Space

 6   in Faneuil Hall, 8 Faneuil Hall

 7   Marketplace, Third Floor, Boston,

 8   Massachusetts, for the purpose of

 9   taking the video deposition of

10   Francesca Dominici, PhD, taken by the

11   defendant in Case No. 10-CV-80883-

12   MARRA, case Magaly Pinares, et al,

13   plaintiffs, versus United Technologies

14   Corporation, Pratt & Whitney Group, a

15   Connecticut corporation, defendant,

16   which is filed in the United States

17   District Court, Southern District of

18   Florida.

19       The court reporter today is Jim

20   Scally of US Legal Support.  The

21   videographer is Couirey Eckmayer of US

22   Legal Support.

23       Would all counsel please state

24   their appearances for the record.

25       MR. LATHAM:  Darren Latham on
```

Page 6

1    behalf of the plaintiffs.
2         MR. LEVINE:  Mark Levine on behalf
3    of defendant United Technologies.
4
5         FRANCESCA DOMINICI, having been
6    satisfactorily identified by her driver's license and
7    production of her driver's license and
8    duly sworn by the Notary Public, was
9    examined and testified as follows in
10   answer to direct interrogatories:
11
12        EXAMINATION
13 BY MR. LEVINE:
14   Q.  All right.  State your name again, please.
15   A.  Francesca Dominici.
16   Q.  Have you been deposed before?
17   A.  Yes.
18   Q.  If you don't understand any of my questions,
19 please let me know so I can rephrase them.  Okay?
20   A.  Sure.
21   Q.  And it's important that you give your answers
22 audibly on the record so the court reporter can take
23 them down, as opposed to shaking your head or
24 shrugging your shoulders.  Okay?
25   A.  Okay.

Page 7

1    Q.  Have you worked with any of the lawyers for
2 the plaintiffs in this case in any previous lawsuits?
3    A.  No.
4         (Exhibit 1, curriculum vitae,
5         marked.)
6    Q.  I'm handing you what I've marked as Dominici
7 Deposition Exhibit 1.  Is this a copy of your
8 curriculum vitae?
9    A.  That's correct.
10   Q.  And are you an expert in statistics?
11   A.  Yes.
12   Q.  I want to ask about some other fields to see
13 if you're an expert in those.  Are you an expert in
14 neuro-oncology?
15   A.  I have collaborated with neuro-oncologists,
16 but I don't consider myself an expert.
17   Q.  Are you an expert -- are you yourself an
18 expert in neuropathology?
19   A.  No.
20   Q.  Are you yourself an expert in physiology?
21   A.  No.
22   Q.  Are you yourself an expert in oncology?
23   A.  I have done extensive research in oncology
24 and collaborated with oncologists, but I do not
25 consider myself an expert in oncology.

Page 8

1    Q.  Do you consider yourself an expert in brain
2 tumor formation or causation?
3    A.  I have been awarded a career award in
4 developing statistical methods to specifically
5 address treatments for glioblastoma, and therefore as
6 part of my career award, I've been taking training in
7 glioblastoma and doing an analysis of treatments for
8 glioblastoma.
9    Q.  But are you qualified to give diagnosis or
10 treatment plans for glioblastoma victims?
11   A.  No.
12   Q.  Are -- do you consider yourself an expert in
13 toxicology?
14   A.  No.
15   Q.  Are you an expert in health physics?
16   A.  Can you elaborate, what health physics?
17   Q.  It relates to -- let me ask you:  Are you an
18 expert in radionuclides?
19   A.  No.
20   Q.  Are you an expert in radiological testing?
21   A.  No.
22   Q.  Are you an expert in the disposal of
23 hazardous substances?
24   A.  I have participated in committee of the
25 National Academy of Sciences that have been

Page 9

1 considered disposal from burn pits, so I consider I'm
2 familiar with the topic, but not an expert.
3    Q.  Are you an expert in the disposal of
4 radionuclides?
5    A.  I chair a committee that review the
6 epidemiologic studies of the Hiroshima and Nagasaki
7 atomic bomb, and as a consequence I've been exposed
8 and read -- well, I've read the literature and
9 overseen some of the studies, but I'm not considering
10 myself an expert on the topic.
11   Q.  And from the Hiroshima and Nagasaki atomic
12 bombs, the issues had to do with the radiation from
13 the bomb itself as opposed to moving soil from one
14 place to another, correct?
15   A.  That's correct.
16   Q.  If you look at page 5 of your CV, under
17 "Consultations," there is a reference to the
18 litigation of Kerr versus Aerojet General
19 Corporation.
20   A.  Yes.
21   Q.  Is that a case where you testified in it?
22   A.  That's correct.
23   Q.  Did you testify by deposition?
24   A.  Yes.
25   Q.  Did you testify at trail or a hearing in a

Page 10

1  court?
2     A.  No.
3     Q.  And did that case relate to a neuroblastoma
4  type of brain cancer?
5     A.  Yes.
6     Q.  And did the plaintiffs who had all -- in that
7  case all have the same kind of brain cancer,
8  neuroblastoma?
9        MR. LATHAM:  Object to form.
10       THE WITNESS:  I'm sorry.  I didn't
11    hear what you said.
12       MR. LATHAM:  I just said "Object
13    to form."  You can go ahead and --
14       THE WITNESS:  Oh.
15       MR. LATHAM:  -- answer unless we
16    tell you not to answer.
17    A.  I believe that was the case.  It was ten
18  years ago, and it was documented in my research paper
19  that went to peer-review publication.
20    Q.  And did the plaintiffs in the Aerojet case
21  that you testified in all have the same exposure
22  pattern?
23    A.  What do you mean by "exposure pattern"?
24    Q.  The way in which they were exposed to the
25  alleged contaminant.

Page 11

1        MR. LATHAM:  Objection.
2     A.  (Pause.)  Can I see my -- can you repeat the
3  question, please?
4     Q.  Sure.  Did the plaintiffs in the Aerojet case
5  get exposed to the alleged contaminant in the same or
6  similar ways?
7        MR. LATHAM:  Objection.
8        THE WITNESS:  So should I not
9     answer, or you me want me to answer?
10       MR. LATHAM:  Okay.  So just to --
11       THE WITNESS:  Explain it.
12       MR. LATHAM:  Just to -- just
13    to clarify.
14       THE WITNESS:  Explain it, because
15    I'm confused.
16       MR. LATHAM:  We're not at a trial.
17    We don't have a judge to rule on
18    objections.  And so when -- it's Levin?
19       MR. LEVINE:  Levine.
20       MR. LATHAM:  Levine.  When Mr.
21    Levine is asking questions, I may,
22    after the question's asked, reference
23    an objection or multiple objections,
24    but you would go ahead and continue to
25    answer.  The only exception would be

Page 12

1     such as if I were believing that the
2     question called for the statement of
3     privileged --
4        THE WITNESS:  Okay.
5        MR. LATHAM:  -- information, in
6     which case, I would ask you not to
7     answer, and then we might have some
8     discussion.  But this is just for the
9     record, so --
10       THE WITNESS:  Yeah, okay.
11       MR. LATHAM:  -- there will
12    probably be a few more of these, so
13    just keep --
14       THE WITNESS:  Okay.  Got it.
15    Understand.  All right.
16       MR. LATHAM:  All right.
17       THE WITNESS:  Because I was
18    confused.
19       MR. LATHAM:  Okay.
20       THE WITNESS:  Can you repeat the
21    question again?  I apologize.
22  BY MR. LEVINE:
23    Q.  Sure.  Absolutely.
24       In the Aerojet case that you testified in,
25  did the plaintiffs all have the same pattern of -- in

Page 13

1  the way in which they were exposed to the alleged
2  contaminant?
3        MR. LATHAM:  Objection.
4     A.  I cannot say that for sure.
5     Q.  Did the -- was the age of diagnosis of the
6  injured parties, the people with neuroblastoma, in
7  the Aerojet case that you testified in similar?
8        MR. LATHAM:  Objection.
9     A.  So if you pull out -- I would love to pull
10  out the paper, the research paper, and there is a
11  table that describes and the distribution of age of
12  diagnosis, and I will be happy to refer to that.
13       (Exhibit 2, article entitled "The
14    role of epidemiology in the law: a
15    toxic tort litigation case," marked.)
16    Q.  Handing you what I've marked as Dominici
17  Deposition Exhibit 2.
18    A.  So --
19    Q.  Let me -- let me just ask first:  I've handed
20  you Exhibit 2.  Is Exhibit 2 the -- a paper called
21  "The role of epidemiology in the law: a toxic tort
22  litigation" that you were the primary author of?
23    A.  Yes, correct.
24    Q.  And is that the research paper that you just
25  referred to in your answer?

Page 14

1    A. Yes, correct.
2    Q. All right. And you referred to a table that
3    would indicate that. Which table are you referring
4    to?
5    A. So you asked the distribution of age of
6    diagnosis of the victim in that case, and I referred
7    to this research paper as table 1 has the table of
8    diagnosis, age of diagnosis, which range from four
9    months to 13 years.
10   Q. And there are five different cases listed
11   there; is that right?
12   A. That's correct.
13   Q. And for four of the cases, the diagnosis was
14   between four months and 4.5 years, and the fifth case
15   was diagnosed at 13 years old; is that right?
16   A. That's -- that's what it -- what the table
17   reports and the best of my knowledge.
18   Q. This article refers to the plaintiffs'
19   experts as P1 and P2. Which one were you, P1 or P2?
20   A. I'm actually P3 --
21   Q. Okay.
22   A. -- as you can read the first line on page 17,
23   which said, "The plaintiff then contacted Dr.
24   Dominici (P3), a biostatistician."
25   Q. All right. Thank you.

Page 15

1    In the Kerr versus Aerojet General case, did
2    you conduct a statistical analysis?
3    MR. LATHAM: Objection.
4    Can you repeat the question, please?
5    Q. In the Kerr versus Aerojet General case, did
6    you personally conduct a statistical analysis?
7    MR. LATHAM: Objection.
8    A. No, I did not. My primary role was to review
9    the statistical analysis that was conducted by Shira
10   Kramer and April Zambelli-Weiner.
11   Q. Were those people that -- that's referring to
12   two other authors of the articles marked as Exhibit
13   2?
14   A. Correct.
15   Q. And were those people experts in the case or
16   people that worked with you as the expert in the
17   case?
18   A. No.
19   MR. LATHAM: Objection.
20   A. They were experts in the case.
21   Q. Were -- were they P1 and P2?
22   A. I believe so.
23   Q. All right. Now, in the -- summary at the
24   very first -- on the very first page, in italics, it
25   refers to "We first present the epidemiological

Page 16

1    analysis carried out by the plaintiffs' experts (Drs.
2    P1, P2, and P3)."
3    That's the very first page of the article.
4    Is that -- in the summary. Were you involved in
5    carrying out an epidemiologic analysis in the Kerr
6    versus Aerojet case?
7    MR. LATHAM: Objection.
8    A. How do you define -- it depends how you
9    yourself define an epidemiologic analysis.
10   Q. I'm just using it the way it was used in this
11   article.
12   A. Well, an epidemiologic analysis means a close
13   collaboration and intellectual input among experts.
14   So the answer is yes in terms of I collaborated with
15   them and conducted an epidemiological analysis and I
16   provide expert knowledge about the statistical
17   calculations they have conducted as part of the
18   epidemiologic analysis.
19   Q. Did -- and by "them," you're referring to
20   Drs. Kramer and Zambelli-Weiner?
21   A. Yes.
22   Q. Did you work with Drs. Kramer and Zambelli-
23   Weiner on the epidemiologic analysis in the Kerr
24   versus Aerojet General case before their reports were
25   issued?

Page 17

1    A. I'm thinking, because this was ten years ago.
2    No. They were -- they contacted me to come to review
3    what they have done so far.
4    Q. All right. But is that before it was turned
5    over to the defense or after?
6    A. I cannot remember that.
7    Q. Have you testified in any other cases besides
8    Kerr versus Aerojet?
9    A. I'm -- I -- no in terms of being deposed.
10   I've been provided -- let me think about it. I would
11   say no. No.
12   Q. Have you been deposed in any other cases?
13   A. No.
14   Q. Have you submitted expert reports in any
15   other cases?
16   A. Yes.
17   Q. How many?
18   A. So, actually, some are defined in my CV.
19   There is -- there are two testimonies in my CV here
20   on the Maryland State Committee on House Economic
21   Matters, and there is -- so you see there are list of
22   testimony on page 5 on my CV.
23   Q. Right.
24   A. And then I have done one recently pro bono,
25   which is not listed here, which was all last summer,

Page 18

1  which was providing a report to a case, which I can
2  provide more detail, about a plan to build a power
3  plant in a community outside Massachusetts, which now
4  I'm blocking the name, but I can provide that
5  information if necessary.
6      Q.  All right.  So the Maryland testimony you're
7  talking about, that was testimony before some
8  government committee?
9      A.  Correct.
10     Q.  Not in a lawsuit?
11     A.  No.
12     Q.  The case you talked about about the power
13  plant in Massachusetts, was that in a lawsuit?
14     A.  Yes.
15     Q.  And were you testifying in that case on
16  behalf of the plaintiffs or the defendant?
17     A.  On the plaintiff.
18     Q.  And was that people who didn't want the power
19  plant to be built?
20     A.  Correct.
21     Q.  Any other cases where you've given expert
22  reports or deposition or trial testimony besides what
23  we talked about?
24     A.  No.
25     Q.  You know that the defendant -- the United

Page 19

1  Technologies statistician expert is Dr. Laurentius
2  Marais?
3      A.  You ask me if I know him?
4      Q.  Do you know -- you know that he's the expert
5  for --
6      A.  Yes.
7      Q.  -- United Technologies?
8         Do you know him?
9      A.  No.
10     Q.  Is she a highly regarded statistician?
11        MR. LATHAM:  Object to form.
12     A.  Based on his -- can I see his -- can I see
13  his curriculum vitae?
14     Q.  I don't have it with me.
15     A.  So I looked -- based on my recollection, when
16  I looked at his curriculum vitae, he has not been in
17  academic world for a very long time.  I don't
18  consider him an expert.
19     Q.  Have you -- you know he works at Wecker &
20  Associates?
21     A.  No.  Who's Wecker & Associates?
22     Q.  The company he works with --
23     A.  Okay.
24     Q.  -- or that he's a partner of.
25        Have you ever had any contact with anyone at

Page 20

1  Wecker & Associates?
2      A.  Not that I can recall or -- no, I don't think
3  so.
4      Q.  What's your hourly rate in this case?
5      A.  $450.
6      Q.  How much time have you spent in this case to
7  date approximately?
8      A.  Approximately, I would say 25 to 30 hours.
9  Maybe more, maybe 40.  I don't remember.
10     Q.  What did you do to get ready for today's
11  deposition?
12     A.  For -- for today's deposition --
13     Q.  Yes.
14     A.  -- specifically?  I reviewed and read my two
15  reports that I submitted, one in December and one in
16  response to Marais.  I re-read some of the FDOH
17  analysis, the case control analysis.  I -- you know,
18  mostly I reviewed the literature and I reviewed
19  whatever was background material that led me to
20  prepare the two reports.
21     Q.  Did you meet with counsel for plaintiffs?
22     A.  Yes.  We met yesterday morning.
23     Q.  For how long?
24     A.  We met -- yesterday morning we met between
25  11:00 a.m. and 1:00 p.m., approximately.

Page 21

1         (Exhibit 3, defendant's amended
2          notice of taking videotaped deposition
3          duces tecum of Francesco Dominici,
4          marked.)
5      Q.  I'm handing you what I've marked as Dominici
6  Dep Exhibit 3.  That's an amended notice of
7  deposition for today's deposition, and there's a
8  reference in the exhibit to documents that were
9  requested.  And if you turn to page 4 through page 6,
10  there's 12 different document -- types of documents
11  requested.  Did you bring any of the documents with
12  you?
13     A.  Yes.  They're here.
14     Q.  All right.  One of them is your engagement
15  letter for this matter.  Do you have that with you?
16     A.  Is that what you're looking for?
17     Q.  Is it correct you were engaged on November
18  16th, 2017?
19     A.  Yeah.
20     Q.  Another thing that's asked for, number 9, is
21  the bills and billing invoices and receipts.  Do you
22  have that with you?
23     A.  Let's see.
24        MR. LATHAM:  If I could, just to
25     be helpful.

Page 22

```
1      MR. LEVINE: Sure.
2      MR. LATHAM: You'll notice your
3  top page, those numbers, those are
4  mentioned in the question.
5      THE WITNESS: Oh.
6      MR. LATHAM: Do you recall --
7      THE WITNESS: Oh, okay. Thank
8  you.
9      MR. LATHAM: Yeah.
10     MR. LEVINE: Maybe what I'll do
11 is --
12     THE WITNESS: Do you -- do you
13 want them one at a time?
14     MR. LEVINE: Why don't I do this:
15 During a break I'll take a look at
16 those, and so we don't have to waste
17 the time on the record doing that.
18     THE WITNESS: Okay.
19     MR. LATHAM: Thanks.
20     THE WITNESS: Thank you.
21     MR. LEVINE: So if you can just --
22     MR. LATHAM: Just put -- yeah.
23 Put it back.
24     MR. LEVINE: Keep them in order.
25     THE WITNESS: Keep it in -- oh,
```

Page 23

```
1  okay. Now I know why you were worried,
2  because --
3      MR. LATHAM: Yeah. When I saw you
4  tearing it apart, I was like you
5  remember those are in sequence?
6      THE WITNESS: Okay.
7      (Exhibit 4, initial expert report
8  of Francesco Dominici, PhD, marked.)
9  BY MR. LEVINE:
10  Q. I'm handing you what I've marked as Exhibit
11 4. Is Exhibit 4 the initial report that you --
12 expert report that you submitted in this case?
13  A. That's correct.
14     (Exhibit 5, rebuttal expert report
15 of Francesco Dominici, PhD, marked.)
16  Q. Now I'm handing you Exhibit 5. Is Exhibit 5
17 the rebuttal report that you submitted in this case?
18  A. Yes, that's correct.
19  Q. You mentioned that you'd spent 25 to 30,
20 maybe 40 hours in this case. How much time did you
21 spend before submitting the initial expert report on
22 December 22nd of last year?
23  A. You know, it was a few days and tried to get
24 myself as familiar as I could with the case and
25 reading the background literature and writing the
```

Page 24

```
1  report. I mean I can't remember exactly the number
2  of hours.
3      Q. Did anyone assist you in drafting either of
4  the expert reports?
5      A. Yes. I -- at the beginning, there are two
6  members, one is Rachel Nethery. She is a PhD
7  student -- she's a PhD, and it was after following my
8  team. She's a PhD in statistics. And the second
9  person was Michaela Jones who was just a college
10 student, but since then she's not been working on the
11 case.
12     Q. And Rachel Nethery?
13     A. Nethery, N-e-t-h-e-r-y.
14     Q. Is she a PhD -- she has a PhD in statistics?
15     A. She has a PhD in biostatistics, and she's
16 currently a postdoctoral fellow at Harvard in the
17 department of biostatistics.
18     Q. And the other person was?
19     A. Her name is Michaela Jones.
20     Q. We'll just say Ms. Jones.
21     A. Ms. Jones.
22     Q. Ms. Jones is an undergraduate?
23     A. Yes.
24     Q. At Harvard?
25     A. No.  No.  She was an undergrad -- she --
```

Page 25

```
1  sorry. She -- she graduated from Purdue University
2  with a BS, and she was just at the beginning
3  assisting me on some of the background material. But
4  she quickly found another job and didn't work on the
5  case anymore.
6      Q. What's IBS?
7      A. An undergraduate degree.
8      Q. Okay.
9      A. A bachelor.
10     Q. Oh, a bachelor of science.
11     A. A bachelor of science.
12     Q. Got it. And what -- what did Ms. Nethery do,
13 or Dr. Nethery, in connection with your expert
14 reports?
15     A. She -- she also reviewed the -- the material
16 and point me towards the most important reading to
17 do, while I discussed with her the key points of our
18 report, and she helped me draft it.
19     Q. For both of the expert reports?
20     A. Correct.
21     Q. There's a reference in some of the expert
22 reports to "we."  Who's the "we" being referred to?
23     A. Yeah.  That's a good question.  Sometimes --
24 what's happening is, it's definitely my own opinion,
25 it refer to I.  This is a little bit of my personal
```

Page 26

1  bias in terms that when we write scientific papers
2  and statistical literature, we always refer to a
3  "we." It's very unusual for someone in academia to
4  write things in terms of "I."
5      Q.  Yeah.  But sometimes -- there were times
6  where it wasn't just "we can see."  It was "we
7  believe," "we have the opinion."  In those cases, who
8  was the "we" you were referring to?
9      A.  It's -- the -- the opinion, and they are
10 stated in the reports, are just mine.
11     Q.  What rate did Ms. Nethery charge for her
12 work?
13     A.  Oh.  I believe -- I don't remember exactly.
14 I believe it was 150.  I might be wrong, though.
15     Q.  And did that get charged to the plaintiffs'
16 counsel?
17     A.  Correct.
18     Q.  Did you perform your own statistical analysis
19 on a cancer cluster in this case?
20         MR. LATHAM:  Object to form.
21     A.  No.
22     Q.  Did you perform independent SIR calculations
23 in this case?
24         MR. LATHAM:  Object to form.
25     A.  No.  However, Dr. Nethery reverse-engineered

Page 27

1  the mechanics that were used by Dr. Smith in
2  calculating the SIR.
3      Q.  All right.  Did -- but did you or Dr. Nethery
4  perform independent SIR calculations aside from what
5  Dr. Smith did?
6      A.  No.
7          MR. LATHAM:  Objection.
8      Q.  And what does SIR stand for?
9      A.  Standardized incidence ratio.
10     Q.  Did -- standardized incidence ratio; correct?
11     A.  Yeah.
12     Q.  Did you or Dr. Nethery perform an independent
13 assessment of P values in this case?
14         MR. LATHAM:  Object to form.
15     A.  No.
16     Q.  I want to look at your initial report,
17 Exhibit 4, and page 3.  And the very bottom under
18 "Critique of Dr. Smith Approach."
19     A.  I'm sorry.  I was looking at the wrong one.
20 Yes.
21     Q.  It says, "I have reviewed the reverse-
22 engineering technique employed by Smith to compute
23 Florida state incidences from the FDOH report (these
24 incidences are critical to his analysis), and I
25 believe these computations are reliable."

Page 28

1      Q.  What calculations are you referring to?
2      A.  So there is a standard way of calculating the
3  standardized incidence ratio that have been used
4  throughout the Smith -- you know, the different Smith
5  reports, and the mechanics are always the same.
6      Q.  So you're referring to the Smith -- Professor
7  Smith calculations of the SIRs?
8      A.  Yes.
9      Q.  Did you perform your own calculations of
10 SIRs, aside from what Dr. Smith did?
11     A.  No.  But it's -- it's not necessary to redo
12 the calculation if the calculation is always the same
13 and it's pretty standard.
14     Q.  Let's look at page 8 of the initial expert
15 report, whis is Exhibit 4.  And there's a header
16 there called "E.3 Critique."  Do you see that?
17     A.  Yeah.
18     Q.  And the first bullet, I want to look at the
19 last sentence of that first bullet.  You wrote, "The
20 right question to ask is whether in Acreage we detect
21 an unusually large number of cancer cases compared to
22 what would have -- would have occurred by chance
23 (absent exposure), with a high level of certainty."
24     Can you say whether any particular individual
25 who got brain cancer living in The Acreage area got

Page 29

1  it due to exposure to a contaminant or by chance?
2          MR. LATHAM:  Object to form.
3      A.  That is not a question that can be
4  addressed -- well, let me -- let me just say that --
5  I'm sorry.  What -- what are you asking again?
6      Q.  Can you --
7      A.  Uh-huh.
8      Q.  -- as a statistician, say whether a
9  particular individual living in The Acreage who got
10 brain cancer got it due to exposure or got it by
11 chance?
12         MR. LATHAM:  Object to form.
13     A.  As a statistician, I have the expertise and
14 the knowledge to look at extensive amount of data
15 that is in front of me to try to address the
16 question, as I stated in my report, whether or not
17 there is an unusually large number of cancer cases
18 compared to what would have occurred by chance.
19     Q.  But can you say whether a particular
20 individual got brain cancer due to exposure to a
21 contaminant or by chance?
22         MR. LATHAM:  Object to form.
23     A.  I cannot address that question with absolute
24 certainty, but I could provide -- I could provide
25 qualified statements about strength of evidence

Page 30

1  toward a causal relationship between exposure to a
2  contaminant and incidence of brain tumor.
3      Q. Let me do it this way: You've reviewed the
4  Florida Department of Health report?
5      A. Uh-huh.
6      Q. You have to answer audibly. Remember that
7  rule?
8      A. Sorry. Yes.
9      Q. And that's sometimes called the FDOH report?
10     A. Yeah.
11     Q. I'm going to hand -- and there was actually
12  an initial report in 2009 and then a follow-up in
13  2010; correct?
14     A. Correct.
15         (Exhibit 6, August 2009 report
16         entitled "Acreage Cancer Review, Palm
17         Beach County," marked.)
18     Q. I'm going to hand you what I've marked as
19  Exhibit 6. Exhibit 6 is -- is that the August 2009
20  FDOH report?
21     A. Yes.
22     Q. And I want you to turn to page 11, and the
23  last paragraph, it says, "In assessing whether The
24  Acreage is experiencing an increase in cancer,
25  Standardized Incidence Ratios were used. This

Page 31

1  involves comparing the observed number of cancer --
2  cancer cases to a number that would be expected if
3  the community were experiencing the same rate of
4  cancer as a larger comparison area (in this case,
5  Palm Beach County or the state of Florida)."
6         Do you agree that that properly characterizes
7  what a standard incidence ratio is, as used here?
8      A. There are different definitions in the
9  statistical literature about standardized incidence
10  ratio. I would consider these definitions not
11  particularly accurate.
12     Q. Okay. And what is a standardized incidence
13  ratio?
14     A. A standardized incidence ratio compares --
15  and it's a ratio between the observed number of cases
16  that have been recorded in a particular community and
17  the expected number of cases that would be expected
18  to see if that community was not experiencing the
19  same risk factor as the community for which the
20  number of cases were --
21     Q. Looking -- I'm sorry.
22     A. -- observed. And the statistical literature,
23  both several textbooks and peer-reviewed
24  publications, calculate the expected number of cases
25  in many different ways.

Page 32

1      Q. And so in shorthand, the statistical
2  incidence ratio is a ratio of the observed cases to
3  the expected number of cases?
4      A. That's correct. But what is important here
5  is how the expected number of cases is defined. In
6  this report, it's defined in a particular way. It
7  could be defined in many different ways.
8      Q. Okay. Let's look at page 27 of the FDOH
9  report marked as Exhibit 6.
10     A. You said twenty --
11     Q. Page 27.
12     A. 27, yeah.
13     Q. And let's look -- there are a number of
14  tables here.
15     A. Yeah.
16     Q. Let's look at table 4. Table 4 is the FDOH
17  reports SIRs for pediatric residents in The Acreage
18  by gender for the years 2000 to 2007; correct?
19     A. That's what the table said.
20     Q. And then it divides it up by male and female?
21     A. Yeah. Stratified by male and female.
22     Q. So for males it shows that there was one
23  observed case of brain cancer for pediatric male
24  patients during that time frame; is that right?
25     A. Yes. So there are two rows that said just

Page 33

1  one, "Brain & other CNS cancers" and "Brain only"; is
2  that the two rows you're reading?
3      Q. Yes. I'm focusing on the "Brain cancers
4  only" line.
5      A. Okay.
6      Q. So one case was observed in The Acreage
7  between 2000 and 2007 for male pediatric residents?
8      A. Yeah.
9      Q. And this -- the FDOH report shows 1.5 or 1.4
10  cases expected depending on whether you're looking at
11  Palm Beach County as a whole or Florida as a whole;
12  is that right?
13     A. They -- this -- this table in particular does
14  not -- oh, okay. I'm sorry. Yes. Based on the
15  caption it said on the table, I believe the expected
16  number of cases was 1.5 if it's compared to Palm
17  Beach County and is 1.4 if it's compared to Florida.
18     Q. Was the one male pediatric brain cancer in
19  The Acreage between the years 2000 and 2007 that of
20  Joseph Baratta?
21     A. There is not that information in this table.
22  I could not possibly know.
23     Q. And are you aware that Mr. Wenderoth was
24  diagnosed with brain cancer in 2016, so he'd be
25  outside this time period?

Page 34

1    A. This is information that I have not reviewed.
2    Q. Okay. Let's look at the female brain cancer
3  part of the table.
4    A. Yeah.
5    Q. For female pediatric brain cancers, the
6  Florida Department of Health table shows five
7  observed cases in The Acreage between 2000 and 2007;
8  correct?
9    A. That's what the table said.
10    Q. And the FDOH table shows 1.2 brain cancers
11  for female pediatric residents expected in Palm Beach
12  County and 1.1 expected in Florida; right?
13    A. That's what the table --
14    Q. Was the one --
15    A. -- said.
16    Q. Was one of the female brain cancers in
17  Acreage among pediatric residents that of Ms.
18  Santiago?
19    A. My understanding is that these calculations
20  that were conducted by the FDOH used the diagnosed
21  cases in the age range group that are reported in the
22  table.
23    Q. Okay. And I just want to know if you know --
24  let me -- let me rephrase it.
25       Do you know whether Ms. Santiago was one of

Page 35

1  the female pediatric residents with brain cancer who
2  was diagnosed in the 2000-to-2007 time frame?
3       MR. LATHAM: Objection.
4    A. Based on the material that I've reviewed,
5  that's my recollection that she was one of the
6  victims.
7    Q. And do you have an expert opinion on whether
8  Ms. Santiago in particular was one of the expected
9  female pediatric brain cancers or one of the observed
10  cancers that wasn't expected?
11       MR. LATHAM: Object to form.
12    A. So they -- when -- can I review, and can I
13  have more information about when the diagnosis of
14  this victim Santiago was -- you -- probably you said.
15  When -- when this case was diagnosed?
16    Q. I'd have to look it up. But do -- have
17  you -- do you have an opinion on whether Ms. Santiago
18  was one of the expected ones or one of the observed
19  ones --
20       MR. LATHAM: Object to form.
21       Sorry.
22    Q. -- as a statistician, or is that something
23  where you defer to others, other experts?
24       MR. LATHAM: Object to form.
25    A. So if -- if -- as a statistician, if it is

Page 36

1  reported to me through accurate diagnosis that she
2  was diagnosed into the community -- in The Acreage
3  community, and if she's younger than 19 years old and
4  she's -- if she's a resident of Acreage, and if she's
5  been diagnosed during the period 2000-2007, she would
6  be one of the observed cases.
7    Q. Okay. And the question I have is: Can you
8  state with reasonable certainty whether Ms.
9  Santiago's cancer was one of the expected cases or
10  not?
11       MR. LATHAM: Object to form.
12    A. It highly depends. It completely depends on
13  how the FDOH calculated expected number of cases and
14  where the number of incidence for the compared
15  community's coming from.
16    Q. Did -- and do you have an opinion on that?
17       MR. LATHAM: Object to form.
18    A. So in -- in the report, I believe that -- I
19  think -- I need to review in the report the details,
20  and I'm happy to take the time, where in the report
21  they detailed how the incidents, the expected number
22  of cases, were calculated.
23    Q. Let me do this: Let's go to the last page of
24  your rebuttal report marked as Exhibit 5. It doesn't
25  have page numbers on it. If you count, it's page 12.

Page 37

1    A. Sorry about that.
2    Q. But it's the last page before the references.
3    A. Okay. Okay.
4    Q. And you write in the second sentence, "A
5  causal claim can only reasonably be made when a
6  combination of biological, toxicological,
7  epidemiologic, and statistical evidence support the
8  claim."
9       Do you see that?
10    A. Yeah.
11    Q. Can statistical analysis alone -- so
12  statistical analysis alone can show a statistically
13  significant excess of cancer over what's expected;
14  correct?
15       MR. LATHAM: Object to form.
16    A. I agree.
17    Q. But statistical analysis alone can't show
18  specific causation for a particular individual such
19  as Ms. Santiago; correct?
20       MR. LATHAM: Object to form.
21    A. It depends. It depends on the amount of data
22  and the amount of information that is available.
23    Q. Right. Well, we have information in here
24  that you've reviewed. Based on the information that
25  you've reviewed, can you, as a statistician, alone

Page 38

1  give an opinion about the specific causation of the
2  brain cancer that Ms. Santiago got?
3          MR. LATHAM: Object to form.
4      A. There is -- my understanding is based on the
5  information that I have reviewed in the context of
6  Ms. Santiago there were being additional testing that
7  were done on her spinal cord where there were
8  elevated levels, I believe, of thorium. So I -- as a
9  statistician, we gather all of the knowledge that we
10  have and provide the weight of the evidence of
11  whether or not a causal relationship might occur.
12      Q. Okay. Well, you're not an expert in thorium;
13  right?
14          MR. LATHAM: Object to form.
15      A. I'm not. But I have the evidence.
16      Q. Okay. And you're not an expert -- and the
17  evidence you're talking about is what other experts
18  have said; right?
19      A. What the -- the information that was provided
20  to me.
21      Q. Right. You're a statistician?
22      A. That's correct.
23      Q. And you're not an expert in elevated levels
24  of radionuclides in different tissue in the body;
25  correct?

Page 39

1          MR. LATHAM: Object to form.
2      A. Well, I've been provided information that --
3  that levels of contaminant, of radioactive
4  contaminant, was, I believe, 16 times higher. So
5  I -- I -- as a statistician, I take the evidence that
6  has been given to me, and I am assuming that
7  information is correct.
8      Q. What if the information's not correct? Does
9  that affect your analysis or opinion?
10          MR. LATHAM: Object to form.
11      A. Yes.
12      Q. In other words, if the information that you
13  relied upon that came from plaintiffs' experts in
14  this case is wrong, does that affect your opinion as
15  a statistician in this case?
16      A. Yes.
17          MR. LATHAM: Object to form.
18      Q. Does -- and what I'm asking is: Independent
19  or separate from what other experts have said, do you
20  have a statistical opinion about whether Ms. Santiago
21  in particular, as opposed to people expected over --
22  observed more generally, had her cancer caused by a
23  radionuclide from United Technologies?
24          MR. LATHAM: Objection.
25      A. Well, I believe that we are entering into a

Page 40

1  territory of disagreement of what statistical opinion
2  is and what data is and what information is. I
3  consider myself, above and beyond of a statistical
4  expert, an expert that analyzes and takes all of the
5  information that is provided to me. I consider
6  myself an expert that conditional to the information
7  that is provided to me and conditional to trust the
8  information that is provided to me is accurate, what
9  is the weight of evidence of a potential causal
10  relationship of hazard on increase of health also in
11  the context of personalized, you know, making
12  statement about individualized case.
13      Q. You talk about a potential causal
14  relationship. Can you testify that there was an
15  actual causal relationship between Pratt & Whitney
16  and the cancer that Ms. Santiago got?
17          MR. LATHAM: Objection.
18      A. It's all in terms of the distinction between
19  a potential causal relationship and an actual causal
20  relationship. An actual causal relationship is -- so
21  I think, going back, I'm asking the question back to
22  clarify what's the distinction between actual and
23  potential.
24      Q. Well, you talked about potential causal
25  relationship. What did you mean by that?

Page 41

1      A. I mean that there is a possibility.
2      Q. Okay. And can you testify that there's more
3  than just a possibility of a causal relationship
4  for -- between Pratt & Whitney and Ms. Santiago
5  getting cancer, but that with reasonable certainty,
6  Pratt & Whitney caused Ms. Santiago's cancer?
7          MR. LATHAM: Objection.
8      A. I haven't quantified the reasonable
9  certainty. I am simply stating that considering the
10  body of the evidence and the information that's been
11  provided to me, there is a reason to believe that
12  that could be a causal relationship.
13      Q. But you can't say anything more than that?
14      A. At this particular time --
15          MR. LATHAM: Object to form.
16      A. -- I -- no.
17      Q. And do you have any opinion on a causal
18  relationship at all for Mr. Baratta or Mr. Wenderoth?
19          MR. LATHAM: Objection.
20      A. No.
21      Q. I want to look again at your rebuttal
22  report. Page 5. You have to count. Sorry.
23      A. It's my fault. Page 5. One, two, three,
24  four, five.
25      Q. And at the very top there's a number 2 there.

Page 42

1   A. Uh-huh.

2   Q. You write, "Dr. Perry confirmed in his report

3   that of the seven Acreage pediatric brain tumors that

4   he has reviewed, each of the tumor types are

5   associated with radiation exposure."

6      Dr. Perry did not say those particular tumors

7   were caused by radiation; correct?

8      MR. LATHAM: Object to form.

9   A. I guess we'll need to review Dr. Perry's

10  report and see exactly what he said. I don't recall.

11  Q. Okay. Let's look at the FDOH report that we

12  had out --

13  A. Sure.

14  Q. -- a second ago, Exhibit 6, and turn there to

15  page 9, please. Give me a second. I need to find

16  the right place.

17  A. Sure.

18  Q. (Pause.) Okay. If you look in the second

19  paragraph under the header "Brain Cancer

20  Epidemiology."

21  A. Uh-huh.

22  Q. Are you with me?

23  A. Yeah, yes.

24  Q. And about two-thirds of the way down there is

25  a sentence that starts, "One issue." Do you see

Page 43

1   that?

2   A. Yes.

3   Q. And the FDOH wrote, "One issue that limits

4   studies on adult or childhood brain cancer is the

5   rarity of brain cancers and the variety of types of

6   brain cancers that comprise this diagnosis."

7      Based on your work with brain cancers over

8   the years, do you agree with that?

9      MR. LATHAM: Objection.

10  A. "The majority of brain cancers remain of

11  unknown cause."

12  Q. Well, I didn't get there yet. I'm going to

13  get there in a second.

14  A. Okay.

15  Q. Well, let me -- let me just get there right

16  now. We'll --

17  A. Okay.

18  Q. The next line reads, "The majority of brain

19  cancers remain of unknown cause," and there are a

20  number of studies that list -- that are listed.

21     Do you have any basis to disagree with that

22  statement?

23     MR. LATHAM: Objection.

24  A. I would not -- I would not disagree with

25  these statements, but I would also not embrace them

Page 44

1   fully. There are other articles and there is

2   extensive literature that do list causes of brain

3   cancer, especially in children, that could be due to

4   radiation exposure and different type of exposure too

5   to other type of city, skin, and treatments, so.

6      Q. Well, you're talking about studies like the

7   Rond (phon sp) study of Israeli patients; correct?

8      A. I'm talking about a very extensive literature

9   review on potential risk factors for brain cancer,

10  specifically in -- in children. And I can provide a

11  more recent literature review on the topic, which I

12  was actually reading about this morning, was dated in

13  2016. I'm more than happy to provide that for the

14  record.

15     Q. Do you know what the dosage was in those

16  studies?

17     MR. LATHAM: Objection.

18  Q. The radiation dosage.

19  A. No.

20  Q. Are you aware of any literature discussing

21  the impact of ionizing radiation in soil or water as

22  opposed to brain cancer treatment or radiation?

23     MR. LATHAM: Objection.

24  A. Could you -- can you repeat the question,

25  please?

Page 45

1   Q. There are studies talking about if you use

2   radiation on children's brains, that could actually

3   cause cancer; right?

4   A. Right.

5      MR. LATHAM: Objection.

6   A. That's correct.

7   Q. Are you aware of any literature discussing

8   the impact of low-level ionizing radiation in soil or

9   water on brain cancer in children?

10  A. I can not --

11     MR. LATHAM: Objection.

12  A. I could not possibly be knowledgeable about

13  all of the literature that is out there.

14  Q. You mentioned -- we talked about Dr. Perry

15  earlier. Did you read Dr. Perry's testimony,

16  including his cross-examination, in the class

17  certification hearing in this case?

18  A. No.

19  Q. And if Dr. Perry testified that the majority

20  of brain cancers are an unknown cause, or idiopathic,

21  would you disagree with that?

22     MR. LATHAM: Objection.

23  A. This is -- this is -- I don't have enough

24  context to say whether or not I will disagree. It

25  has to be in the context of what type of cancer and

Page 46

1   who is -- I can't respond to that.
2       Q.  What expertise did Dr. Perry have that led
3   you to rely on his opinion and refer to that in your
4   reports?
5           MR. LATHAM:  Objection.
6       A.  I have -- it is not my role in writing this
7   report and in my opinion to check the qualification
8   of the other experts.  I rely on the information they
9   provide on being accurate.
10      Q.  Do you know what Dr. Perry's expertise is in?
11          MR. LATHAM:  Objection.
12      A.  No.
13      Q.  If you look at page 15 of the FDOH report,
14  there's a header called "Type of Brain Cancers."  Do
15  you see that?
16      A.  Yes.
17      Q.  And it says there that "Brain cancers are a
18  diverse group of tumors with numerous tumor types."
19      You agree with that; right?
20          MR. LATHAM:  Objection.
21      A.  Yes.
22      Q.  And then it says the "Different types of
23  cancers have different risk factors."
24      You agree with that; right?
25          MR. LATHAM:  Objection.

Page 47

1       A.  Not necessarily.
2       Q.  Do you -- and then it says, the FDOH says,
3   "In other words, it is unlikely different types of
4   brain cancers share the same cause."
5       You see that?
6       A.  Yes.
7       Q.  Did you take that into account in putting
8   together your expert reports?
9           MR. LATHAM:  Objection.
10      A.  I don't consider the F -- the FDOH report --
11  so -- I'm sorry.  To address your -- your question, I
12  am not embracing the sentence nor agree with the
13  sentence.  It is highly -- it is unlikely different
14  types of brain cancers share the same cause.  Again,
15  it's -- this is a sentence in this report that
16  doesn't have any peer-reviewed reference and doesn't
17  refer to which cause they're talking about.
18      Q.  Do you have an expert opinion on the causes
19  of different types of brain cancer?
20          MR. LATHAM:  Objection.
21      A.  On causes of different types of brain cancer,
22  I think I have familiarity with the issue, and as I
23  said at the beginning, I would not considering myself
24  an expert.
25      Q.  Are there different types -- are there

Page 48

1   different causes of different types of brain cancer?
2           MR. LATHAM:  Objection.
3       A.  I don't think that has been fully established
4   in the scientific literature.
5       Q.  Okay.  Let's look at your initial expert
6   report, page 2, please.  And there is a header there
7   called "Overview," and then there's a mini header
8   underneath that called "Summary."  Are you with me?
9       A.  Correct.
10      Q.  And the last four lines of the summary, you
11  write, "There is extensive evidence: (i) that UTC's
12  industrial activities in the vicinity of The Acreage
13  have contaminated the soil and water within The
14  Acreage and (ii) that exposure to UTC-sourced
15  environmental contaminants, including radioactive
16  materials, has been the cause of cancer cases,
17  particularly brain and CNS tumors, diagnosed in The
18  Acreage since the 2000s"; correct?
19      A.  Uh-huh.
20      Q.  Now, do you yourself have an expert opinion
21  on soil contamination by UTC's industrial activities?
22          MR. LATHAM:  Objection.
23      Q.  Or are you relying on others?
24      A.  As I said at -- before, to provide the weight
25  of evidence and to make statements about causes, a

Page 49

1   statistician, and actually what I consider myself, a
2   data scientist, needs to rely on the information
3   that's provided to him or her.  So it's not necessary
4   for me to be an expert on contaminated soil.  I need
5   to rely on the information that is provided to me,
6   combine the information, and express an opinion that
7   is justified based on the information provided to me.
8       Q.  Okay.  Is the reference to UTC's industrial
9   activities contaminating the soil and water within
10  The Acreage a statement that you made based on your
11  reliance on testimony of other experts?
12          MR. LATHAM:  Objection.
13      A.  Yes.
14      Q.  And is the statement that you made that
15  exposure to UTC-sourced alleged contaminants being
16  the cause of cancer cases in The Acreage something
17  that's based on the testimony of other plaintiffs'
18  experts?
19          MR. LATHAM:  Objection.
20      A.  Yes.
21      Q.  Do -- and did you review the expert reports
22  of other plaintiffs' experts?
23      A.  No.
24      Q.  How do you know what the other plaintiffs'
25  experts have said if you didn't review the reports?

Page 50

1    A.  Well, this was -- was information that was
2  summarized by Darren to me.
3    Q.  By plaintiffs' counsel?
4    A.  Yeah.
5    Q.  Have you reviewed the deposition testimony of
6  any of plaintiffs' experts?
7    A.  Dr. Marais.
8    Q.  Okay.  Dr. --
9    A.  Sorry.  Plaintiff.  Okay.  No.
10    Q.  All right.  So let me -- let me repeat it
11  again so I --
12    A.  Yes, thank you.
13    Q.  -- get a clean question and answer.
14       Have you reviewed the deposition testimony of
15  any of plaintiffs' experts that you refer to in your
16  report?
17    A.  No.
18    Q.  All right.  And I'll be particular.  Have you
19  reviewed -- let me ask this way:  Have you reviewed
20  the report or deposition testimony of Dr. Sawyer?
21    A.  No.
22    Q.  Have you reviewed the report or deposition
23  testimony of Dr. Franke?
24    A.  No.
25    Q.  Have you reviewed the report or deposition

Page 51

1  testimony of Dr. Moore?
2    A.  No.  However, I was provided -- I was
3  provided some written material that Brian Moore
4  submitted as the -- the information regarding the
5  soil transport from UTC to the facility and the
6  dumping of the soil.
7    Q.  What -- what information is that you
8  reviewed?
9    A.  It was information that was provided to me
10  by -- by the plaintiffs' counsel, and I believe it
11  was the information due to the fact that during --
12    Q.  I'm just trying to ask:  Is it, was it an
13  expert report?  Was it a memo?
14    A.  Oh.  Was -- was --
15    Q.  What was the form of it?
16    A.  Was -- was just text.  It was text that was
17  provided to me by the plaintiffs' --
18    Q.  Okay.
19    A.  -- counsel, yeah.
20    Q.  And have you reviewed the expert report or
21  deposition of Dr. Kaltofen?
22    A.  No.  I just was provided some of the
23  expert -- some of the exert of --
24    Q.  Excerpts?
25    A.  -- excerpts where, as I mentioned to my

Page 52

1  report, where there was evidence of, I think in my
2  report on page -- somewhere in my report I do mention
3  that Dr. Kaltofen found elevated level of thorium
4  into the spinal cord sample of I think Santiago.
5    Q.  And that's based on what plaintiffs' counsel
6  told you; right?
7    A.  That's correct.
8       MR. LATHAM:  Objection.
9    Q.  And did you review the expert reports or
10  testimony of Dr. Perry?
11    A.  No.
12    Q.  So for all of plaintiffs' experts, instead
13  of -- you didn't look at their actual reports or
14  testimony; you looked at information that you
15  received from plaintiffs' counsel; correct?
16    A.  That's correct.
17       MR. LATHAM:  Objection.
18    Q.  Did you review the responsive reports to
19  those experts by any of Pratt & Whitney's experts?
20    A.  No.
21       MR. LATHAM:  Objection.
22    Q.  Have you reviewed the report of Dr. Frazier?
23    A.  No.
24    Q.  Do you -- do you even know who he is?
25    A.  No.

Page 53

1    Q.  Have you reviewed the report of Dr. Mitchell?
2    A.  No.
3    Q.  Do you even know who he is?
4    A.  No.
5    Q.  Do you think a neuro-oncologist who -- a
6  practicing physician who's written numerous articles
7  about brain cancer would be knowledgeable about brain
8  cancer?
9       MR. LATHAM:  Objection.
10    Q.  Right?
11    A.  I don't know who he is.
12    Q.  Right.  But would you generally expect a
13  neuro-oncologist who treats brain cancer patients and
14  operates on brain cancer patients to be knowledgeable
15  about brain cancer?
16    A.  Yes.
17    Q.  You'd certainly hope so before you went in
18  for surgery, I assume, but we can skip that.
19       Do you know who Dr. Borch is?  B-o-r-c-h.
20       MR. LATHAM:  Objection.
21    A.  No.
22    Q.  So you didn't -- you didn't look at what
23  plaintiffs' experts said on a topic and then look at
24  what defendant's experts said and try to come up with
25  your own view of who was right or wrong; correct?

Page 54

1       MR. LATHAM: Objection.
2       A. No, I would not say so. I had two roles. My
3   primary role was to look at the statistical analysis
4   that was conducted by Dr. Smith, and I needed to rely
5   on additional information provided by the plaintiff
6   about the major criticism that Dr. Marais provided on
7   that analysis, on the multiple comparison problem.
8   And so I have asked additional information about the
9   case that will justify whether or not the multiple
10  comparison adjustment was adequate.
11      It wasn't in my role -- this is a case, in my
12  understanding, has been going on for seven years, and
13  I've been involved for only a few months. So I think
14  that the way you are -- you are describing my
15  involvement, it's not accurate.
16      Q. All right. I'm actually trying to find out
17  what you did and didn't do. So let me ask it again
18  in this way: Am I right that you didn't look at
19  plaintiffs' expert's reports, compare them to
20  defendant's expert reports, and then come up with a
21  determination of who's right and wrong. That's
22  not --
23      MR. LATHAM: Objection.
24      Q. -- what you did; right?
25      MR. LATHAM: Objection.

Page 55

1       A. I -- I've -- my main role was to look at both
2   sides in terms of the statistical analysis, because
3   that is my major area of expertise, and the two sides
4   are Richard Smith and Marais and the FDOH report and
5   the case-control study.
6       In my report, as you see on page 1, on my
7   December 22 report, I did say in preparing this
8   report, I have reviewed the Acreage cancer review,
9   the Acreage SIR calculation, which -- of
10  population estimate methods and results.
11      (Discussion off the record.)
12      A. In my -- if we refer to the report that I
13  provided on December 22, in the first page of my
14  report, and I'm reading what I said, "In preparing
15  this report, I have reviewed The Acreage Cancer
16  Review, Palm Beach -- Palm Beach County, which is
17  called the FDOH Level I; The Acreage SIR
18  Recalculation Population Estimate Methods and Results
19  from the Florida Department of Health, 2010; The
20  Acreage Community Case-Control Data Analysis, which
21  is also called the FDOH Level II; The Acreage
22  Drinking Water & Soil Sampling, February, March, and
23  April 2010, from the Florida Department of
24  Environmental Projection in August 2010; and the
25  reports previously filed by the plaintiffs, including

Page 56

1   two statistical analysis reports by statistical
2   expert Richard Smith (August 8, 2016, December 23rd,
3   2016) and Dr. Smith's Affidavit of December 2017."
4       Q. Okay. So what -- I want to go back to
5   something you said a couple minutes ago. You said
6   that you needed to rely on additional information
7   provided by the plaintiff about the major criticism
8   that Dr. Marais provided on the multiple comparison
9   problem. What -- why did you need to rely on
10  additional information to respond to Dr. Marais?
11      A. Dr. Marais made -- one of the major
12  criticisms that Dr. Marais made of the statistical
13  analysis, of the calculation of the standardized
14  incidence ratio, was that it was affected by the
15  multiple comparison problem. And he purposely
16  identified this, what is called the Texas
17  sharpshooter phenomenon, which is that the
18  geographical boundaries and the time period and the
19  cases were purposely selected after the fact to
20  indicate there was -- you know, to purposely indicate
21  there was statistically significant evidence of a
22  nexus of cases with respect to -- the observed cases
23  with respect to the expected.
24      And my role, in reply to this criticism, what
25  he made several assumptions, and the only way that

Page 57

1   his statements could hold, I would say, the
2   credibility of a statistician would be that many of
3   the strong assumptions that he made were considered
4   valid.
5       One of the strong assumptions that he made in
6   making that statement of multiple comparison is that
7   you could consider that you could take the entire
8   state of Florida and chop it into many, many
9   communities that have the same population size of
10  Acreage, and there would be absolutely no difference
11  between the different communities; all of these
12  communities were exactly the same and exactly
13  exchangeable. He would assume that individuals
14  living in the community and their experience would be
15  considered absolutely independent from each other.
16  He made an assumption that is embraced in the
17  frequencies part of it, where what has occurred in
18  Acreage could be casted as an occurrence of an
19  experiment that could have been occurred under the
20  exact same circumstances million and million of
21  times, and this is an assumption that he must rely to
22  calculate the P value. He made an assumption of
23  absolutely not existence of correlation of data
24  between the units. He made -- he made several
25  assumptions.

Page 58

1     And to assess whether or not his arguments
2  were adequate was absolutely necessary for me to get
3  a sense, and not to be an expert, of whether or not
4  some of his assumptions were valid. So I rely on the
5  expert of my plaintiffs' counsel to get additional
6  information on UTC, on the characteristics of UTC, of
7  what type of material UTC was managing, of whether or
8  not there were potential -- the potential of a source
9  of contamination, what the cases, and every
10 additional information that was conducted that would
11 make me to believe that Acreage -- the assumption The
12 Acreage was absolutely a community that is absolutely
13 identical to any other community to consider a
14 comparison was an adequate hypothesis --
15    Q.  And the information --
16    A.  -- and assumption.
17    Q.  Sorry.  And the information that you received
18 on UTC and contamination and radiation all came from
19 plaintiffs' counsel; correct?
20        MR. LATHAM:  Objection.
21    A.  From plaintiffs' counsel, and also from what
22 I read.  You know, I -- I did a Google search, and I
23 read what was, you know, in the literature, in the
24 news especially.
25    Q.  Right.  But you didn't actually look at the

Page 59

1  expert reports of plaintiffs' experts; correct?
2        MR. LATHAM:  Objection.
3     A.  Yeah.  That's -- that's correct.  But I also
4  wanted to emphasize that my role was not to assess
5  whether or not these experts and whether or not what
6  they were saying was true or not.  It was just to
7  have enough information to make me to believe there
8  was something different about The Acreage community
9  compared to any other community that could be
10 considered random.
11    Q.  And you didn't look at the defendant's
12 expert's reports at all; correct?
13    A.  That's correct.
14        MR. LATHAM:  Objection.
15    Q.  Can you look at the rebuttal report, please,
16 Exhibit 5.  I want you to turn to page 3.
17    A.  Rebuttal report, page 3, yeah.
18    Q.  Very first line, you refer to "The quality
19 and the amount of evidence that's been provided by
20 the plaintiff regarding" a number of topics.
21        Do you see that?
22    A.  Uh-huh.
23    Q.  You have to answer audibly.
24    A.  Sorry.  Yes.
25    Q.  And the qual -- and you're referring there to

Page 60

1  information provided to you by plaintiffs' lawyers;
2  right?
3     A.  Where are you --
4        MR. LATHAM:  Objection.
5     A.  Where are you reading?
6     Q.  The very beginning of page 3 of your rebuttal
7  report.  You refer to "The quality and the" --
8     A.  Oh.
9     Q.  -- "amount of evidence that has been provided
10 by the plaintiff regarding the reckless handling of
11 these radioactive and other toxic materials by UTC
12 and their migration outside the UTC facility," et
13 cetera.
14        Do you see that?
15    A.  Yes.
16    Q.  And all I want -- all I'm asking is whether
17 your statement about the quality and amount of
18 evidence that's been provided is based on what you
19 were told by plaintiffs' counsel in this case.
20        MR. LATHAM:  Objection.
21    A.  Yes.
22    Q.  Okay.  If you look at -- well, let me ask
23 this, and I'm going to ask about some specific
24 issues.  For any issues about whether contamination
25 or contaminated material was trucked from the UTC

Page 61

1  plant to Acreage, that's something that is based on
2  what plaintiffs' counsel told you; correct?
3        MR. LATHAM:  Objection.
4     A.  The reason this line of questioning that it's
5  beyond of what I was trying to do in this report, and
6  I want to restate it again.  The -- my role was to
7  assess the reliability and the adequacy of the
8  calculation be -- into the -- the state -- the
9  standardized incidence ratio.
10        One of the major criticisms was the multiple
11 comparison problem.  And the multiple comparison
12 problem arises in a context where there is absolutely
13 no information whatsoever about The Acreage that
14 could be differentiated by any other community.
15        So what I, in my role, is to have enough
16 information, I'm not making a statement about
17 anything specifically, so I have enough information
18 that will characterize this community as being
19 potentially exposed to a source of contamination.
20    Q.  You mentioned the multiple comparisons
21 problem.  Can you explain what that is -- in a
22 general sense?
23        MR. LATHAM:  Objection.
24    A.  Yeah.  Is -- it's basically making --
25 whenever there is a -- so it's -- some -- it could --

Page 62

1  it could be characterized in multiple ways.  But the
2  multiple comparison problem can be described as if
3  there are multiple tests that are conducted, multiple
4  statistical tests that are conducted on the same
5  data, even if the null hypothesis is true, in this
6  context, so there will be no elevation of an observed
7  number of cases with respect to the expected, you
8  might expect to see some false positives, just
9  because of the randomness and the number of tests
10  that you will be conducting.
11     Q.  And what's the Texas sharpshooter problem?
12     A.  So it's often is -- it's a phenomenon that is
13  brought by deniers of cancer cluster evidence, and
14  it's called a Texas sharpshooter because what they
15  argue is that it's after the number of cases have
16  been observed and where they've been observed and the
17  timing, there is a post hoc selection of the
18  geographical boundaries and the timing so that it's
19  purposely emphasize the largest possible differences
20  between the observed and the expected.
21     Q.  Is there a difference between the multiple
22  comparisons problem and the Texas sharpshooter
23  problem, or are they two names for the same thing?
24     A.  No.  There is a difference.  I think I would
25  consider the Texas -- I mean there are subtle

Page 63

1  differences, and depends, you know, again, in the
2  context.  I think they are both try to raise the
3  issues of false positive.  And because in the Texas
4  sharpshooting, by doing the selection of these
5  geographical areas purposely around where the cases
6  are occur, you tend to, you know, emphasize that
7  there is a statistical significance of observed
8  number of cases with respect to compared to the
9  expected, where actually there's not.
10     Q.  And if you don't take into consideration the
11  multiple comparisons problem, can you have the
12  potential of reporting apparently statistically
13  significant results that don't represent actual
14  outliers?
15        MR. LATHAM:  Objection.
16     A.  It highly depends on the context of whether
17  or not the multiple comparison problem might exist.
18  And it's based on the assumption that you are making.
19     Q.  Do you need to take into account the
20  possibility of the multiple comparisons problem to
21  know if you have a statistically valid finding?
22     A.  Not always.
23     Q.  How about in this case is it fair to consider
24  whether there's a multiple comparisons problem?
25        MR. LATHAM:  Objection.

Page 64

1     A.  I think that to a certain extent, I will
2  consider there will be -- it will be reasonable to
3  conduct sensitivity analysis to see as whether or not
4  the strength of the evidence persists based on
5  different statistical assumptions.  I would not
6  consider it reasonable to apply and think that there
7  is a multiple comparison problem to the extent that
8  has been brought up by Marais.
9     Q.  Did you conduct the sensitivity analysis in
10  this case?
11     A.  I didn't need to personally conduct a
12  sensitivity analysis because, as I said, the
13  sensitivity analyses were conducted by Dr. Smith with
14  respect to the choice of the time period and to a
15  certain extent to the correction of the multiple
16  comparison problem as well.
17     Q.  Now, the Florida Department of Health found a
18  cancer cluster here; correct?
19     A.  Based on what they say in the report.
20        And can we have a break at some --
21     Q.  Sure.  Let me just finish up this
22  questioning --
23     A.  Yeah.
24     Q.  -- and then we'll take a break.
25        All right.  So let me ask the question

Page 65

1  again --
2     A.  Okay.
3     Q.  -- so it doesn't look like the answer is
4  about whether we can take a break.
5        Did the Florida Department of Health find a
6  cancer cluster here?
7     A.  Well --
8        MR. LATHAM:  Objection.
9     A.  So which report are you referring to?
10     Q.  Well, I'm asking more generally, but if you
11  want to look at the 2009 report, you can.  I'm just
12  asking if the Florida Department of Health found a
13  cancer cluster.
14     A.  Well, that's -- that question is too broad
15  for me to answer.
16     Q.  Do you -- you -- you have experience with
17  cancer clusters; right?
18        MR. LATHAM:  Objection.
19     A.  Yes.
20     Q.  Do you agree that just because there's a
21  cancer cluster does not mean that the cancer was
22  caused by an environmental contaminant?
23        MR. LATHAM:  Objection.
24     A.  Can you restate the question?
25     Q.  Do you agree that just because there was a

Page 66

1  cancer cluster does not mean that the cancer was
2  caused by an environmental contaminant?
3         MR. LATHAM: Objection.
4     A. You can not exclude that.
5     Q. But it -- is it necessarily true that if
6  there's a cancer cluster that it must have been
7  caused by an environmental contaminant?
8         MR. LATHAM: Objection.
9     A. If there is a strong evidence of a cancer
10 cluster, a cause must exist and must be --
11    Q. Right.
12    A. -- determined.
13    Q. Right. But is it necessarily true that the
14 cause of -- well, let me ask it this way: Is the
15 cause of every cancer cluster an environmental
16 contaminant?
17        MR. LATHAM: Objection.
18    A. To my knowledge, looking at the full
19 literature -- well, again, depends what we mean by
20 "environmental contaminant" and by -- by source of
21 contamination, especially -- if there is especially
22 aggregated. So if -- if there is an elevation of
23 cancer cases that are found to be much higher than
24 expected in a confined area, it's because the
25 genetics are most of the time due to independence,

Page 67

1  there has to be an underlying cause, and often an
2  underlying cause that is spatially correlated is an
3  environmental cause.
4     Q. You said it's -- you said environmental
5  causes are often the underlying cause of a cancer
6  cluster; is that right?
7     A. No. I didn't say that. I said that if there
8  is an elevated -- if there is a cancer cluster and
9  the definition of "cluster" means that these cases
10 have been occurring in a proximity of each other, it
11 means that there has to be a cause. A cause has to
12 be spatially correlated because that's why the cases
13 have been occurring in proximity. And I'm saying
14 that most of the causes that shows a spatial pattern
15 are environmental.
16    Q. What percentage?
17        MR. LATHAM: I -- if I could just
18    interject, the expert asked for a break
19    several minutes ago, and you indicated
20    you wanted to ask one more question.
21        THE WITNESS: It was another --
22        MR. LATHAM: I think we've far
23    exceeded that.
24        MR. LEVINE: Well, I said --
25        MR. LATHAM: Could we take a

Page 68

1     break?
2         MR. LEVINE: I said one more area.
3     This -- this will probably be the last
4     question. I'm just trying to follow
5     up, finish this area, and then we're
6     going to go to a completely different
7     area.
8         I mean if you -- if you have to
9     go, that's fine. But hopefully we can
10    just finish this up.
11        THE WITNESS: It depends how many
12    more questions --
13        MR. LEVINE: Well --
14        THE WITNESS: -- you're talking
15    about.
16        MR. LEVINE: This may -- if -- if
17    I get an answer, this will be the last
18    one:
19    Q. What percentage?
20        MR. LATHAM: Objection.
21    A. You are asking what percentage of? I think
22 the -- the great majority of environment causes are
23 spatially correlated, I would say a good 95 percent.
24    Q. So 95 percent of cancer clusters are caused
25 by environmental clusters?

Page 69

1     A. No. This --
2         MR. LATHAM: Objection.
3     A. This is not what I said.
4         MR. LEVINE: Okay. Let's take a
5     break.
6         THE WITNESS: Okay.
7         THE VIDEOGRAPHER: The time is
8     11:30 a.m. This is the end of disk 1.
9     We are off the record.
10        (Recess.)
11        THE VIDEOGRAPHER: The time is
12    11:41 a.m. This is the beginning of
13    disk 2. We are on the record.
14 BY MR. LEVINE:
15    Q. Are 100 percent of cancer clusters caused by
16 environmental contaminants?
17        MR. LATHAM: Object to form.
18    A. I don't think no one has ever addressed that
19 question.
20    Q. Can you say what percent are?
21        MR. LATHAM: Object to form.
22    A. No one has looked into that question.
23    Q. Have you ever seen a cancer cluster that was
24 not caused by an environmental contaminant?
25        MR. LATHAM: Objection.

Page 70

1    A. If I see a cancer cluster that was not in the
2  analysis of observational data, you can never rule
3  out pretty much anything, even if there is no
4  evidence, to we're accepting the true lack of
5  evidence, doesn't mean absolutely certain of no
6  relationship, of no causal relationship.
7    Q. Have you ever seen a cancer cluster where
8  there was a lack of evidence of environmental
9  contamination as a cause?
10      MR. LATHAM: Objection.
11    A. Again, I think that when -- this is an ill-
12  formed question, because in the context of cancer
13  cluster investigation, you -- we have to rely on
14  analysis of observational data, and therefore we can
15  provide the weight of the evidence toward as to
16  whether or not there could be a cause or a particular
17  cause or multiple causes. That's the best that we
18  can do, and that's possibly the best that everyone
19  can do.
20    Q. All right. I want you to look at your
21  rebuttal -- yeah, your rebuttal report, the first
22  page. Second paragraph starts, "It has been
23  discussed." Do you see that paragraph?
24    A. Yes.
25    Q. And I think six lines down in the middle you

Page 71

1  write, "This is because, absent any information or a
2  hypothesis on the putative source of hazard, the
3  boundaries of the cluster and the time period and the
4  outcome could be artificially defined in a manner
5  that makes the number of cases appear more extreme
6  and therefore creates favorable conditions for
7  finding statistical significance."
8      MR. LATHAM: Objection. And also
9      there was a -- misread the quote.
10      MR. LEVINE: What did I misread?
11      MR. LATHAM: You said "more
12      extreme." It says "most extreme."
13      MR. LEVINE: Okay. I'll re-read
14      it, then. Thanks.
15    Q. You wrote, "This is because, absent any
16  information or hypothesis on the putative source of
17  hazard, the boundaries of the cluster and the time
18  period and the outcome could be artificially defined
19  in a manner that makes the number of cases appear
20  most extreme and therefore creates favorable
21  conditions for finding statistical significance. In
22  addition, in this setting, alternative and equally
23  valid choices of geographic and temporal boundaries
24  might make the number of cases appear entirely normal
25  and insignificant," and you say then "the Texas

Page 72

1  sharpshooter problem."
2      Did I read that right?
3    A. Uh-huh, yes.
4    Q. Is it possible to have artificial,
5  geographic, and temporal boundaries that could create
6  a Texas sharpshooter problem?
7      MR. LATHAM: Objection.
8    A. Everything is possible, but I also say that's
9  not what happened here.
10    Q. Right. I'm just asking more generally. You
11  could have a situation if you used artificial,
12  geographic, and temporal boundaries that could create
13  the so-called Texas sharpshooter problem; correct?
14    A. Yes.
15    Q. And you could come up with a set of different
16  temporal and geographic boundaries that lead to
17  normal results; correct?
18      MR. LATHAM: Objection.
19    A. I think that there is always the possibility
20  that if it's done viciously, the geographic regions,
21  and they could be purposely, you know, engineered
22  choice of how you define the number of expected cases
23  and the number of observed cases so that the amount
24  of statistical significance will be inflated. That's
25  always possible. In any statistical analysis, anyone

Page 73

1  could artificially make things --
2    Q. And you mentioned geographic regions. Is
3  that also true with time periods?
4    A. Yes.
5    Q. And when you refer to "temporal boundaries,"
6  in the context of that -- this case, is that
7  referring to the time periods used in determining --
8  looking at cancers?
9    A. Cancer cases, yes.
10      THE VIDEOGRAPHER: Pardon the
11      interruption, but the witness --
12      (Discussion off the record.)
13    Q. Can the temporal boundaries that are used, or
14  time period, make a difference in the conclusions
15  that are reached?
16      MR. LATHAM: Objection.
17    A. Again, these are questions in abstract. I
18  think that any statistical investigation has to look
19  at the full information that is available to justify
20  an adequate choice for a geographic boundary and a
21  time boundary, and the analysis will be conducted
22  based on that choice.
23    Q. All I'm asking is: The choice of the time
24  boundaries that are used, can that make a difference
25  in the conclusion that's reached?

Case 9:10-cv-80883-KAM   Document 337-18   Entered on FLSD Docket 06/06/2018   Page 20 of
39
Transcript of Daniel Dror II, M.D.   74 to 77
May 04, 2018

Page 74

1    A.  Well, I mean --
2        MR. LATHAM:  Objection.
3    A.  -- it's -- it's an ill-posed question,
4    because there is a rationale of how these decisions
5    are made that will justify how the conclusions are
6    reached.  So you can choose if -- if you make choices
7    that are not defendable, I will not consider then
8    they will come to a reasonable conclusion.
9    Q.  If different time periods are used, can you
10   get different conclusions as a result?
11       MR. LATHAM:  Objection.
12   A.  Again, this is a question that all depends on
13   the context and the data.
14   Q.  Now, you believe the temporal boundaries in
15   this case should be 2004 to 2009; correct?
16   A.  I think that's --
17       MR. LATHAM:  Objection.
18   A.  -- a reasonable choice.
19   Q.  Did -- and you looked at what Dr. Smith did
20   on that; right?
21   A.  Correct.
22   Q.  Did Dr. Smith conduct different analyses
23   where he started with different time boundaries and
24   ultimately, only on the third try, ended up with 2004
25   to 2009?

Page 75

1        MR. LATHAM:  Objection.
2    A.  It is my understanding, and based on the
3    recollection I have by reviewing Dr. Smith's
4    calculation, that he conducted what I called
5    sensitivity analysis and choosing the different time
6    periods.
7    Q.  Did Dr. -- did you review all of Dr. Smith's
8    reports and affidavit in this case?
9    A.  I think, yes, I think there were two reports
10   and an affidavit.
11   Q.  And in the first two reports, did Dr. Smith
12   use two thou -- the temporal boundaries of 2004 to
13   2009?
14   A.  I don't recall that.  I think the FDOH used
15   2004 to 2007, and at some point Dr. Smith extended
16   the analysis up to 2009.
17   Q.  Is the FDOH 2004 to 2007 or 2005 to 2007?
18   A.  Well, we can look.  I don't remember.  But we
19   can check here.  It's in the table.
20   Q.  Since you're looking at a table, tell me
21   which table you're looking at.
22   A.  Sure.  Well, I'm just looking at the -- let's
23   see.  (Pause.)  So table 2, 3, 4, and 5, 6, and 7 all
24   end the study period to 2007 and consider a different
25   initial study period.  So I think, based on my review

Page 76

1    of the FDOH report, they have reported the results up
2    to 2007.
3    Q.  But that's the end date; right?
4    A.  That's the end date.
5    Q.  Okay.
6    A.  That's correct.
7    Q.  And there are different start dates that are
8    used by the FDOH, being 1995, 2000; and if it's a
9    three-year period, they're looking at 2005; correct?
10   A.  That's correct.
11   Q.  Were there any malignant pediatric brain
12   cancers that were observed in The Acreage in 2002 or
13   2003?
14   A.  I can only rely on the information that is
15   provided to me, and these tables provide aggregate
16   numbers of observed cases within each of these time
17   periods.  So ...
18   Q.  Did you look at the individual data to see
19   whether there were any malignant pediatric brain
20   cancers in 2002 or 2003?
21   A.  I do -- I do remember looking at the
22   individual data at some point, but I don't remember
23   the exact year of diagnosis of all the individual
24   case.
25       (Discussion off the record.)

Page 77

1    A.  I don't remember the year of when each
2    individual cases were -- were diagnosed.
3    Q.  Are you aware that there were no malignant
4    pediatric brain cancers diagnosed in The Acreage in
5    2002 or 2003?
6    A.  I'm not aware.
7    Q.  Are you aware that there were no malignant
8    pediatric brain cancers diagnosed in The Acreage in
9    2010 or 2011?
10       MR. LATHAM:  Objection.
11   A.  Again, I am -- I'm not aware.  I rely on the
12   table that are showed -- that are provided to me.
13   Q.  Did you do any analysis to see what the SIR
14   results would be for pediatric brain cancers in The
15   Acreage if time period that was used was 2002 to
16   2011?
17   A.  As I said at the beginning of the
18   questioning, I have not conducted statistical
19   analysis myself.  I have reviewed, as I stated in my
20   report, the FDOH report and the Richard Smith
21   analysis and reviewed the whole body of the evidence
22   about statistical significance of the SIR based on
23   the time periods that were chosen.
24   Q.  Are you aware of anyone who's looked at what
25   the SIR -- SIR results would be if the time period

Page 78

1  used was 2002 to 2011?
2       MR. LATHAM: Objection.
3    A. No.
4    Q. If – if – and I want you to assume that
5  there were no malignant pediatric brain cancers in
6  The Acreage in 2002, 2003, 2010, or 2011. You
7  understand the assumption?
8    A. So you're saying let's make the assumption
9  there would be zero cases in – zero pediatric cases
10 in two thou –
11   Q. 2002, 2003, 2010, and 2011.
12   A. Okay.
13   Q. And that the – and I'm talking about brain
14 cancer in pediatrics. You understand that?
15   A. Pediatric brain cancer.
16   Q. And assume that the number of malignant
17 pediatric brain cancers in The Acreage in 2004 to
18 2009 are the number that you know that were observed.
19 With me so far?
20   A. Yeah.
21   Q. If you did the same SIR analysis that was
22 done by Dr. Smith for 2004 to 2009, but instead
23 extended the period to be 2002 to 2011, would the
24 SIR – SIR be lower?
25       MR. LATHAM: Objection.

Page 79

1    A. I mean I think that's – that's an analysis
2  that must be conducted. I don't know.
3    Q. Did you discuss with Dr. Smith why he used
4  2004 to 2009 as the time period in his last report?
5    A. I have not had any discussion with Dr. Smith
6  about this calculation.
7    Q. Okay. Have you had any discussion with Dr.
8  Smith about any of the issues in this case?
9    A. Sorry?
10   Q. Have you had any discussions or calls or
11 meetings with Dr. Smith in connection with this case?
12   A. No. I know Dr. Smith. Also it's important
13 to disclose that. And I meet – I often – well,
14 sometimes I run into him into conferences, but
15 purposefully have not engaged in any conversation
16 with him about this case.
17   Q. And is it correct that Dr. Smith first used
18 the 2004-to-2009 time period in December 2017 in his
19 affidavit?
20   A. That is my recollection, but to be able to –
21 to answer that with certainty, I would need to look
22 at his affidavit again.
23   Q. Did Dr. Smith, in any of his reports or
24 affidavit, refer to the latency of cancer or any
25 reason for selecting the 2004-to-2009 time period?

Page 80

1       MR. LATHAM: Objection.
2    A. The – there is – I do recall that there is
3  information about the latency to be shorter for
4  children than for adults into the FDOH report. I
5  don't recall information about latency into Smith
6  affidavit, but I'd be happy to double-check with you,
7  if you want.
8    Q. I'm going to mark all the different Smith
9  reports and affidavits –
10   A. Okay.
11   Q. – as exhibits and hand them to you.
12       (Exhibit 7, 8/8/16 statistical
13       analysis report, marked.)
14   Q. Okay. Exhibit 7, is that the Smith report
15 from August 8, 2016?
16   A. Yeah. Sorry. Yes.
17       (Exhibit 8, 12/23/16 statistical
18       analysis report, marked.)
19   Q. And is Exhibit 8 the Smith report from
20 December 23rd, 2016?
21   A. Yes.
22   Q. I'm handing it to you now. Sorry.
23   A. Oh, okay. Sorry. Okay. I'm sorry. Yes,
24 different – that's the – okay. So it's just a
25 different date, yeah. Okay.

Page 81

1    Q. Yeah. I'm going to give you all of these.
2  I'm just –
3    A. Okay.
4    Q. – doing it one at a time because I only have
5  two hands.
6       Is Exhibit 9 that I'm handing to you the
7  affidavit of Dr. Smith dated December 1st, 2017?
8       (Exhibit 9, affidavit of Richard
9       L. Smith, PhD, marked.)
10   A. Yes.
11       (Exhibit 10, 3/13/18 rebuttal
12       report of Richard L. Smith, marked.)
13   Q. Is Exhibit 10 the Dr. Smith report that's a
14 response to Dr. Marais dated February 13th, 2018?
15   A. March 13. Oh, no. I'm sorry. Oh –
16   Q. Well, actually –
17   A. Oh, yeah.
18   Q. Actually, it has both dates. It says
19 February 13th at the top, and right below it says
20 March 13th. If you look at page 9 of Exhibit 10, you
21 see it refers there –
22       MR. LATHAM: I think it –
23   Q. – to March 13.
24       MR. LATHAM: One – one is saying
25       what it's responding to.

Page 82

1      THE WITNESS:  Correct.
2      MR. LATHAM:  The other is –
3      MR. LEVINE:  Oh, I see.
4      MR. LATHAM:  – saying the date of
5   the report.
6      THE WITNESS:  Yeah.  We're all
7   correct.
8  BY MR. LEVINE:
9      Q.  All right.  So is Exhibit 10 the Smith report
10  of March 13th, 2018?
11     A.  Yes.
12     Q.  And is – is the Smith report of March 13th,
13  2018, something that – have you seen that before?
14     A.  Yes.
15     Q.  And is that something that you saw after you
16  submitted your rebuttal report on that same date,
17  March 13, 2018?
18     A.  So I submitted my rebuttal on March –
19     Q.  Same date, March 13.
20     A.  Yeah.  I'm – I'm – I'm almost certain I saw
21  this after.
22     Q.  You saw the Smith rebuttal report marked as
23  Exhibit 10 after you submitted your rebuttal report
24  marked as Exhibit 5; correct?
25     A.  I'm pretty confident, yes.

Page 83

1      Q.  Yeah.  All right.  So now let's go back to
2   where we were.
3      A.  Okay.
4      Q.  Did Dr. Smith in any of his three reports
5   that you saw before you submitted your report,
6   Exhibits 7, 8, or 9, discuss latency for cancer
7   periods?
8      MR. LATHAM:  Objection.
9      A.  Well, as I said, I don't recall any
10  information about latency in any of the Richard Smith
11  reports.  Doesn't mean they didn't.
12     I do recall information about latency and
13  being shorter, one to eight years in the pediatric
14  brain, as that was provided in the FDOH report.
15     Q.  Did Dr. Smith mention anything in his August
16  8th, 2016, report or December 23rd, 2016, report
17  about reasons for choosing 2004 to 2009 as the
18  temporal boundaries or time period?
19     MR. LATHAM:  Objection.
20     A.  I think regardless of what Richard Smith
21  provided as rationale, I developed my own rationale
22  based on the information I read across all of the
23  reports, which is what I believe I have stated in one
24  of my reports as well.
25     Q.  But I'm just asking you – that's – I know

Page 84

1   that's what you want to say.  That's fine.  I'm just
2   asking you a very specific question, though.  Did Dr.
3   Smith mention anything in his August 8th, 2016,
4   report or December 23rd, 2016, report about reasons
5   for choosing the 2004 to 2009 as the time period?
6      MR. LATHAM:  Objection.
7      A.  I – I mean I can't – I can't exclude that.
8   I need to reread the report.  I don't remember every
9   single thing –
10     Q.  Well –
11     A.  – every single report that's been written.
12     Q.  You recall – you recall that Dr. Smith
13  didn't come up with 2004 to 2009 as the time period
14  until his affidavit of December 1st, 2017, marked as
15  Exhibit 9; correct?
16     A.  I think this is all – all – all of this –
17  of this questioning is beyond my initial point.  My
18  understanding and my role and what I expressed in
19  both my reports was to reverse-engineer the
20  calculation of Richard Smith into the calculation,
21  the standardized incidence ratio for pediatric, and
22  to understand to the best of my knowledge and rely on
23  my expertise as to whether or not overall, across
24  many time periods and across many sensitivity
25  analyses and by looking at the full analysis of both

Page 85

1   Dr. Smith and Marais, the calculation about
2   standardized incidence ratio and statement about
3   potential cancer cluster were affected or not by –
4   by the Texas sharpshooter problem.
5      So I reviewed these – these reports.  I
6   don't remember the temporal range of when these
7   reports were – were written.  But my understanding
8   is the role of Richard Smith was to conduct
9   additional calculations that were conducted by the
10  FDOH report in extending the time period and
11  adjusting for the multiple comparison problem.
12     Q.  Was it relevant to your analysis at all that
13  Dr. Smith didn't come up with the 2004-to-2009 time
14  period until his December 1st, 2017, affidavit?
15     A.  Can you –
16     MR. LATHAM:  Objection.
17     A.  Can you repeat the question, please?
18     Q.  Was it relevant to your analysis that Dr.
19  Smith didn't come up with the 2004-to-2009 time
20  period as the temporal boundary until his December
21  1st, 2017, affidavit?
22     A.  December 1st, 2017, affidavit.  I – no, not
23  necessarily, because as I considered the whole body
24  of evidence toward number of cases exceeding the
25  expected and the whole body of evidence about

Page 86

1  potential causation, all of my opinion does not rely
2  to a specific calculation or to a specific selection
3  of a boundary.  All of my rationale is reviewing all
4  of the different analyses and how the analyses are
5  sensitive to the different choices and whether or not
6  these choices were justifiable.
7      Q.  Okay.  So let's talk -- the -- for 2004 to
8  2009, the 2004 is the start date and 2009 is the end
9  date --
10     A.  Yeah.
11     Q.  -- correct?
12         All right.  So let's go through them one at a
13  time.
14     A.  Okay.
15     Q.  The start date that you thought was
16  appropriate was 2004; correct?
17     A.  Where?  Where did you read this?
18     Q.  Well, I'm -- the -- what you looked at as the
19  time period was 2004 to 2009; right?
20     A.  Well, I looked at -- as I said in my report
21  again, I looked at the calculations of the
22  standardized incidence ratio that were provided in
23  all the reports.  So not only for 2004-2009.  I
24  looked at the whole body of evidence of when the
25  standardized incidence ratio where the --

Page 87

1      (Discussion off the record.)
2      A.  Where -- I -- I looked at the whole body of
3  evidence of -- that was provided across all of the
4  different reports concerning the calculation of the
5  standardized incidence ratio across different time
6  periods.
7      Q.  And you explain that "a causally related
8  female pediatric brain tumor cluster might not emerge
9  until 2004"; right?
10     A.  Where?  Where do you read this?
11     Q.  Page 5 of your initial report at the top.
12  (Pause.)  And let me point you to somewhere else.
13     A.  Yeah.
14     Q.  If you look at page 4 of your initial report.
15     A.  Uh-huh.
16     Q.  Right before D1, you say, "All of these point
17  toward the elevation of tumor incidence particularly
18  between 2004 and 2009"; correct?
19     A.  I -- I'm reading under "Critique of Dr. Smith
20  Approach," this -- this --
21     Q.  No.
22     A.  No.  Where?  Sorry.
23     Q.  Okay.  Your initial expert report, not your
24  rebuttal.
25     A.  Yes.

Page 88

1      Q.  Okay.
2      A.  December 22.
3      Q.  Page 4.
4      A.  Okay.  One, two, three, four.
5      Q.  There's a section called "D.  The Texas
6  Sharpshooter Fallacy."
7      A.  Yeah.
8      Q.  Second paragraph there, the last --
9      A.  Okay.
10     Q.  -- full sentence you wrote, "All of these
11  point toward the elevation of tumor incidence
12  particularly between 2004 and 2009."
13         That's what you wrote; right?
14     A.  That's correct.
15     Q.  And 2004 there would be the start date, and
16  2009 would be the end date; correct?
17     A.  Correct.
18     Q.  And then when discussing the time frame below
19  in D1.1, you see that?
20     A.  Yeah, uh-huh.
21     Q.  You say that "I assume for this analysis that
22  evidence supports the Plaintiffs' allegation that
23  significant contamination of sites throughout the
24  Acreage community by UTC-sourced materials occurred
25  during an intensive phase of UTC's RCRA remediation

Page 89

1  process between August 2000 and March 2001."
2      You see that?
3      A.  Yes.
4      Q.  And that's -- that assumption is based on
5  what you understood from plaintiffs' lawyers;
6  correct?
7      MR. LATHAM:  Objection.
8      A.  That's correct.
9      Q.  And if that assumption is incorrect, does
10  that affect the proper start date for the temporal
11  boundary?
12     A.  Well, it all depends of how incorrect the
13  information is and how certain we are of the latency
14  period.
15     Q.  Have you -- well, we'll get to the latency
16  period in a second, because the first part of it is
17  that soil goes to The Acreage, and then you have to
18  look at the latency period in your analysis; correct?
19     A.  Yes.
20     Q.  So for the soil going to The Acreage, if the
21  assumption is incorrect and soil actually didn't go
22  from UTC to The Acreage, would that affect the start
23  date for the temporal boundary?
24     MR. LATHAM:  Objection.
25     A.  I think that, as -- as I said, you know, in

Page 90

1  the past, it depends on how incorrect information is,
2  and it depends how sensitive would be the results to
3  the selection of the beginning of the start date.  In
4  any of these investigations, there is never a magic
5  bullet of whether a single source of information can
6  completely change or overturn a statistical analysis.
7  It is a collection of pieces of evidence and a
8  collection of depending on how these pieces of
9  evidence are accurate and reliable.
10     Q.  Did you look at what the effect of the
11  assumption of soil being moved to The Acreage from
12  UTC if that -- would have on the temporal boundary
13  and the analysis if that assumption is incorrect?
14        MR. LATHAM:  Objection.
15     A.  It -- there -- my understanding is, and based
16  on -- it's not my understanding.  Based on the many
17  calculations that have been done, this calculation of
18  the standardized incidence ratio being calculated
19  under different time periods, both in terms of the
20  start date and both in terms of the end date.  So, as
21  I said, the -- the way to assess whether or not
22  deviation from this assumption about, you know, when
23  the remediation process could have affected the
24  submission of the standardized incidence ratio,
25  it's -- it's hard -- it's hard to -- to anticipate.

Page 91

1  I think the question is whether or not that does mean
2  occur at all.
3     Q.  All I'm asking is whether you've done that.
4  Have you looked at what the result would be if the
5  assumption about the moving of the soil was
6  incorrect?
7        MR. LATHAM:  Objection.
8     A.  As I said at the beginning of this -- of --
9  from this questioning, I have not conducted
10  individual statistical analysis myself.  I have
11  reviewed what the other statistical analysis were
12  provided by others.
13     Q.  Okay.  And then you looked at the latency
14  period for cancer after that; right?
15     A.  I read and I rely in my opinion based on the
16  latency period of one to eight years for pediatric
17  cancer that was reported in the FDOH report.
18     Q.  Okay.  Let's look at page 6 of your initial
19  report.  There's a reference there in the first
20  bullet, in the little bullet underneath it, to the --
21  for pediatric cancers the latency period is
22  "generally considered 1 to 8 years."
23        Do you see that?
24     A.  Uh-huh, yeah.
25     Q.  And that's what you're referring to?

Page 92

1     A.  Yes.
2     Q.  Does that break it down by type of cancer?
3        MR. LATHAM:  Objection.
4     A.  I cannot possibly recall that.
5     Q.  Did you look at whether the latency period
6  for blood cancers, such as leukemia, is different
7  than the latency period for solid tumor cancers, such
8  as brain cancer?
9     A.  That's beyond --
10        MR. LATHAM:  Objection.
11     A.  -- my area of expertise.
12     Q.  Are you -- you did refer to the atomic bomb
13  data that you've looked at; right?
14     A.  I only said that I served on a statistical
15  and epidemiologic panel that reviewed epidemiologic
16  studies conducted as a result of the Hiroshima and
17  Nagasaki bomb.
18     Q.  Did you look at the latency periods for
19  cancers in children for different types of cancers
20  from the Hiroshima and Nagasaki data?
21        MR. LATHAM:  Objection.
22     A.  No.  No.
23     Q.  If the latency period for brain cancers in
24  children is more than one to eight years or longer,
25  would that affect the start date that should be used

Page 93

1  for the temporal boundaries?
2        MR. LATHAM:  Objection.
3     A.  If the latency period would be long -- I'm
4  sorry.  Can you repeat the question?
5     Q.  If the latency period for pediatric brain
6  cancers is longer than one to eight years for that
7  type of cancer, would that affect the start date that
8  should be used for the temporal boundaries for the
9  statistical analysis?
10        MR. LATHAM:  Objection.
11     A.  It's -- again, this -- this will depend on
12  many different pieces of evidence.  Number one is how
13  reliable will be the information coming from the fact
14  that the latency period could be longer and shorter,
15  and based on which data.  Two, it depends on the
16  sources of contamination.  Three, it depends on
17  exposure to this contamination.
18     Q.  And did you do any analysis in looking at
19  what the effect would be on the statistical results
20  if a different latency period were used?
21        MR. LATHAM:  Objection.
22     A.  It was not necessary to conduct different
23  analyses with respect to different latency periods,
24  because different analyses were conducted and the
25  different choices of the -- of the time period.  So a

Page 94

1  sensitivity analysis per se, with respect to the
2  choice of the time period, was conducted overall by
3  the different experts.
4     Q.  Right.  But I'm asking:  Did you do a
5  sensitivity analysis on the effect of using a longer
6  latency period than the one to eight years for brain
7  cancers?
8     A.  I think that the --
9        MR. LATHAM:  Objection.
10    A.  The answer is always the same:  I did not
11  conduct the statistical analysis myself.  I reviewed
12  statistical analyses that were conducted by others.
13    Q.  Okay.  For the end date you used 2009;
14  correct?
15    A.  I did not use 2009.  I explain why in my
16  opinion the end date -- the choice of 2009 is a
17  reasonable choice.
18    Q.  Okay.  And let's look at pages 5 to 6 of your
19  initial report.  At the bottom, starting with the
20  little sub-bullet there.
21    A.  Yes.
22    Q.  You refer to the "publicity of elevated
23  incidence of pediatric brain tumors had reached a
24  critical mass at least within the community of
25  parents of minor children in The Acreage by 2000 --

Page 95

1  by early 2009."
2        Is that correct?
3     A.  Yes.  Yeah, that's correct.
4     Q.  And that's one of the reasons you give why
5  2009 is an appropriate end date for the temporal
6  boundary; correct?
7     A.  Correct.
8     Q.  And another reason that you give for the 2009
9  being the appropriate end date for the temporal
10  boundary is, you write that there is "some degree of
11  exodus of families with minor children beginning in
12  2009"; is that right?
13    A.  That's correct.
14    Q.  And then the -- if you look on the top of
15  page 6 of your initial report, the final reason that
16  you give for 2009 being an appropriate end point is
17  that the contamination would disperse or become more
18  diffuse after 2009; right?
19        MR. LATHAM:  Objection.
20    A.  That's -- that's all what -- that's correct
21  that that's what I --
22    Q.  Okay.
23    A.  -- put in my report.
24    Q.  Did you look at any -- did you perform any
25  mathematical models or statistical analysis on any of

Page 96

1  these three factors?
2     A.  Again, no, I did not.  And my expertise here
3  was -- was related to assessing whether or not
4  overall there was evidence of standardized --
5  statistical significance of the standardized
6  incidence ratio, whether or not the evidence was
7  affected by the multiple comparison problem.  I would
8  like to argue that the mathematical modelling, even
9  if there were more information and more specific
10  information about the latency period, would have led
11  to -- to a great degree the same amount of
12  sensitivity analysis about the -- the choice of the
13  beginning and the end period that was similar as the
14  one that was performed.
15    Q.  But you haven't done that analysis yourself;
16  correct?
17    A.  That's correct.
18    Q.  Did you look at any home sales data to see if
19  there was a change in the number of sales in The
20  Acreage?
21        MR. LATHAM:  Objection.
22    A.  I don't recall.  There were -- a lot of
23  information was -- was provided to me.  I don't
24  recall if I looked at that particular data.
25    Q.  Did you see any expert testimony on the

Page 97

1  change in children's behavior in The Acreage?
2        MR. LATHAM:  Objection.
3     A.  I didn't look at expert testimony, but it
4  was -- was -- you know, seems -- seems reasonable to
5  me, having a child myself, that if I would know of
6  such information, I would change the behavior of my
7  children.
8     Q.  Did you look at any expert testimony on the
9  change in population of The Acreage?
10    A.  No, I did not.
11    Q.  Did you look at any US Census data on the
12  change -- on any change in population of The Acreage?
13    A.  No, I did not.
14    Q.  Did you look at any expert testimony about
15  the diffusion or dispersion of contamination in The
16  Acreage?
17    A.  No, I did not.
18    Q.  Do you have any expert opinion on the amount
19  of dispersion or diffusion of contamination in 2010
20  as compared to 2013, let's say?
21        MR. LATHAM:  Objection.
22    A.  No.
23    Q.  You say you understand there was a degree of
24  exodus of families with minor children.  Where does
25  that understanding come from?

Page 98

1       MR. LATHAM: Objection.
2    A. Well, this was -- was information related to
3 the fact that it was -- I mean I remember reading a
4 lot about the -- the news and the media coverage and
5 this information that was contextual about the
6 statistical analysis that was provided to me by
7 the -- by the plaintiffs' counsel.
8    Q. And the -- and the reference at the top of
9 page 6 to the diffusion or dispersion occurring, is
10 that -- it's something you -- is that information you
11 also got from plaintiffs' lawyers?
12      MR. LATHAM: Objection.
13   A. Yes. Plus some information that was provided
14 directly by Brian Moore. Some -- reading some of
15 the -- of the information that the expert witness
16 Brian Moore provided.
17   Q. That's an excerpt of his report or something?
18   A. Correct. Correct.
19   Q. But you didn't read his deposition; right?
20   A. No.
21   Q. It's the way I asked it was -- gave -- it
22 could be misconstrued.
23   A. Oh, I'm sorry.
24   Q. Did you read Mr. Moore's deposition?
25   A. No, I did not.

Page 99

1    Q. Okay. Look at your rebuttal report, page 11,
2 please. You're going to have to count the number of
3 pages, sorry.
4       MR. LATHAM: I just went ahead and
5    numbered them by hand, just for going
6    forward.
7       MR. LEVINE: I know. But she's
8    got the official --
9       MR. LATHAM: It's quite the
10   innovation.
11      MR. LEVINE: No. That's what I
12   did too, but the witness has the
13   official copy.
14      MR. LATHAM: Would you object to
15   hand-numbering the pages in the
16   official copy?
17      MR. LEVINE: You know, we're
18   getting near -- I don't think there's
19   going to --
20      MR. LATHAM: Okay.
21      MR. LEVINE: There aren't that
22   many more times it's going to happen,
23   so.
24      MR. LATHAM: All right.
25      MR. LEVINE: Luckily it's not a

Page 100

1       100-page document.
2 BY MR. LEVINE:
3    Q. Okay. So there is a place, the second full
4 paragraph of page 11 of your rebuttal report, you
5 say, "My statement."
6    A. Yes.
7    Q. Okay. And I want to go a little bit further
8 there. Where -- I'm sorry. Right above where you
9 say -- right above that you, say, "Dr. Smith
10 performed a very conservative adjustment for multiple
11 comparisons - a test I do not believe to have been
12 necessary given the well-specified hypothesis about
13 environmental contamination that he was
14 investigating - still found statistical
15 significance."
16      Do you see that?
17   A. Yes.
18   Q. What is the conservative adjustment you're
19 referring to? Is it the Bonferroni correction?
20   A. Yes. I do recall that in one of Dr. Smith's
21 reports, he did an adjustment for multiple comparison
22 using Bonferroni and that it was -- that I considered
23 conservative because he did account for a pretty
24 large number of potential tests that could have been
25 conducted.

Page 101

1    Q. If Dr. Smith admitted that -- or testified
2 that he didn't identify what -- the proper Bonferroni
3 correction in his analysis, would that affect your
4 opinion?
5       MR. LATHAM: Objection.
6    A. Honestly, no, because I considered, and it is
7 not only my opinion, but it's a widely embraced
8 opinion around the statistical literature, that there
9 is not a perfect number of Bonferroni adjustment to
10 make. I -- my opinion and my expert opinion about
11 the entire statistical analysis and all of the
12 different calculations is that some adjustment, and I
13 call it not an adjustment for multiple comparison,
14 but more a sensitivity analysis, would be a good
15 practice to do, which is something that would have
16 been done in any other statistical analysis. But a
17 specific number of the -- a perfect number of
18 adjustment for multiple comparison, I don't think
19 that exists, not here, not anywhere else.
20   Q. And you refer that with his conservative
21 adjustment, he still found statistical significance?
22   A. That's what I recall based on the inspection
23 of the reports.
24   Q. And what is -- why does that matter that he
25 found statistical significance?

Page 102

1          MR. LATHAM: Objection.
2     A.   Well, it all depends on which is the question
3   that we're trying to address.  If the question which
4   I was asked to provide an expert opinion is whether
5   or not there is a statistically significant evidence
6   that the number of cancer cases in Acreage are higher
7   than the expected, that's relevant because what I was
8   looking at and what I was responding here was that
9   even after accounting for potential -- for the
10  potential of conducting multiple testing and
11  selecting the study period in different ways or even
12  the geographic boundary, then it's relevant that the
13  evidence is -- is still there.
14         And I -- what I would like to emphasize here
15  that apply to any of these analysis is not the degree
16  to which there is under certain choice that it's
17  statistically significant versus another choice that
18  is not statistically significant or whether or not
19  it's the best possible number to adjust for multiple
20  comparison.
21         The best practices that is done in the
22  investigation of cancer cluster in general in any
23  type of analysis of exposure to environmental
24  contaminant and risk of cancer is to look at the
25  whole body of evidence and to assess the degree to

Page 103

1   which the results are robust to several assumptions.
2          And so that is the way and the lens under
3   which I have been analyzed and reviewed all of this
4   material -- all of this material.  So it's about
5   robustness of degree of the evidence with respect to
6   different assumptions and not necessarily I didn't
7   define the best possible number to adjust for
8   multiple comparison, not potentially knowing with
9   absolute certainty of which is the best time period
10  for which to conduct the calculation.
11    Q.   Okay.  I want you to look at your initial
12  expert report, page 6.
13    A.   Yeah.
14    Q.   Your initial report.  The first one.
15    A.   Oh, I'm sorry.  Okay.  I was numbering the
16  wrong one.
17    Q.   That's all right.  The one that has numbers
18  on it already.
19    A.   Oh, 4, 5, 6.  Okay.
20    Q.   And there's a section at the bottom of page 6
21  called "Acreage boundaries."
22    A.   Yes.
23    Q.   Is "Acreage boundaries" referring to the
24  geographic scope or geographic boundaries that we
25  discussed earlier briefly?

Page 104

1     A.   Yes, I believe so.  It's -- it's text
2   regarding selection of Acreage boundaries, yeah.
3     Q.   Then in the third line there you say, "if a
4   study region is defined a priori to be of interest
5   because it includes a pollution source (UTC), one
6   does not suffer from post hoc analysis problems
7   because the internal spatial structure of disease
8   incidence did not influence the choice of the
9   region."
10         Do you see that?
11    A.   Yes.
12    Q.   What is a post hoc analysis problem?
13         MR. LATHAM: Objection.
14    A.   The -- in the overall statistical literature
15  sometimes there is used the term "post hoc analysis,"
16  which refers to a situation where a statistical
17  investigation is conducted conditioned to having the
18  outcome already be measured and observed.
19    Q.   Is the post hoc analysis problem related at
20  all to selection bias?
21         MR. LATHAM: Objection.
22    A.   Oh.  No, not necessarily.  Again, this is a
23  very vague question, and unfortunately in the
24  statistical and epidemiologic literature, the
25  terminology of "post hoc analysis" and "selection

Page 105

1   bias" are used, you know, in many, many different
2   ways.  But I would say that if you want my personal,
3   you know, my personal opinion, my expert opinion of
4   what a selection bias is -- is that -- okay.  Let me
5   step back for a moment.
6     Q.   Well, let me just ask you:  What is selection
7   bias?
8     A.   Okay.  That's what I was going to say.
9          I think that selection bias is considered and
10  defined in the statistical and epidemiologic
11  literature as selecting.  It could be the selection
12  of a specific group of people or a selection of a
13  time period or a selection of a geographic boundary
14  that is done in a way that could bias the conclusion
15  of the statistical procedure.
16    Q.   And you refer to "internal spatial structure
17  of disease."  What does that refer to?
18    A.   Yeah.  It's -- it's admittedly vague.  But in
19  general what I -- you know, my intention and what I
20  meant to say is that the choice of the study region
21  is -- was selected and was started independently from
22  when actually the disease cases have -- have
23  occurred.  So in a certain way, let me -- let me
24  rephrase that.
25         What -- what I meant with that sentence is

Page 106

1  the jococda (phon sp) and the geographical location of
2  the cases were not used directly to inform the
3  selection of the study region.
4      Q.  All right.  And "internal spatial structure
5  of disease" is -- means the geographic location of
6  the diseases?
7      A.  Correct.
8      Q.  And can you have --
9      A.  I could have said it clearly.
10     Q.  And can you have the risk of a post hoc
11 analysis problem where the geographic location of the
12 disease influences the choice of the geographic
13 boundary?
14         MR. LATHAM:  Objection.
15     A.  Again, this is -- very much depends on all of
16 the different elements of a statistical -- of a
17 statistical investigation, from the design, from the
18 underlying causes, from the geographical location,
19 from actually ultimately the choice of the geographic
20 region has been made.
21     Q.  If the study region is not defined a priori,
22 or beforehand, to be of interest because of a
23 pollution source, can you have the post hoc -- post
24 hoc analysis problem?
25     A.  No.

Page 107

1          MR. LATHAM:  Objection.
2      A.  No, not necessarily.  It's often -- and this
3  has been done repeatedly in many, many, many
4  epidemiologic studies.  That's not necessarily the
5  case.  I think the question is to justify how the --
6  the region has been chosen.
7      Q.  And if the region -- if the geographic
8  boundaries are chosen based on the geographic
9  location of the disease, can that create either
10 selection bias or a post hoc analysis problem?
11         MR. LATHAM:  Objection.
12     A.  I mean, again, this is -- it's -- it's not a
13 question I'm comfortable to answer because it depends
14 on the disease and depends on which specific
15 geographic location.  It depends on what are the
16 potential causes.  It depends on how the -- the study
17 had been designed, and it depends ultimately on how
18 the region has been defined.
19     Q.  Is there ever a time where choosing the
20 geographic boundary based on the geographic location
21 of the disease can create a selection bias or post
22 hoc analysis problem?
23     A.  There is that -- that is -- it's possible.
24     Q.  Does -- can selection bias in a geographic
25 area for a cancer cluster create a predetermined

Page 108

1  expectation that the number of observed cancers in
2  the study area will be higher than the expected even
3  if there's no causal effect?
4          MR. LATHAM:  Objection.
5      A.  Again, that's not necessarily true.
6      Q.  Is it possible?
7      A.  Of course, everything is possible.
8      Q.  Well, can selection bias increase the risk
9  that you will see a false positive?
10         MR. LATHAM:  Objection.
11     A.  Yes, that's possible.
12     Q.  Did Dr. Smith make an independent assessment
13 of the geographical -- geographic boundaries to use?
14     A.  To my knowledge, he didn't.
15     Q.  Did Dr. Smith adopt the FDOH boundary?
16     A.  That's my understanding.
17     Q.  Are you aware of any discussion by Dr. Smith
18 of trucking or dumping of soil as the basis for the
19 geographic area?
20         MR. LATHAM:  Objection.
21     A.  I have not had any communication with Dr.
22 Smith.
23     Q.  Okay.  Are you aware of any reference by Dr.
24 Smith in any of his reports or affidavit to trucking
25 or dumping as the basis for the geographic area?

Page 109

1      A.  I don't recall any.
2      Q.  Now, the -- did the FDOH explain in its 2009
3  report how it picked the geographic boundaries?
4      A.  I believe they did.  Let me look at it.  I
5  think there is a map at the end.  Let me see if I can
6  find it.  And in my understanding, by looking at
7  it -- yes.  So there is on this map, number 2, and
8  also in preparation of this report, I did -- I did on
9  Google Earth -- on Google Map and looked at myself
10 the geographic description of The Acreage community.
11 This was before preparing my first report, as I was,
12 myself -- I wanted to get more information of, you
13 know, what Acreage community was.  So it's map number
14 2.
15     Q.  What page?
16     A.  I'm sorry.  Page 24 of the FDOH report.
17     Q.  And the FDOH did not describe selecting
18 geographic boundaries in its 2009 report based on the
19 presence of a contamination or pollution source;
20 correct?
21         MR. LATHAM:  Objection.
22     A.  Well, it is my understanding and my knowledge
23 that the -- and I think what I wrote in my own report
24 that what started and initiated an investigation of
25 the FDOH was concern of family there were cancer

Page 110

1  clusters in The Acreage community.
2     Q.  Okay.
3     A.  I'm sorry.  Maybe I misunderstood your
4  question.
5     Q.  No.  That's fine.
6        And did the FDOH initiate its level 1 cancer
7  inquiry in response to these resident concerns?
8     A.  That is my understanding.
9     Q.  And did the FDOH select and refine the
10  boundaries of the study area based on the locations
11  of the reported pediatric cancer cases?
12        MR. LATHAM:  Objection.
13     A.  I -- I don't recall that.  From the map, in
14  this particular map, and in the way, as I see, they
15  took some of the geographic location of -- of the
16  cases, the map on page 2 is identifying a community
17  in terms of two geographical areas where there were a
18  lot of residency.
19        So it seems to me that the way they were --
20  were chosen, the geographic boundary was with respect
21  to, you know, geographical blocks where people live,
22  and it was not as often considered in the statistical
23  literature the Texas sharpshooter of literally
24  drawing a geographic boundary around where the cases
25  have occurred.  That's my understanding of what's

Page 111

1  behind.
2     Q.  Did the FDOH look at a larger geographic area
3  as well as looking at The Acreage?
4     A.  To my knowledge, they didn't, but it's
5  also -- that's also why I think in this context and
6  this investigation, which is also done consistently
7  of any investigation of environmental causes of
8  disease, it seems to me that how they have chosen the
9  geographical area in terms of geographical boundary
10  and in terms of being located in the vicinity -- in
11  the vicinity of potential sources of contamination
12  was reasonable.
13        Of course, as you are selecting communities
14  where the cancer cases could occur more broader in a
15  way that you will be less confident of potential
16  sources of contamination, that will create some
17  selection bias as well.
18     Q.  Let's look at page 16 of the FDOH report.  Do
19  you see there's a section there called "Additional
20  Analyses"?
21     A.  Yup.
22     Q.  And it -- the FDOH says, "In order to further
23  explore these rates in a larger geographic area, the
24  above analyses were conducted using data from the
25  three ZIP codes that include and surround The Acreage

Page 112

1  as well as these three ZIP codes minus the actual
2  Acreage."
3     A.  Yeah.
4     Q.  So does that refresh your memory --
5     A.  Yeah.
6     Q.  -- that the FDOH actually did look at a
7  larger geographic area as well?
8     A.  Well, I mean -- I meant when -- when you
9  use -- yes.  I mean I know this --
10     Q.  Okay.
11     A.  -- this very well.  But what I meant, what I
12  thought that you meant, "large geographical area," I
13  thought that you meant, you know, something much more
14  larger, like, you know, West Palm Beach County, so --
15     Q.  No.  I'm just talking about --
16     A.  Yeah.
17     Q.  -- drawing the boundaries --
18     A.  Yeah.
19     Q.  -- the FDOH, in addition to looking at The
20  Acreage --
21     A.  Right.
22     Q.  -- looked at a larger area based on ZIP
23  codes; right?
24     A.  Well, yeah.  I mean --
25     Q.  Okay.

Page 113

1     A.  These -- these three ZIP roads are three ZIP
2  codes that, you know -- so the -- the Acreage
3  community touch all of these -- these three ZIP --
4  ZIP codes.  So, yes, it conducted these as additional
5  analysis, sensitivity analysis, yeah.
6     Q.  And that -- that would be a larger
7  boundary --
8     A.  Yeah.
9     Q.  -- that they looked at?
10        And in using The Acreage as the boundary, the
11  FDOH recognized that doing so may be an artificial
12  boundary; correct?
13     A.  Well, I mean it's all --
14        MR. LATHAM:  Objection.
15     A.  Again, it depends on how you define
16  "artificial boundary."  It's a community; it's a
17  residential community.  And so I think the world --
18  the word "artificial" is highly subjective in this
19  context.
20     Q.  Let's look at page 18 of the FDOH report.
21  The second full paragraph, the FDOH wrote that
22  "Limiting the study area to the census block areas
23  that comprise The Acreage may be an artificial
24  boundary for this concern"; right?
25     A.  Well, that's what FDOH said.

Page 114

1    Q. And then the FDOH wrote that the "Analysis of
2  the larger ZIP code area and the ZIP code area minus
3  the Acreage residents indicated that the majority of
4  any excess was related to the Acreage area.  However,
5  there is no biological reason why any excess would be
6  limited to within these artificial boundaries,
7  particularly as no environmental issues have surfaced
8  at this time."
9       Is that what the FDOH said?
10   A. That's what FDOH wrote.
11      MR. LEVINE:  Let's go off the
12   record.
13      THE VIDEOGRAPHER:  The time is
14   12:44 p.m.  We are off the record.
15      (Recess.)
16      THE VIDEOGRAPHER:  The time is
17   1:37 p.m.  This is the beginning of
18   disk 3.  We are on the record.
19  BY MR. LEVINE:
20   Q. Earlier we looked at the FDOH report where it
21  was comparing the observed cancers to cancers in Palm
22  Beach County and Florida as a whole.  Do you recall
23  that?
24   A. Uh-huh.  Yes.
25   Q. And if you look at page 3 of your initial

Page 115

1  report, and look, you see there's a section C there
2  at the bottom?
3    A. Yes.
4    Q. The paragraph before section C --
5    A. Yes.
6    Q. -- the second line, you wrote that, "As
7  pointed out above, because the rest of the state is
8  likely to me somewhat" -- I think that's supposed to
9  be "to be," right, this typo?
10   A. I don't know what -- where are you reading?
11  I'm sorry.
12   Q. It says "As pointed out above."  Do you see
13  that?
14   A. So you said the paragraph before that said
15  "Instead of selecting matched communities."
16   Q. Right.
17   A. Okay.
18   Q. Second line.
19   A. "As pointed above," yes.
20   Q. Right.  "As pointed out above, because the
21  rest of the state is likely to me," do you mean "to
22  be"?  I think it was a typo; is that right?
23   A. Yes.
24   Q. Okay.
25   A. It is "to be."

Page 116

1    Q. All right.  So you said, "As pointed out
2  above, because the rest of the state is likely to be
3  somewhat exposed to hazardous materials like those
4  used by UTC, it does not represent a relevant
5  'unexposed' or 'control' population with which to
6  compute the expected incidence."
7       Did you look at the -- any data on the amount
8  of thorium-230 in the soil in Florida?
9       MR. LATHAM:  Objection.
10   A. That's -- you know, regardless of the amount
11  of thorium that would have been in Florida, this
12  statement that I made represents what is my expert
13  opinion in the context of how you select a control
14  population.  And so as I started that paragraph, it
15  said "Instead of selecting matched control
16  community."  And the statement I'm making is that the
17  selection of the state of Florida, it's not a matched
18  community with respect to Acreage, with respect to
19  anything, above and beyond what is the contamination
20  of the soil.
21   Q. Okay.  Let's go back to my question, though.
22  Did you look at any data on the level of contaminants
23  in the soil or water in Florida?
24      MR. LATHAM:  Objection.
25   A. No.  But that was --

Page 117

1    Q. Okay.
2    A. -- not necessary to make this statement.
3    Q. Did you look at any data on the level of the
4  contaminants in the soil or water in Palm Beach
5  County?
6       MR. LATHAM:  Objection.
7    A. No, I did not.
8    Q. Okay.  Let's look at page 3 again.  Right
9  above -- so we have that paragraph we were looking at
10  that says "Instead of selecting."
11   A. Yes.
12   Q. And right above that, I'm going to look, the
13  sentence or two right before that at the end of the
14  prior paragraph, four lines from the bottom of that
15  paragraph you write, "For these reasons, evidence of
16  causality should be gauged by a critical evaluation
17  of design decisions such as whether an adequate set
18  of matched control communities that are as similar as
19  possible to Acreage but are not exposed to a similar
20  set of contaminants can be identified.  We called
21  them matched control communities."
22      Did I read that right?
23   A. Yes.
24   Q. And matched controlled communities are
25  similar in terms of geographic, demographic,

Page 118

1  socioeconomic, and behavioral features, but not
2  proximate to a potential source of industrial
3  chemical exposure; correct?
4      A. Are you reading something I -- are you
5  reading the text of this, or is it a question?
6      Q. Well, we can look at -- if you look at page 5
7  of your rebuttal report. And at the bottom of that
8  page under where it says "Response," and tell me when
9  you're there, and I'll -- I'll wait.
10     A. One, two, three, four, five. Okay. I'm
11  there.
12     Q. Do you see it says, "Response," and then
13  the -- I think it's the eighth line down in the
14  middle, you say, "A better approach would have been
15  to identify communities that are similar to The
16  Acreage in terms of geographic, demographic,
17  socioeconomic, and behavioral features but are not
18  proximate to a potential source of industrial
19  chemical exposure."
20         Do you see that?
21     A. Yes.
22     Q. And that's referring to the same matched
23  control communities that you're referring to at page
24  3 of your initial report; right?
25     A. I believe so, yes.

Page 119

1      Q. Did you identify any matched control
2  communities to Acreage?
3         MR. LATHAM: Objection.
4      A. As I said at the beginning, I -- up to now I
5  have not conducted a statistical analysis myself.
6  This report and what I'm arguing here was about the
7  standard procedure in causal inference to
8  identified -- when in -- okay.
9         Under causal inference framework, if you
10  wanted to make causal statement about whether or not
11  the number of cancer cases in the Acreage community
12  is elevated with respect to the expected number, the
13  expected number of cases should be calculated from a
14  set of communities that are matched. That means they
15  are as similar as possible to ostensive
16  characteristics to Acreage but to the degree as
17  possible not -- not being exposed to the same
18  contaminants.
19         And what I was arguing here, which I think
20  it's a statement that would be very much embraced by
21  the causal inference literature, which is also an
22  analysis I haven't conducted, I reviewed myself, back
23  to the Aerojet case, is that the state of Florida as
24  a whole cannot be considered an adequate control for
25  this type of -- of calculation. It could, you know,

Page 120

1  lead to upward bias -- sorry -- could lead to upward
2  bias of the expected, so -- and downward bias of the
3  submission of the SIR.
4      Q. Did Dr. Smith identify any matched control
5  communities to Acreage?
6      A. Not to my recollection.
7         MR. LEVINE: No further questions.
8         MR. LATHAM: Okay. Seemed quicker
9      than 15 minutes, even. So just give me
10     a second, and we'll begin. (Pause.)
11
12         EXAMINATION
13  BY MR. LATHAM:
14     Q. Good afternoon, Dr. Dominici.
15     A. Good afternoon.
16     Q. I believe that in your testimony this morning
17  you said something to the effect that you consider
18  yourself a, quote, data scientist, close quote; is
19  that correct?
20     A. Yes.
21     Q. Could you explain what you mean by that?
22     A. Yes. So I am one of the two directors of
23  data science at Harvard. Right now in the most
24  recent days, there is, I would say, this up-and-
25  coming field where it's widely acknowledged that we

Page 121

1  have access to much more information and several
2  sources of heterogeneous information that can advance
3  our knowledge --
4      Q. If I can pause you, several sources of, what
5  was that word?
6      A. Information.
7      Q. I thought there was an inter something
8  information.
9      A. Oh, sorry. Several sources, maybe I said
10  "heterogenous information"?
11     Q. Yes.
12     A. Yes.
13     Q. Thank you.
14     A. And I think that it's very well accepted that
15  these days, because of our ability to use cellphone
16  data and ability to use sensors, ability to access
17  genetic information, and so on, we tend to have at
18  our disposal many, many sources of heterogeneous
19  information.
20         The goal of a data scientist is to take
21  different sources of information, integrate, assess
22  the reliability of the different sources of
23  information and advanced knowledge in different
24  areas.
25         I consider myself an expert not only in data

Page 122

1  science, but the intersection of data science and
2  environmental health, which is a field that is
3  specifically targeted into assessing health risks
4  associated with exposure to environmental causes or
5  environmental contaminants.
6      Q.  And -- and the word that I had -- had paused
7  you on just earlier was "intergenous"; is that
8  correct?
9      A.  "Heterogenous."
10     Q.  Oh, I -- now I understand.
11     A.  I'm sorry.  Heterogenous.
12     Q.  I was hearing "inter" and not "hetero."  Yes,
13  heterogenous.
14     A.  Heterogenous.
15     Q.  Yes.  I know this word.  Thank you.
16         And --
17     A.  Different -- sources of different types,
18  different nature.
19     Q.  Yes, yes.  Of course.
20         And I believe that you also have referenced
21  that in addition to being an expert statistician, you
22  are an expert biostatistician?
23     A.  That's correct.
24     Q.  How -- how does the expertise in
25  biostatistics differ from just expertise in general

Page 123

1  statistics?
2      A.  Yes.  The expertise in biostatistics is an
3  area where, in addition of being an expert as a
4  statistician, you acquire additional expertise in the
5  general field, what I will call it the biomedical
6  sciences.  And so better understanding and knowledge
7  and expertise on etiology of diseases, the risk
8  factors, and, you know, all things related to health
9  data and cause and prevention.  Cause of adverse
10 health effect and prevention of adverse health
11 outcomes.
12     Q.  Does -- does this expertise in some way,
13 then, relate to expertise in disciplines dealing with
14 biology and health?
15     A.  Yes.  Very much.
16     Q.  Could you explain that a little bit?  What
17 is -- how does the biostatistician interact with
18 those experts and their materials?
19     A.  Yeah.  Yeah.  I mean, you know, my entire --
20 my entire career, academic career, and my extensive
21 record of peer-reviewed publications demonstrate that
22 in the great majority of studies of epidemiologic and
23 clinical studies that have been conducted, because
24 always require highly interdisciplinary expertise.
25 And so we work with varying interdisciplinary team

Page 124

1  members with expertise ranging from biological
2  expertise, clinical expertise, radiation, oncology
3  expertise.  We rely on these experts.  We rely on the
4  information they provide to us on the different
5  forms, and that's why I use the word "heterogenous."
6  And because when we're thinking about a statistical
7  analysis in the context of data science, their
8  expertise play a primary role into forming the
9  conclusion.
10     Q.  So does the expert biostatistician have
11 expertise that allows her to, in some way, critically
12 incorporate the conclusions of these other fields?
13         MR. LEVINE:  Objection.  Leading.
14     A.  Yes, I would guess so.  I mean I would say
15 so, because, you know, as you can imagine, when you
16 are working intrinsically with hetero -- very
17 multidisciplinary sense of, you know, expertise
18 yourself, you get, you know, very familiar with --
19 with, you know, several topics that are above and
20 beyond calculating a statistical test, which is why
21 I've objected early this morning about what would be
22 a definition of "statistical expertise."
23     Q.  In your expert work as a biostatistician, do
24 you then rely on the conclusion of reports of experts
25 in biological, medical, and health fields?

Page 125

1      A.  Yes.
2          MR. LEVINE:  Objection.  Leading.
3      A.  Yes, all the time.  And maybe -- maybe I can
4  provide -- I don't know if that would be helpful.  I
5  can provide an example.  You know, they -- I -- when
6  the Environmental Protection Agency set the new
7  National Ambient Air Quality Standards, which are the
8  most extensive, consequential regulatory policy, and
9  lowered the safety standard of level of air pollution
10 in the air, themselves, and myself as a
11 biostatistician, incorporate and review and base all
12 the epidemiologic, toxicology, and biological
13 evidence that is about the potential harmful effect
14 of this level of contaminants.
15         MR. LATHAM:  What exhibit number
16 are we at now?
17         MR. LEVINE:  11.  Here's stickers
18 if you want them.
19         MR. LATHAM:  Yeah.  Yeah.  That'd
20 be great.
21         (Exhibit 11, SharePoint
22 screenshots, marked.)
23     Q.  Okay.  Introducing Exhibit 11, which is a
24 two-page composite exhibit, the first page having
25 what appears to be clipped images from a web page.

Page 126

1      Dr. Dominici, if you could refer to the first
2  page of this exhibit, the top image, if you could
3  examine that, including the URL and the material in
4  the main part of that.  Does that -- is that image
5  familiar to you?
6      A.  This image said "Files > Acreage, Expert
7  Francesca Dominici."  And you say if -- if it's
8  the filed expert reports, is this familiar, yes.  So
9  this is familiar.  This is a -- what they call it --
10  a share file, a folder where all different
11  information was saved.
12     Q.  Okay.  And -- and from the -- the URL, can
13  you tell the source of this?
14     A.  Yes.  It's your search.  "Searcylawfirm," the
15  SharePoint.  That's the personal drive that you have
16  shared with me.
17     Q.  Okay.  Do you recall the -- the context in
18  which I shared this drive and material with you?
19     A.  Yes.  You have done this to provide as much
20  information as possible about the case.
21     Q.  If you could refer to the second image there
22  on that first page.  Sorry, still on the first page.
23     A.  Okay.
24     Q.  It's -- it's hard to see.  There are actually
25  two -- the copy's not that clear.  There are two

Page 127

1  clips from that web -- or from different pages at
2  that website.
3          What do you note here in the second image?
4      A.  Second -- second image are folders which are
5  organized based on topics.  So I -- I read all of the
6  "Affidavits filed 12-1-17," the "Biostatistics,"
7  "Environmental Contamination," "Human Physiological
8  Effects," and "Other Potentially Relevant," I
9  meant -- I believe --
10     Q.  And -- and --
11     A.  -- it's "Experts."
12     Q.  And what title -- what -- what folder do
13  those five folders that you just read appear to be
14  subfolders of?
15     A.  Oh, of -- of course.  "Filed Expert Reports."
16     Q.  Thank you.
17          If you could refer to the -- to the next
18  page, do you recognize this list?
19     A.  Yes, I do.  This was at the beginning where
20  we -- you have engaged me in the case, and you have
21  created these shared files with subfolders organized
22  by the biostatistics and environmental contamination
23  and the human and physiological effects.  And so
24  there are subfolders organized, and within each
25  subfolder, there are different reports organized

Page 128

1  based, you know, the topic, the biostatistics,
2  contamination, and the physiological effects.
3      Q.  And from what is listed here, can you tell
4  whether these are all reports from plaintiff experts?
5      A.  I'm sorry.  What -- can you repeat the
6  question?
7      Q.  Can you tell whether all the reports listed
8  here are from experts engaged by the plaintiffs?
9      A.  To my understanding, to the best of my
10  recollection, yes, they are.
11     Q.  Okay.  What about Dr. Marais?  Or Marais.
12     A.  Yes.
13     Q.  Is he an expert for the plaintiffs?
14     A.  Oh, I'm sorry.  No, he's not.  He's an expert
15  for the defense.
16     Q.  Okay.  And what about, going down to the next
17  category, Dr. Frazier?
18     A.  Yeah.  And, I'm sorry, I -- I must have --
19  I'm getting tired.  I must not have understood your
20  question.  I thought that you meant these were all
21  information that you were providing to me.
22          So this was the full extent of information to
23  my recollection that you -- you provided to me, and
24  it was a mix of reports from, you know, both sides,
25  from the plaintiff and the defense.

Page 129

1      Q.  Now, when you say this is the full extent of
2  information, are you asserting that what's listed on
3  this page is all that was provided?
4      A.  No, I'm not certain about that.  But a lot of
5  these reports, you know, ring -- ring a bell of -- of
6  information that you have indeed included in these --
7  into this SharePoint drive.
8      Q.  Do you recall whether Rachel Nethery has
9  reviewed any of the expert reports and discussed
10  summaries of the contents with you?
11          MR. LEVINE:  Objection.
12     A.  Yes.
13          MR. LEVINE:  Lacks foundation.
14     A.  Yes, she -- she did.  I -- I -- I charged her
15  or asked her to abstract from the SharePoint drive
16  any relevant information with respect to -- that
17  would be relevant, either that was from each side,
18  whether it was from the plaintiff or from the
19  defense, for addressing issues related to the
20  multiple comparison problem.
21     Q.  And did -- did both you and Ms. Nethery
22  review Dr. Marais's reports?
23     A.  Yes.
24     Q.  Do you recall whether in his reports, Dr.
25  Marais has -- had made reference to any of the

Page 130

1  conclusions of the experts for the defense?
2      MR. LEVINE: Objection. Leading.
3      A. No.
4      Q. You don't recall?
5      A. Oh, I recall that he did not.
6      Q. Okay. This morning you were asked about Dr.
7   Smith's several reports and the change of the time
8   interval for which statistics were given between each
9   report. Do you recall that?
10     A. Yes.
11     Q. Okay. For an expert biostatistician, would
12  it be customary practice to alter one's analysis when
13  provided additional information?
14     MR. LEVINE: Objection to form.
15     A. If -- you know, I guess it highly depends on
16  the type of additional information. If the
17  additional information would be extremely relevant in
18  terms of reverting conclusion, of course, yes.
19     Q. Have you been provided any information about
20  this case or anything related to it by any attorneys
21  besides me?
22     A. No.
23     Q. Okay. When you have indicated that I have
24  provided information, in what forms, different types
25  of forms, would the information be provided?

Page 131

1      A. So the most extensive way of providing the
2   information was to sending this shared drive where
3   all of the reports were listed and organized by
4   topic, and then in some specific instances -- I'm
5   sorry -- in some specific instances are responding
6   our questions about some of the materials,
7   considering that the material provided to me was too
8   extensive, and my involvement in the case has been
9   now for a limited number of time, the attorney
10  responded questions and often referenced his answer
11  based on information that was included in these
12  reports, saved in the shared drive.
13     Q. So the -- do I understand that I would
14  provide information, then, in response to your
15  questions about the material you already have?
16     A. Correct.
17     MR. LEVINE: Objection. Leading.
18     Q. Okay. And in those answers, would I cite to
19  expert reports?
20     MR. LEVINE: Objection. Leading.
21     A. That's correct.
22     Q. With regard to information about latency,
23  what type of sources might an expert biostatistician
24  consult?
25     A. I think the most -- most two important

Page 132

1   sources are the peer-reviewed scientific literature,
2   information on the Internet that has a reliable
3   source, like, you know, the American Cancer Society,
4   and information of collaborators that are experts in
5   the field.
6      Q. I believe you mentioned that you had reviewed
7   a draft of -- strike that.
8      Have you -- have you reviewed some of the
9   transcript of testimony from Dr. Marais's deposition
10  of this week, specifically May 1st, 2018?
11     A. Yes, I did.
12     Q. Do you have any opinions as to what was said
13  there that are relevant to your critique of his
14  analysis?
15     MR. LEVINE: I'm going to object
16     to that as, number one, going beyond
17     the scope of my direct, and number
18     two, improper under Rule 26.
19     MR. LATHAM: Could you be more
20     specific with regard to Rule 26?
21     MR. LEVINE: Yeah. If someone has
22     an opinion under Rule 26, you've got to
23     submit a report. You can't just get up
24     and ask in a deposition, "Hey, what
25     else do you have to offer?"

Page 133

1      MR. LATHAM: Well, okay. I'll
2      note your objection. I'll also note
3      that I don't think it's beyond the
4      scope because you asked her about his
5      deposition testimony.
6      MR. LEVINE: Actually, I didn't.
7      A. Can I still answer?
8      Q. Yeah. Please go ahead.
9      A. In my -- my opinion are I'll just -- the --
10  the opinion that I -- I have, based on reviewing the
11  deposition, is confirmed -- is confirmed some of the
12  opinions I expressed before that Dr. Marais has no
13  experience whatsoever on integrating information,
14  biological and biomedical information, in the context
15  of assessing the weight of evidence of exposure to an
16  environmental contaminant on health.
17     His example and his rationale and his
18  statistical framework under which he casts the
19  problem, I found it unreasonable and not capturing
20  the real situation. He uses examples related to coin
21  tossing and -- is it the roulette? So he uses
22  examples that are not relevant in this case and
23  assume independence, assume -- independence of unit,
24  assume complete randomization and deny the potential
25  of even of the existence of a source of

Page 134

1 contamination. It ignores a possibility of spatial
2 correlation of the data.
3       So from his deposition, it's clear that there
4 is absolutely no -- no multidisciplinary expertise
5 that Dr. Marais has, you know, has had the
6 credibility to bring these issues on the table.
7    Q. And -- and how is multidisciplinary
8 expertise -- or is multidisciplinary expertise
9 important for the analysis at issue that you've
10 examined in this case?
11    A. I'm bringing in and referring to what is
12 considered the state of the art across all of the
13 government agencies, including the Institute of
14 Medicine, the National Academy of Science, the
15 Environmental Protection Agency, and IARC, which is
16 the Institute of Agency for Cancer Research.
17       Across all of the highest level and rigorous
18 governmental agency that studied whether or not there
19 is a causal relationship between an environmental
20 source of contamination and increased risk, whatever
21 is the contamination, whatever is the risk, in all of
22 the settings, what they do, they assemble
23 multidisciplinary expert panel of group of experts
24 across the different fields.
25       In my own role as a biostatistician and as

Page 135

1 surveying of at least seven of these Institute of
2 Medicine reports has been to -- got to learn to
3 integrate multidisciplinary information to ultimately
4 make an assessment of the weight of evidence as to
5 whether or not it's more likely than not that an
6 environmental source of a contaminant can causally
7 increase the risk of disease, and I've done that
8 across many different settings.
9    Q. And is that process you just described what
10 you have employed with your work so far in this case
11 in your two reports?
12    A. Yes. So that's -- that's exactly my career,
13 my expertise, and that's what I do all the time.
14    Q. Okay. And for -- in preparation of your two
15 reports in this matter, did you rely on Rachel
16 Nethery to provide summaries for you of some of the
17 relevant sources?
18    A. Yes, of course. That's also what I do all
19 the time. As -- as the source of information on so
20 many in heterogenous that I rely on trustworthy,
21 trained PhD-level experts in my team to help me with
22 extracting the relevant information to the case.
23       And I should also add that in every setting
24 of -- again, and I'm mentioning the Institute of
25 Medicine, the National Academy of Science, these are

Page 136

1 multidisciplinary teams; even when they gather toward
2 extending and judging causal relationships between
3 exposure to contaminants and health are themselves
4 supported by PhD staff members employed by the
5 Institute of Medicine that provide information to
6 them. That's the standard procedure that is done.
7 (Pause.)
8       I could probably -- can I -- can I expand on
9 that for a moment? If we --
10    Q. Certainly.
11    A. If we go to page 3 of my curriculum vitae,
12 under page 3 there is "Participation on Advisory
13 Panels."
14    Q. Uh-huh.
15    A. And I am just reading the -- the occasion
16 where this procedure, this same identical procedure
17 that I have applied in this case, has been applied in
18 this -- in this advisory panel. Number 3 is
19 "Member of the Scientific Advisory Committee for the
20 Solutions for Energy, AiR, and Climate," which is an
21 interdisciplinary center funded by the EPA.
22       Just going down, if -- just -- just citing
23 the National Academy of Science specifically, the
24 "National Academy of Sciences, Institute of Medicine
25 Committee on Designing an Epidemiologic Study for

Page 137

1 Multiple Sclerosis and Neurologic Diseases in pre-
2 and post-9/11 Gulf War veterans."
3       "Member of the Radiation Effects Research
4 Foundation Board of Councilors."
5       "National Academy of Sciences, Institute of
6 Medicine Committee Research on Health Effects of Low-
7 Level Ionizing Radiation Exposure: Opportunities for
8 the Armed Forces Radiobiology Research Institute."
9       I'm just selecting the National Academy.
10 "National Academy of Sciences, Institute of Medicine
11 Committee on Gulf War and Health: Long-Term Effects
12 of Blast Exposures."
13       "National Academy of Sciences, Institute of
14 Medicine Committee to Review the Federal Response to
15 the Health Effects Associated With the Gulf of Mexico
16 Oil Spill."
17       "National Academy of Sciences, Institute of
18 Medicine Committee on Long-Term Health Consequences
19 of Exposure to Burn Pits in Iraq and Afghanistan."
20       "National Academy of Sciences, Institute of
21 Medicine Committee on Secondhand Smoke Exposure and
22 Acute Coronary Events."
23       "National Academy of Sciences, Institute of
24 Medicine Committee to Review ATSDR's Great Lakes
25 Report," which there were contaminants there.

Page 138

1    "National Academy of Sciences, Institute of
2    Medicine Committee on Making Best Use of Agent Orange
3    Exposure Reconstruction Model."
4         Two more. "National Academy of Sciences,
5    Institute of Medicine on Gulf War and Health," and
6    finally "National Academy of Sciences Committee,
7    Institute of Medicine to assess potential health
8    effects from exposures to PAVE PAWS low-level phased-
9    array radiofrequency energy in Cape Cod."
10        In all of these settings, this was a
11   multidisciplinary panel, and the type of review they
12   have done was perfectly consistent with the review
13   I've done in this setting.
14        Q.  What is your opinion on -- strike that.
15        Are the opinions with regard to the multiple
16   comparisons question that you've expressed in your
17   report dependent on a precise knowledge of all of the
18   evidence in the case on exposure and contamination?
19        A.  No.
20             MR. LEVINE:  Objection to form.
21        A.  I elaborated on that previously.  And this is
22   true in any context of the multiple comparison
23   problem is it's not necessary to have a precise in
24   order to form a personal opinion about the
25   reliability of every single source of information.

Page 139

1    What is important is to know enough of the context
2    surrounding the choice of the time period and
3    surrounding the choice of the geographical region
4    that you will have some sort of understanding of the
5    many -- what is reasonable to assume of the entity
6    of, you know, the false positive rate.  So it's --
7    it's the context that is important more than
8    absolutely precise knowledge about every single
9    source of information.  And that was my intent in
10   this.
11             MR. LATHAM:  Just a second.
12        (Pause.)
13        Q.  With regard to the geographic area of The
14   Acreage that was selected for the study by the FDOH,
15   does that appear to be an incidence-driven boundary
16   selection?
17             MR. LEVINE:  Objection.  Leading,
18        form.
19        A.  Not -- I mean not at all.  I think for the
20   following reason:  One is -- and I think -- I believe
21   I included a figure in -- in my report.  If we refer
22   to my report, the one dated March 13, figure 2, going
23   back to what were considered a post hoc and a
24   selection bias analysis and also, again, what I
25   extensively researched about what it means, the Texas

Page 140

1    sharpshooter phenomenon, that would mean selecting a
2    geographical area post hoc where the incidence case
3    would have occurred and so would have led to this
4    triangle here where the Acreage community, which not
5    only I -- it was described in FDOH report, but I went
6    myself on Google Earth to look, is clearly defined as
7    a geographical area, and the boundaries are drawn
8    where the residential area, and it's pretty evident
9    to me from any visual inspection from, you know, the
10   Google Earth, the Google Earth map.
11        Q.  Does your opinion on whether or the degree to
12   which there's a multiple comparisons problem in this
13   case with respect to geographic area or other
14   categories change if the begin and -- beginning and
15   ending interval dates change by a year or two on
16   either end?
17             MR. LEVINE:  Objection to form.
18        Q.  And if you could answer audibly.
19        A.  Sure.  No, it will not change.  As I
20   explained before, there are two extremes.  And the
21   Marais analysis, in my opinion, is purposely designed
22   to maximize and inflate the multiple comparison
23   problem at the highest possible extreme, because he
24   considered and maximized the total number of all
25   conceivable tests that you could have done,

Page 141

1    maximizing about all of the possible geographical
2    areas that you could have selected, even I would say
3    in an highly unreasonable way by -- by partitioning
4    the entire state of Florida in all possible
5    combinations of subsets of the same -- of subset
6    geographical regions based on the -- on the same
7    population size, and maximizing all of the
8    conceivable selection of study periods, the
9    certification by tumor size and gender.
10        So I -- I have a strong opinion that the
11   Marais analysis and infantization (phon sp) of the
12   multiple comparison problem was purposely designed to
13   maximize the number of potential tests that could be
14   conducted.
15        On the other extreme, I think that even
16   though that it would be reasonable to do some
17   sensitivity analysis to assess the robustness of the
18   conclusion to different assumption, the number of
19   sensitivity analyses, the number of alternative
20   analyses that could be done would be a reasonable
21   number.  And even under all of these reasonable
22   numbers and even under the Bonferroni correction, the
23   whole body of evidence will be still supportive of an
24   excess number of cases expected to observe.
25        So a quick answer to your question is changes

Page 142

1  of a year or two or even small changes with respect
2  to the geographical boundary or even per se of the
3  different approaches for submitting the -- the
4  expected number of cases would have not reversed my
5  conclusion and my understanding of the extent of the
6  multiple comparison problem because Marais considered
7  the worst possible, unreasonable scenario.
8          MR. LATHAM:  That's all I have.
9
10             EXAMINATION
11  BY MR. LEVINE:
12    Q.  You mentioned that Rachel, is it Nethery?
13    A.  Nethery, yeah.
14    Q.  Rachel Nethery did some summaries for you.
15  Did you bring those summaries with you in response to
16  the subpoena?
17    A.  I believe not.
18    Q.  Okay.  You also said, if you look at Exhibit
19  11, which was provided to you by Mr. Latham, the
20  second page lists a number of expert reports.  Do you
21  see that?
22    A.  Oh, this one here?
23    Q.  Yes.
24    A.  Sorry.  The Exhibit 11, yes.
25    Q.  Second -- yeah.  The second page lists some

Page 143

1  reports.
2    A.  Yup.
3    Q.  And you testified that Ms. Nethery would
4  provide excerpts to you; is that right?
5    A.  Yes.
6    Q.  Do you recall any particular excerpts that
7  Ms. Nethery provided to you with respect to
8  defendant's expert reports other than Mr. Marais --
9  Dr. Marais?
10    A.  Yes.  I -- I believe she did.  I cannot point
11  on anything in particular to tell you how the -- you
12  know, how the interaction with Dr. Nethery occurred
13  is that Dr. Nethery and I meet regularly for an hour
14  a week.  And in this context, if there were
15  information related to the report that were important
16  for me to review, you know, we will discuss.  So it's
17  totally possible that verbally she would have
18  mentioned some of them.
19    Q.  Do you remember anything in writing that Dr.
20  Nethery provided to you with respect to Dr. Frazier,
21  Dr. Missimer -- I guess those two.
22    A.  No, I don't recall.  But I would like to
23  point out again that my intent and also the work with
24  Dr. Nethery was not to assess the reliability or have
25  an expert opinion about any of these reports in

Page 144

1  specific, not the one of the plaintiff, not the one
2  of the defense.
3    Q.  All I want to know is what you remember.  Do
4  you remember getting anything specific in writing
5  from -- from Dr. Nethery about what was said by Dr.
6  Frazier or Dr. Missimer?
7    A.  No.
8    Q.  Okay.  And you testified a while about your
9  work in interdisciplinary panels; right?
10    A.  That's correct.
11    Q.  And you've referred to a number of National
12  Academy of Science panels that you've been on; right?
13    A.  That's correct.
14    Q.  And you're on those panels with other people
15  who are experts in other fields besides statistics or
16  biostatistics; correct?
17    A.  That's correct.
18    Q.  And when you're members of the panel with
19  these other experts, do you get to interact with the
20  experts?
21    A.  That's correct.
22    Q.  Do you get to talk to them about jointly what
23  you're working on?
24    A.  That's correct.
25    Q.  And do you get to review in writing, you

Page 145

1  know, what they've said about their particular area
2  that's relevant to the panel?
3    A.  That's correct.
4    Q.  Did you speak to any of the plaintiffs'
5  experts in this case?
6    A.  No, I did not.
7          MR. LEVINE:  Nothing further.
8      Thank you for your time.
9          MR. LATHAM:  Okay.
10          THE VIDEOGRAPHER:  The time is
11      2:30 p.m.  This is the end of the
12      deposition.  We are off the record and
13      disk.
14          (Deposition concluded.)
15
16
17
18
19
20
21
22
23
24
25

Page 146

1    ERRATA SHEET DISTRIBUTION INFORMATION

2    DEPONENT'S ERRATA & SIGNATURE INSTRUCTIONS

3

4

5        ERRATA SHEET DISTRIBUTION INFORMATION

6

7    The original of the Errata Sheet has been

8    delivered to Darren Latham, Esquire.

9    When the Errata Sheet has been completed by the

10   deponent and signed, a copy thereof should be

11   delivered to each party of record and the ORIGINAL

12   forwarded to Mark L. Levine, Esquire, to whom the

13   original deposition transcript was delivered.

14

15        INSTRUCTIONS TO DEPONENT

16

17   After reading this volume of your deposition,

18   please indicate any corrections or changes to your

19   testimony and the reasons therefor on the Errata

20   Sheet supplied to you and sign it.  DO NOT make marks

21   or notations on the transcript volume itself.  Add

22   additional sheets if necessary.  Please refer to the

23   above instructions for Errata Sheet distribution

24   information.

25

Page 147

1    PLEASE ATTACH TO THE DEPOSITION OF FRANCESCA DOMINICI

2    CASE:  MAGALY PINARES, ET AL. VS. UNITED TECHNOLOGIES

3    CORPORATION

4    DATE TAKEN:  MAY 4, 2018

5        ERRATA SHEET

6    Please refer to Page 146 for Errata Sheet

7    instructions and distribution instructions.

8    PAGE LINE   CHANGE     REASON

9    _____

10   _____

11   _____

12   _____

13   _____

14   _____

15   _____

16   I have read the foregoing transcript of my

17   deposition, and except for any corrections or changes

18   noted above, I hereby subscribe to the transcript as

19   an accurate record of the statements made by me.

20

21   Executed this _____ day of _____, 2018.

22

23        _____

     FRANCESCA DOMINICI

24

25

Page 148

1    COMMONWEALTH OF MASSACHUSETTS       SUFFOLK, SS.

2

3        I, JAMES A. SCALLY, RMR, CRR, a
     Certified Shorthand Reporter and Notary Public duly

4    commissioned and qualified in and for the
     Commonwealth of Massachusetts, do hereby certify that

5    there came before me on the 4th day of May, 2018, at
     10:08 a.m., the person hereinbefore named, FRANCESCA

6    DOMINICI, who provided satisfactory evidence of
     identification as prescribed by Executive Order 455

7    (03-13) issued by the Governor of the Commonwealth of
     Massachusetts, was by me duly sworn to testify to the

8    truth and nothing but the truth of her knowledge
     concerning the matters in controversy in this cause;

9    that she was thereupon examined upon her oath, and
     her examination reduced to typewriting under my

10   direction; and that this is a true record of the
     testimony given by the witness to the best of my

11   ability.
        I further certify that I am neither

12   attorney or counsel for, nor related to or employed
     by, any of the parties to the action in which this

13   deposition is taken, and further, that I am not a
     relative or employee of any attorney or counsel

14   employed by the parties hereto or financially
     interested in the action.

15

16

     My Commission Expires:  April 8, 2022

17

18

19

20        _____
        James A. Scally, RMR, CRR
        CSR/Notary Public

21

22

23

24

25

```
 1   PLEASE ATTACH TO THE DEPOSITION OF FRANCESCA DOMINICI
 2   CASE:  MAGALY PINARES, ET AL. VS. UNITED TECHNOLOGIES
 3   CORPORATION
 4   DATE TAKEN:  MAY 4, 2018
 5                     ERRATA SHEET
 6   Please refer to Page 146 for Errata Sheet
 7   instructions and distribution instructions.
 8   PAGE LINE    CHANGE        REASON
        See attached.
 9   _____
10   _____|
11   _____
12   _____
13   _____
14   _____
15   _____
16          I have read the foregoing transcript of my
17   deposition, and except for any corrections or changes
18   noted above, I hereby subscribe to the transcript as
19   an accurate record of the statements made by me.
20
21       Executed this  14  day of  May    , 2018.
22
23                      Francesca Dominici.
24                      FRANCESCA DOMINICI
25
```

U.S. LEGAL SUPPORT
www.uslegalsupport.com