**Initial Expert Report of Francesca Dominici, Ph.D.**
**Bio-Statistical Review of Reports and Data on Acreage Community Brain Cancer Incidence and Causality Issues**

**December 22, 2017**

I am Francesca Dominici, Ph.D., Professor of Biostatistics at the Harvard T.H. Chan School of Public Health and one of the Directors of the Harvard Data Science Initiative.  My expertise is in the development of statistical methods for the analysis of large, messy data and for combining information across heterogeneous data sources.  I have lead several interdisciplinary groups of scientists with the ultimate goal of addressing important questions in environmental health science, climate change, comparative effectiveness research in cancer, and health policy.

In recent years, I have led a team to conduct rigorous statistical analyses of terabytes of data to provide robust evidence on the adverse health effects of air pollution. My studies have directly and routinely impacted air quality policy and led to more stringent ambient air quality standards in the US.

In 2016, I was awarded the Janet L. Norwood Award for Outstanding Achievement by a Woman in the Statistical Sciences. In 2015, I was awarded the Florence Nightingale David award based on my contributions as a role model to women and my demonstrated excellence in: statistical research, leadership of multidisciplinary collaborative groups, statistics education and service to the profession of statistics. In 2015, I was recognized by Thomson Reuter's in the list of the most highly cited researchers, ranking in the top 1% of scientists cited in my field.  In 2017, I was recognized as one of the top 10 Italian women scientists with the largest impact in biomedical sciences across the world. My most recent work published in the New England Journal of Medicine[1] on June 29, 2017 has  been covered by the New York Times, Los Angeles Times, and NPR, among many others. I have published more than 190 peer-reviewed publications; my H-index is 63 and H10-index is 159. More details are available in my CV and my web site (https://sites.sph.harvard.edu/francesca-dominici/).

I have been engaged by plaintiffs' counsel Searcy, Denney, Scarola, Barnhart & Shipley, P.A., to provide an opinion in in connection with the case United States District Court – Southern District of Florida case no:  10-cv-80883-Marra/Hopkins (Consolidated Case) Magaly Pinares, et al, plaintiff vs United Technologies Corporation, Defendant, in particular on behalf of the individual plaintiffs in Santiago v. United Technologies Corp., Case No. 14-cv-81385, and Featherston v. United Technologies Corp., Case No. 17-cv-80545.

In preparing this report, I have reviewed:

- *Acreage Cancer Review, Palm Beach County* (Florida Department of Health, August 2009) (FDOH Level I)
- *Acreage SIR Recalculation Population Estimate Methods and Results* (Florida Department of Health, 2010)
- *Acreage Community Case-Control Data Analysis* (Florida Department of Health, September 2010) (FDOH Level II)

- The Acreage Drinking Water & Soil Sampling, February, March and April 2010, Loxahatchee, Palm Beach County, Florida (Florida Department of Environmental Protection, August 2010)
- Reports previously filed by the plaintiffs in the above-referenced cases or in the related consolidated putative class action, including two statistical analysis reports by statistical expert Richard L. Smith (August 8, 2016 and December 23, 2016) and Dr. Smith's Affidavit of December 1, 2017 (filed in Case No. 13-cv-80928.)

### A. Overview

I have been asked to address the following two questions with the highest possible rigor:

1) Is there strong evidence that number of cancer cases in Acreage is larger than what would be expected by chance?

2) Is there strong evidence that acute and chronic exposure to UTC-sourced environmental contaminants increased the risk of cancer in Acreage?

I have also been asked to provide my expert opinion regarding the FDOH Level 1 analysis (section B), Richard Smith's statistical analyses (section C), FDEP water and soil sampling study and FDOH Level 2 case control study (section E). I will also discuss as whether the FDOH analyses could be affected by the multiple comparison and the Texas sharpshooting fallacy (section D).

**Summary**: In brief, I generally agree with Dr. Smith's analyses and conclusions, and reject the applicability of the multiple comparison fallacy to the statistics reported by the FDOH and corrected and extended by Dr. Smith. The main reason why I reject the multiple comparisons critique is that we are not dealing with a situation of <u>after the fact selection of patches to be tested</u>. Indeed, as detailed in section D, the selection of the time frame (2004-2009) and the geographical area of Acreage is well justified. There is extensive evidence: (i) that UTC's industrial activities in the vicinity of the Acreage have contaminated the soil and water within the Acreage and (ii) that exposure to UTC-sourced environmental contaminants, including radioactive materials, has been the cause of cancer cases, particularly brain and CNS tumors, diagnosed in the Acreage since the 2000s.

### B. The FDOH Approach of Using the Entire State of Florida as the Control Might Overestimate the Relevant Expected Rate, as It Is Derived in Part from Incidence in Exposed Populations

The FDOH uses a well-accepted statistical approach to test whether the observed number of cancer cases in Acreage is statistically significantly higher than what would be expected. However, I am concerned that the current estimate of the expected number of cancer cases (denominator of the SIR) adopted by the FDOH could be biased upwards. I argue that if (i) some types of industrially-sourced environmental contamination cause brain cancer, (ii) those types of industrial contamination were present in parts of Florida other than the vicinity of the Acreage, then the expected rate employed by the FDOH—based on incidence in the entire state of Florida—was likely higher than the rate that should be expected were the Acreage community free of that type of contamination.

To explain the rationale behind that concern, I briefly review key principles on how to establish causation in analyses of observational studies. In scientific research, the gold standard for assessing links between exposure (e.g. acute and chronic exposure to contaminants from UTC's industrial activities) and disease (e.g. brain cancer) is to conduct a randomized experiment. That is, we would randomly assign individuals to be exposed to these contaminants and others not to be exposed at all to any of these contaminants. Because of the randomization, the only intentional difference between these two groups is the exposure to the contaminants: because of the randomization, on average the population of individuals that are exposed and unexposed will be similar in terms of other characteristics such as socio-economic status, age, gender, race etc.[2] An example of randomized experiment is the controlled clinical trials, which is the gold standard in the context of drug approval. In a randomized clinical trial, scientists have control of the experiment and randomly choose which patients get the new drug and which patients get the old drug or the placebo. On average, the only difference between these two groups of patients will be the assignment to the old versus the old drug.

However, a randomized experiment to estimate the causal effects of exposure to contaminants from UTC's industrial activities on cancer cannot be conducted for ethical reasons. Rather, we must find a way to use observed variation in exposure to contaminants to learn causal effects. Following well established and peer reviewed contributions in causal inference, so-called matching methods have become standard approaches to causal inference in observational studies[3–8]. In a nutshell, matching methods aim to find study participants or study regions who differ in their exposure status (in our example, being exposed versus not being exposed to the UTC contaminants), but are as <u>similar as possible to each other</u> in all other important respects (e.g., age, gender, race, socio- economic status, etc.). If the matches are similar enough, then who gets the exposure is very similar to being random among the two members of each pair, and the matching analysis can in fact identify causal effects[8]. For these reasons, evidence of causality should be gauged by a critical evaluation of design decisions such as whether an adequate set of matched control communities that are as similar as possible to Acreage but are not exposed to a similar set of contaminants can be identified[2]. We called them matched control communities.

Instead of selecting <u>matched control communities</u>, the FDOH computed the expected cancer incidence in the Acreage using the entire state of Florida. As pointed out above, because the rest of the state is likely to me somewhat exposed to hazardous materials like those used by UTC, it does not represent a relevant "unexposed" or "control" population with which to compute the expected incidence. Thus, their calculations could have led to an inflated estimate of the expected incidence due to the inclusion of populations exposed to local-industrially-sourced, carcinogenic contaminants on a scale similar to the Acreage population's exposure. And such an inflated expected incidence value would have decreased the SIR reported by the FDOH. The better approach would seek out unexposed communities (matched control communities) with which to compute the expected cancer incidence. I believe that this is a better approach to assess the role of the UTC's contaminants in the development of the cancer cluster.

**C. Critique of Dr. Smith Approach**
I have reviewed the reverse-engineering technique employed by Smith to compute Florida state incidences from the FDOH report (these incidences are critical to his analysis), and I believe that these computations are reliable. Smith also improves on the FDOH analysis by extending the time period to

2004-2009 and using so-called "exact" methods to compute confidence intervals for the SIR. These exact methods, which rely on an assumption regarding the probability distribution underlying the data, are typically more accurate than the approximation technique used in the FDOH report, which relies both on the distributional assumption of the exact method and an additional, often imprecise approximation of the assumed distribution.

The scope of Smith's analysis was limited to critiquing, correcting, and expanding on the FDOH methodology—that is, using the entire state of Florida as the "control" with which to calculate the expected number of cancer cases in the Acreage. This could lead to the phenomena detailed in the previous section—confounding and/or inflation of the expected number of cases due to inclusion of exposed communities.

**D. The Texas Sharpshooter Fallacy**
The Texas Sharpshooter Fallacy, which is closely related to the multiple comparisons problem described above, is a common topic of debate in the cancer cluster literature. The criticism is regarding an <u>after the fact selection of patches to be tested</u>. The name is a play on the idea that there is a backwards process of hypothesis testing analogous to firing a gun at the side of a barn, and later painting a target around the tightest cluster of bullet holes and claiming to be a sharpshooter. In the cancer cluster literature, the argument typically made is that the geographic location and time period of the cluster are defined based on where and when the unusual number of cases was observed, whereas if cancer cluster hypotheses had been made a priori, many tests likely would have had to be performed to determine the locations and time periods of clusters and, thus, statistics related to cancer clusters must be adjusted for these hypothetical multiple comparisons.

As mentioned at the beginning of this report, I do not believe that the current calculations conducted by the FDOH and Dr. Smith regarding estimation of the SIR are affected by the multiple comparison and the Texas sharpshooter fallacy. The following enumerates the rationale behind the geographical area and the time period under study (D.1), including: a) the time frame (D.1.1); b) the potential incidence variation across age, cancer-type, (D.1.2); and c) the selection of the Acreage boundaries (D.1.3**).** All of these points towards the elevation of tumor incidence particularly between 2004 and 2009, among children, sited in the brain, and within the specific geographic bounds of the Acreage community.

**D1. Rationale behind the Geographic Area and Time Period under Study**
In statistical analyses investigating causal links between an exposure and a rare health outcome, care must be taken to define the geographic area and time period under study based on a reasonable hypothesized exposure pathway, rather than on specific observed incidence patterns.

> **D.1.1. Time frame**
> I assume for this analysis that evidence supports the Plaintiffs' allegation that significant contamination of sites throughout the Acreage community by UTC-sourced materials occurred during an intensive phase of UTC's RCRA remediation process between August 2000 and March 2001. And I understand the midpoint of this massive soil transfer episode was around October 24, 2000. That date is the midpoint of the accumulating tallies of truckloads and tonnage of soil manifested as destined for the Magnum processing facility during that interval, which Plaintiffs allege were a source of Acreage contamination. Using that date as an estimate for an initial

environmental contamination event in the Acreage, a causally-related female pediatric brain tumor cluster might not emerge until 2004 for the following reasons:

- An initial environmental contamination event often is temporally separated from a resulting disease diagnosis by many stages, spanning the exposure-pathway and disease process:
  - First, the stages comprising the period from general environmental contamination to specific human exposure:

    Stage 1:  Initial, externally-sourced contamination event (here, late 2000)

    Stage 2:  Migration of contaminant to specific local environment of a particular human subject, gradually (as by groundwater movement, rain, wind, etc.) or episodically (as by a significant flood event)

    Stage 3:  Time between contaminant's initial appearance in victim's specific local environment and human exposure to the contaminant (the uptake event)

    Stage 4:  If effective exposure is chronic rather than acute, an additional duration of repeated uptake events

  - Next, the emergence and progress of the disease (induction and latency):

    Stage 5:  Time from exposure to beginning of disease process (induction period)

    Stage 6:  Time from initiation of disease process (e.g., tumor cell formation) to development of tumor symptoms

    Stage 7:  Time from symptoms emergence to diagnosis

- Those factors, combined with specific indications of disease latency related to age, brain tumors referenced below, point towards the potential emergence of pediatric cluster being delayed to 2004

- Other extrinsic factors point towards the conclusion of the cluster time interval. That is, why the diagnostic manifestations of a late-2000 initial contamination event might begin subsiding in 2010 for the pediatric group:
  - I understand that publicity of the elevated incidence of pediatric brain tumors had reached a critical mass at least within the community of parents of minor children in the Acreage by early 2009. This naturally would impel some parents to modify their children's behavior to reduce environmental exposure, which I understand is reflected in parent testimony and interviews.
  - I understand there was some degree of exodus of families with minor children beginning in 2009, especially after the August 2009 Acreage Cancer Review report identifying the pediatric cancer cluster, then exacerbated by ensuing news media coverage, community events, social media and other informal communications, and the February 2010 FDOH and CDC confirmation of the cluster

- o A final factor on the 2009 endpoint, as supported by the reports of other experts for Plaintiffs, I understand the nature of the alleged late-2000 contamination event is such that not only would the contamination disperse from its initial location over time to expose a wider proportion of the population, but it also may progressively diffuse, in general, thus introducing an endpoint to the quantity and intensity of exposures that would, following latency periods, yield significantly increased incidence in the Acreage. Thus, some endpoint is expected, and the above factors indicate why it could be 2009.

**D.1.2 Potential incidence variation across age and cancer-type**

I have not conducted a comprehensive review of literature regarding incidence or latency variations for the specific types of brain tumors suffered by the Acreage pediatric victims compared to other types of cancer and across age groups. But an incidence of tumors being particularly elevated in brain tissue compared to other sites plausibly may be caused by environmental contamination, based on the following general factors:

- Regarding latency and age

    - o In general, childhood cancers have a shorter latency period than adult cancers. The 2009 Acreage Cancer Review, for instance, includes an excerpt from the FDOH's "Cancer Inquiry Protocol" indicating the latency range for cancer in general to be "8 to 20 years or more depending on the type of cancer"; but for pediatric cancers, it is "generally considered 1 to 8 years." (2009 ACR at 5).

    - o That shorter pediatric latency also applies to brain tumors (latency being especially short for infants and fetuses exposed in utero).

    - o An approximate 1 to 8 years latency range is consistent with a pediatric brain tumor cluster, caused by an environmental contamination event in late 2001, emerging in 2004, with adult incidence lagging enough not be identified in a study period ending in 2007 (as was that in the Acreage Cancer Review).

- Regarding cancer type

    - o National incidence studies have found brain tumors to be the most common type of cancer for children aged 0 to 14

    - o Ionizing radiation has been identified as the primary scientifically-verified environmental cause of brain tumors

**D.1.3 Acreage boundaries**

I have not seen any indication that the FDOH selected the Acreage community as the geographic bounds of its study population only to encompass the reported pediatric brain cancer cases. As argued by Dominici et al.[9] and by Lawson[10], if a study region is defined a priori to be of interest because it includes a pollution source (UTC), one does not suffer from post hoc analysis problems because the internal spatial structure of disease incidence did not influence the choice of the region. Indeed, the Acreage community was selected for all the following reasons.

- The Acreage is identified by name as an "Unincorporated Rural Neighborhood," with specific boundaries, in the Palm Beach County Comprehensive Plan and has been designated a Census Designated Place (specifically, "The Acreage CDP") by the U.S. Census Bureau.

- I understand that the Acreage comprises a large area of fully-developed residential tracts, comprising more than 12,000 homes that rely on individual wells and septic systems. It is bounded primarily by a combination of wildlife preserve lands, farming tracts, and some smaller residential areas. These other residential areas are distinguishable from the Acreage as newer developments that primarily rely on city water, not wells.

- While the Acreage did, in fact, encompass the case homes identified to the FDOH in 2009, it also comprised a large expanse and population relatively-similarly-situated with respect to any potential common local environmental contamination at that time. By contrast, a substantially-smaller (in area and population) geographic boundary drawn around the case homes would yield much higher SIRs but also constitute a suspect arbitrary selection.

- Finally, please note that the results provided by Smith show that, under very conservative adjustments for multiple comparisons, the number of female pediatric brain cancer cases in Acreage is still significantly higher than would be expected by chance.

**E. Criticisms of FDEP Water and Soil Sampling Study and of the FDOH Level 2 Case-Control Study**

**E.1 Background: The FDEP conducted the Acreage Drinking Water & Soil Sampling.** Between August 2009 and April 2010, the FDEP conducted seven sampling events in The Acreage to collect various water and soil samples. These samples were tested for more than 200 individual chemicals associated with industrial or agricultural operations used currently and historically. This extensive sampling included: a) water samples from over 70 private drinking water wells from homes in The Acreage b) pre-treatment and post-treatment water samples from the Seminole Improvement District water treatment plant that provides drinking water to schools and businesses located in The Acreage; and c) Soil samples from 35 private residences and 11 background locations, and Water samples from nearby canals.

As requested by DOH, the homes sampled by DEP included residences where cases of pediatric brain cancer have been identified, as well as a number of other nearby homes to serve as a control group. <u>Control homes were identified by DOH as residences where no children have been diagnosed with a brain tumor, but other characteristics were similar to the case homes.</u> DEP control homes were selected based on <u>geographic proximity</u> to case homes in order to evaluate sites solely on environmental conditions. Although contaminant levels exceeding Florida Primary Drinking Water Standards were detected in some samples, the investigation found no evidence of substantial spills, dumping or area-wide contamination.

**E.2 Background: The FDOH conducted a Level 2 case-control study in the Acreage** Community to determine if there is an association between potential risk factors and pediatric brain tumors among study participants. Cases included individuals under the age of 20 at the time of diagnosis living in the study area who developed a brain tumor between 1994 and 2008. <u>Controls were identified from the same community and matched to the case participants by gender and age (+/- 24 months)</u>. A detailed

questionnaire was administered to the cases and controls. The questionnaire covered a variety of topics related to potential risk factors picked from the scientific literature, other similar studies, and concerns from residents in the study area. Data from the questionnaire responses were entered into a database. One hundred seventy-one categorical variables and one continuous variable were constructed and analyzed in response to two study questions:

1. Is exposure to the potential risk factors outlined in the questionnaire associated with the development of pediatric brain tumors among study participants?
2. Is the amount of time exposed to the study area ("duration of residency" or "exposure time") associated with the development of pediatric brain tumor among study participants?

The findings from the analysis of the case-control data do not indicate any significant and relevant associations between the potential risk factors and the development of pediatric brain tumors among study participants. None of the 172 factors investigated in the study was identified as a risk factor of pediatric brain tumor among study participants in the Acreage Community.

**E.3 Critique**. There are several issues with both these studies and they are listed below.

- First, because the putative source of contamination could have affected the cases and control homes and individuals similarly, the question to be asked is NOT whether case and control homes (which are both located in Acreage) have statistically significant differences in the levels of contaminants (FDEP study) nor whether cancer cases and controls have statistically significant differences in some of their risk factors (FDOH Level 2). The right question to ask is whether in Acreage we detect an unusually large number of cancer cases compared to what would have occurred by chance (absent exposure), with a high level of certainty.

- Imagine a school-bus with 50 children crashes and three of them die. To ask the surviving children whether they were on the bus does not help answer the question of whether the crash caused the death of the other three.

- In the context where there is more certainty on the putative sources of hazard and a pathway of exposure has been characterized, then a more scientifically sound investigation will require assessment of whether homes and their residents in Acreage experience exposure to much higher levels of the contaminants from the putative sources of hazard than homes and their residents that are located in more pristine communities, that is, in communities where we can conclude with a high level of certainty that there is no exposure to these dangerous contaminants.

- The absence of statistically significant differences in the levels of contaminants between cases and controls homes, both of which are located in the community hypothesized to have been exposed, does not mean that exposure to contaminants does not cause an increased risk of cancer. In other words, accepting the null hypothesis of no difference in exposure to contaminants between case and control homes cannot be interpreted as lack of a causal relationship between exposure to dangerous contaminants and risk of brain cancer.

- Even under the hypothetical situation where the exposure levels to these contaminants between the cases and controls home would have been exactly the same, again, this would not mean that exposure to these contaminants does not cause an increase in cancer risks. This is because exposure to contaminants increases the CHANCE of getting cancer and such chance is small. Thus, even if every home in Acreage had been equally exposed, and the exposure indeed caused an increased risk of a rare cancer, the risk to each child was still likely to be small and only a small number of children would have developed cancer.

- To increase the rigor of a case control study, a better analysis would have been to find matched controls (children who are similar as possible to the kids that are in Acreage) who reside outside Acreage, in a community unlikely to have been exposed to these contaminants. `

- In the FDOH Level 2 study, the selection of the control kids is flawed. Again, as in the FDEP, case and control children are both residing in Acreage and therefore it is a foregone conclusion that there are no statistically significant differences in any of their risk factors related to contamination.

- In addition, as for the FDEP, even assuming that the risk factors between the cases and controls where exactly the same, this would not exclude the possibility that the whole Acreage community is exposed to a putative source of hazard that increase the risk of brain cancer.

- Also, in both of these studies, in addition to the flawed approach for the selection of the control groups, no sample size calculations are provided, and no consideration is given to the issue of multiple comparisons (e.g. they test for differences between over 200 contaminants for cases and control homes and over 171 risk factors between cases and control kids).

I reserve the right to revise or refine my opinions as new data and information are received.

*Francesca Dominici*

Professor Francesca Dominici, Ph.D.

December 22, 2017

**References**

(1) Di, Q.; Wang, Y.; Zanobetti, A.; Wang, Y.; Koutrakis, P.; Choirat, C.; Dominici, F.; Schwartz, J. D. *New England Journal of Medicine* **2017**, *376* (26), 2513–2522.

(2) Rubin, D. B. *The Annals of Applied Statistics* **2008**, *2* (3), 808–840.

(3) Dominici, F.; Zigler, C. *Am J Epidemiol* **2017**, *186* (12), 1303–1309.

(4) Austin, P. C. *Multivariate Behav Res* **2011**, *46* (3), 399–424.

(5) Rosenbaum, P. R.; Rubin, D. B. *Biometrika* **1983**, *70* (1), 41–55.

(6) Rubin, D. B. *Biometrics* **1973**, *29* (1), 159–183.

(7) Hernán, M. A.; Robins, J. M. *Journal of Epidemiology & Community Health* **2006**, *60* (7), 578–586.

(8) Stuart, E. A. *Stat Sci* **2010**, *25* (1), 1–21.

(9) Dominici, F.; Kramer, S.; Zambelli-Weiner, A. *Law Probab Risk* **2008**, *7* (1), 15–34.

(10) Lawson, A. B. *Journal of the Royal Statistical Society. Series A (Statistics in Society)* **1993**, *156* (3), 363–377.