# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

Case No.: 10-80883-CIV-MARRA
Consolidated Case: Lead Action

MAGALY PINARES, et al.,

      Plaintiffs,

vs.

UNITED TECHNOLOGIES CORPORATION,
Pratt & Whitney Group, a Connecticut Corporation,

      Defendant.

_____/

CASE No.: 17-CV-80545-MARRA

JOYCE FEATHERSTON, Personal
Representative of the ESTATE of
JOSEPH MICHAEL BARATTA, decedent,

      Plaintiff,

vs.

UNITED TECHNOLOGIES CORPORATION,
Pratt & Whitney Group, a Connecticut Corporation,

      Defendant.

_____/

# PRATT & WHITNEY'S *DAUBERT* MOTION TO
# EXCLUDE THE TESTIMONY OF WILLIAM SAWYER
# AND INCORPORATED MEMORANDUM OF LAW

# **TABLE OF CONTENTS**

INTRODUCTION ................................................................................................. 1

BACKGROUND ................................................................................................. 1

ARGUMENT ...................................................................................................... 3

I.      SAWYER'S ANALYSIS SHOULD BE EXCLUDED AS IRRELEVANT
        BECAUSE IT DOES NOT INCLUDE A SPECIFIC CAUSATION OPINION ............... 4

II.     EVEN IF SAWYER HAD DISCLOSED A SPECIFIC CAUSATION OPINION,
        IT WOULD NOT HAVE BEEN BASED ON A RELIABLE METHODOLOGY ........... 5

        A.      Sawyer Does Not Have A Reliable—Or Any—Dose-Response
                Assessment ................................................................................ 6

        B.      Sawyer Does Not Rule Out, Or Even Consider, Other Potential Causes Of
                Baratta's Tumor. ....................................................................... 9

        C.      Sawyer Fails To Take Into Account The Background Risk Of Brain
                Tumors. .................................................................................... 10

CONCLUSION................................................................................................... 12

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Allison v. McGhan Med. Corp.*,
    184 F.3d 1300 (11th Cir. 1999) ................................................................ 4

*Cano v. Everest Minerals Corp.*,
    362 F. Supp. 2d 814 (W.D. Tex. 2005) .................................................... 6

*Chapman v. Procter & Gamble Distrib., LLC*,
    766 F.3d 1296 (11th Cir. 2014) ................................................... 6, 9, 11

*Daubert v. Merrell Dow Pharms., Inc.*,
    509 U.S. 579 (1993).............................................................................. 3, 4

*Kumho Tire Co. v. Carmichael*,
    526 U.S. 137 (1999).................................................................................. 3

*McClain v. Metabolife Int'l, Inc.*,
    401 F.3d 1233 (11th Cir. 2005) ............................................... 4, 6, 10, 11

*Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.*,
    326 F.3d 1333 (11th Cir. 2003) ............................................................... 4

*Rink v. Cheminova, Inc.*,
    400 F.3d 1286 (11th Cir. 2005) ............................................................... 4

*United States v. Frazier*,
    387 F.3d 1244 (11th Cir. 2004) ........................................................... 3, 4

*Williams v. Mosaic Fertilizer, LLC*,
    889 F.3d 1239 (11th Cir. 2018) ...................................................... passim

*Williams v. Mosaic Fertilizer, LLC*,
    No. 8:14–cv–1748–T–35MAP, 2016 WL 7175657 (M.D. Fla., June 24, 2016)................. 3, 11

**Rules**

Fed. R. Evid. 702 .......................................................................................... 3

## INTRODUCTION

Dr. William Sawyer is Plaintiff's only "specific causation" expert. His apparent role in Plaintiff's case is to connect Joseph Baratta's two brain tumors to his alleged exposure to Thorium-230 in the environment. Sawyer's analysis, however, is both irrelevant and unreliable, and should therefore be excluded.

Sawyer's analysis is irrelevant because he does not actually offer an opinion on what caused Baratta's tumors. More specifically, Sawyer nowhere opines that Thorium-230 caused either of Baratta's tumors. To the contrary, Sawyer in fact testified that exposure to radionuclides in the Acreage affirmatively *did not* cause Baratta's first tumor, which was diagnosed just six weeks after Baratta moved to the Acreage. Sawyer is silent in his report as to what he thinks caused Baratta's second tumor, and at his deposition Sawyer disclaimed having any specific causation opinion related to Baratta. Because Sawyer is a specific causation expert without a specific causation opinion, his analysis should be excluded as irrelevant.

Even if Sawyer had issued a specific causation opinion, the unreliability of that opinion would be manifest as well. Sawyer's analysis suffers from the same defects as the expert analysis excluded in the recent Eleventh Circuit case *Williams v. Mosaic Fertilizer, LLC*, 889 F.3d 1239 (11th Cir. 2018). There, an expert's specific causation opinion was excluded because he did not reliably establish that the plaintiff received a dose of a contaminant that could have caused the plaintiff's disease, he did not rule out other potential causes of the plaintiff's disease, and he did not take into account the background risk of acquiring the disease in question without exposure to the contaminant. Sawyer's analysis suffers from precisely the same flaws. In fact, Sawyer does not identify *any* dose of radiation purportedly received by Baratta, he did not even pay lip service to potential alternative causes, and he did not even mention the background risk of developing the type of tumor Baratta had without exposure to environmental radiation.

In sum, Sawyer's lack of a specific causation opinion renders him irrelevant to this case. And even if he had disclosed a specific causation opinion, his failure to engage in the necessary toxicological steps outlined by the Eleventh Circuit would render such an opinion unreliable. Sawyer should therefore be excluded from this case.

## BACKGROUND

***Baratta's Medical History***. Baratta moved with his family to the Acreage on December 15, 2004. Ex. 1 (7/25/13 Interrog. Resp.) at 17. Roughly six weeks later, in January 2005, a

tumor was discovered in Baratta's brain, which his doctors eventually diagnosed as a pilocytic astrocytoma—one of the more common types of brain tumors for children. Ex. 2 (8/26/15 Morrison Dep.) 11:20-15:23; Ex. 3 (12/22/17 Corrected Sawyer Rpt.) at 3-4; Cmplt. ¶ 18; Ex. 4 (2/20/18 Mitchell Rpt.) at 9. The doctors described this tumor as "huge." Ex. 5 (2/25/05 Record) at 2. They further observed that it had "low proliferative activity . . . confirmed by the very low MIB-1 labeling," meaning it was slow-growing. Ex. 6 (3/3/05 Record); Ex. 2 (Morrison) 32:19-34:25.

Baratta's 2005 tumor was partially resected, then treated with medical radiation therapy. Ex. 3 (Sawyer) at 3-4; Ex. 7 (7/14/15 Wen Dep.) 44:3-45:10. Between April and May 2005, 50.4 gray (5,040 cGy, or 5,040 rem) of radiation was directed to the site of Baratta's tumor. Ex. 3 (Sawyer) at 4; Ex. 7 (Wen) 44:3-45:10, 54:19-24, 62:13-63:13. Baratta's doctors warned him and Plaintiff that such high, concentrated doses of radiation carried a risk of "malignant transformation" and a "secondary tumor." Ex. 7 (Wen) 19:3-23:25. After this treatment, Baratta's original tumor was stable for several years. Ex. 3 (Sawyer) at 4.

In December 2008, Baratta's doctors found a new, more aggressive tumor—a glioblastoma multiforme—in his brain. Ex. 3 (Sawyer) at 4-5. The tumor was in the field of irradiation from the radiation treatment of Baratta's first tumor. Ex. 3 (Sawyer) at 5; Ex. 7 (Wen) 57:14-58:25; Ex. 8 (1/23/09 Record). In other words, the new tumor was in the same location as Baratta's original tumor. Ex. 7 (Wen) 58:22-25. Baratta's 2008 tumor caused his death on September 12, 2009. Ex. 3 (Sawyer) at 6.

***Sawyer's Reports And Opinions.*** Sawyer produced his initial report in this case on December 22, 2017. Ex. 9 (12/22/17 Sawyer Rpt.). In that report, Sawyer based his opinions in part on radiological data purportedly related to tissue samples from Baratta. *Id.* at 27, 29, 36-37. Plaintiff, however, never conducted any radiological testing on tissue samples from Baratta; she only produced radiological data from testing done on Baratta's cremated remains. Ex. 3 (Sawyer) at 27-28. Plaintiff's counsel later admitted that Sawyer was mistaken about the source of the tissue-based data on which Sawyer relied, and produced a new version of Sawyer's report with "cross-outs" that eliminated the portions of his report purportedly related to the misidentified data. Ex. 10 (2/9/18 Email); Ex. 3 (Sawyer).

Though Plaintiff alleges multiple types of contamination at her property, the only substance that Sawyer's report even alludes to as potentially being related to Baratta's brain

tumors is Thorium-230. Ex. 3 (Sawyer) at 35-38. Indeed, Sawyer's report contains a section entitled "Specific Causation Analysis of Mr. Baratta's Thorium-230 Exposures." *Id*. Despite that misleading heading, however, Sawyer's report does not contain any statement regarding what Sawyer believes caused either of Baratta's tumors. *Id*. Sawyer did not identify what he believes to be the cause of either of Baratta's tumors at his deposition, either. In fact, Sawyer testified that he does not have any specific causation opinion regarding Baratta. Ex. 11 (4/23/18 Sawyer Dep.) 215:16-18. Sawyer did, however, affirmatively rule out the possibility that Baratta's first tumor was caused by exposure to anything in the environment in the Acreage, including radionuclides. *Id.* at 213:13-214:8.

Pratt & Whitney submitted a number of expert reports in response to Sawyer's opinions, and Sawyer replied with two rebuttal reports. Ex. 12 (3/23/18 Sawyer Rebuttal Rpt.); Ex. 13 (3/23/18 Sawyer Rebuttal Rpt.). The reports essentially rehash Sawyer's claims from his original report, largely focus on a different plaintiff, and do not contain any analysis specific to Baratta.

**ARGUMENT**

The Court must act as a "gatekeeper" to ensure that the admission of expert testimony is consistent with the requirements of the Federal Rules of Evidence. *See Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 n.7 (1993); *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004). The court's gatekeeping function requires an exacting analysis of the reliability, relevancy, and "intellectual rigor" required by Fed. R. Evid. 702. *Frazier*, 387 F.3d at 1260 (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999)). Because "expert testimony may be assigned talismanic significance in the eyes of lay jurors," the significance of the court's role under *Daubert* "cannot be overstated." *Id*. at 1260, 1263. That role is even more pronounced with respect to purported experts in toxicology like Sawyer. "The uncertainty of the evidence in toxic tort cases, dependent as it is upon speculative scientific hypotheses and epidemiological studies, creates a special need for robust screening of experts and gatekeeping under Rules 403 and 703 by the court." *Williams v. Mosaic Fertilizer, LLC*, No. 8:14–cv–1748–T–35MAP, 2016 WL 7175657, at *4 (M.D. Fla., June 24, 2016) (citation omitted). Plaintiff bears the burden of establishing the admissibility of Dr. Sawyer's testimony under Rule 702. *Frazier*, 387 F.3d at 1260.

3

The Eleventh Circuit has distilled the exacting *Daubert* analysis into a "rigorous three-part inquiry." *Id.* at 1260. *First*, the proffered expert must be qualified to offer his opinions.[1] *Id.* *Second*, the expert's opinions must be based on a sufficiently reliable and discernible methodology. *Id.*; *Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1292 (11th Cir. 2005); *Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333, 1346 (11th Cir. 2003). *Third*, the proffered expert's testimony must "fit" the facts of the case such that the testimony is helpful to the trier of fact and, thus, relevant. *Daubert*, 509 U.S. at 591; *Frazier*, 387 F.3d at 1260. Importantly, "*any* step that renders the analysis unreliable under the *Daubert factors renders the expert's testimony inadmissible.*" *McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1245 (11th Cir. 2005) (citation omitted).

I.   **SAWYER'S ANALYSIS SHOULD BE EXCLUDED AS IRRELEVANT BECAUSE IT DOES NOT INCLUDE A SPECIFIC CAUSATION OPINION**

Starting at the end of the Eleventh Circuit's three-part *Daubert* inquiry, Sawyer's analysis should be excluded because it does not "fit" with this case. It is not "relevant to the task at hand" because it does not "logically advance a material aspect" of this case. *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1312 (11th Cir. 1999) (citation omitted). That is because Sawyer does not, in fact, advance any specific causation opinion at all.

The "material aspect" of the case to which Sawyer's analysis purportedly relates is Plaintiff's burden to prove the specific cause of Baratta's tumors. More specifically, Sawyer is the expert who is supposed to say that Thorium-230 caused Baratta's tumors. That is clear from the role he played in the related *Santiago* case, in which he submitted a very similar report[2] blaming Thorium-230 for a different plaintiff's tumor, and in which Plaintiff's counsel referred to Sawyer's opinions as "specific causation analysis." DE 344 at 1. And in case there was any remaining doubt about Sawyer's role in this case, his report contains a section entitled "Specific Causation Analysis of Mr. Baratta's Thorium-230 Exposures." Ex. 3 (Sawyer) at 35.

_____

[1] While not the subject of this motion, Pratt & Whitney does not concede that Sawyer is qualified to offer opinions on medical causation in the case of cancer allegedly related to exposures to radioactive material. Sawyer has a PhD in toxicology, but he is not a medical doctor and he does not treat patients, for neurological or oncological issues or otherwise. He also has no apparent expertise related to the effects of exposure to radioactive material; he is not, for example, a health physicist.

[2] Indeed, several portions of each of the reports are identical to one another. *Compare, e.g.,* DE 325-2 at 5-15, 23-30, 35-36, *with* Ex. 3 (Sawyer) at 15-26, 29-35, 36-38.

Yet neither Sawyer's "specific causation" section nor the rest of his report contains an actual specific causation opinion—that is, a statement identifying the purported cause of Baratta's tumor. *See generally* Ex. 3. In fact, Sawyer outright admitted at his deposition that he has no specific causation opinion regarding Baratta:

> 215:16   Q.   Do you have any specific causation opinion with
> 215:17        respect to Mr. Baratta?
> 215:18   A.   No.

Ex. 11 (Sawyer) 215:16-18.

Plaintiff's counsel has tried to suggest that Sawyer walked back that admission with an erratum to his deposition,[3] but he did no such thing. Sawyer's deposition erratum merely says that his "[o]verall opinions in pgs 35-38 of report have not changed." Ex. 14 (4/23/18 Sawyer Dep. Errata) at 4. But that is meaningless because Sawyer's report also does not include any specific causation opinion; it does not say—either in the referenced pages or anywhere else— that Sawyer believes Thorium-230 caused Baratta's tumor. *See* Ex. 3 (Sawyer) at 35-38. The absence of such a statement is brought into stark relief when one compares Sawyer's Baratta report to his report in the *Santiago* case, which clearly *did* purport to offer a specific causation opinion. *See* DE 325-2 at 39 ("[I]t is my opinion to reasonable toxicological certainty that the evidential factors as presented above are consistent with Cynthia Santiago's ependymoma being causally induced from her childhood exposures to ionizing alpha radiation from Thorium.").

The fact that Sawyer—Plaintiff's "specific causation expert"—does not actually have a specific causation opinion related to this case renders his analysis irrelevant. Sawyer's testimony should therefore be excluded.

## II.   EVEN IF SAWYER HAD DISCLOSED A SPECIFIC CAUSATION OPINION, IT WOULD NOT HAVE BEEN BASED ON A RELIABLE METHODOLOGY

Plaintiff's counsel has previously claimed that Sawyer's report does, in fact, include a specific causation opinion. *See supra* note 3. That is not true. But even if Sawyer had issued an opinion identifying Thorium-230 as the purported cause of Baratta's tumors, such an opinion would be unreliable. Sawyer has not put forth the type of analysis necessary for a specific causation opinion to pass muster under any scrutiny, not to mention the extra scrutiny due to the

---

[3] This discussion came in response to the Rule 11 letter that Pratt & Whitney sent to Plaintiff's counsel after the Sawyer deposition established that he had no specific causation opinion in this case. Ex. 15 (5/15/18 correspondence).

opinions of a toxicologist. *See supra* at 3. More specifically, Sawyer fails to put forth any analysis whatsoever regarding the "hallmark" of toxicology: the dose-response relationship. He also fails to consider any potential alternative causes of Baratta's second tumor, including the blatantly obvious likelihood that Baratta's high-dose medical radiation treatment caused his second tumor. Sawyer finally fails to consider the background rate of Baratta's diagnosis—that is, the chance that someone could develop a brain tumor without being exposed to environmental radiation. For each of these independent reasons, Sawyer's testimony should be excluded from this case.

### A.    Sawyer Does Not Have A Reliable—Or Any—Dose-Response Assessment

"[T]he relationship between dose and effect (dose-response relationship) is the hallmark of basic toxicology, and is the single most important factor to consider in evaluating whether an alleged exposure caused a specific adverse effect."[4] *Chapman v. Procter & Gamble Distrib., LLC*, 766 F.3d 1296, 1307 (11th Cir. 2014) (citation omitted). That is why "the court should pay careful attention to the expert's testimony about the dose-response relationship" "when analyzing an expert's methodology in toxic tort cases." *Williams*, 889 F.3d at 1246 (quoting *McClain*, 401 F.3d at 1241-42). A toxicologist must establish "not simply proof of exposure to the substance," but a "dose or level of exposure at which [the substance at issue] causes harm." *McClain*, 401 F.3d at 1241-42. *See also Cano v. Everest Minerals Corp.*, 362 F. Supp. 2d 814, 853 (W.D. Tex. 2005) ("[H]is failure to link the Plaintiffs to the study subjects on any basis, including dose and dose rate, which are significant in determining biological effects of radiation and which he acknowledges affect risk, renders his specific causation opinion unreliable.").

Failure to perform a dose assessment is grounds for exclusion. In *Williams*, for instance, the Eleventh Circuit deemed a toxicologist's specific causation opinion excludable because he did not "conduct[] an independent dose calculation specific to [the plaintiff]," but rather provided a mere estimate based on the levels of a contaminant found in the plaintiff's general environment. 889 F.3d at 1246. The Eleventh Circuit further held that the expert's specific causation opinion was excludable because the toxicologist failed to "demonstrate a scientific basis for concluding that [the plaintiff's] exposure levels would likely produce, contribute to, or

---

[4] Plaintiff expert Bernd Franke confirmed that this tenet holds true in cases concerning alleged exposure to radiation, noting that "the further down you go with dose, the greater the uncertainty becomes with respect to the effect." Ex. 16 (4/16/18 Franke Dep.) 31:12-32:4.

exacerbate [the plaintiff's] conditions." *Id*. In other words, the excluded expert neither established a reliable dose nor demonstrated that such a dose was high enough to cause the plaintiff's injury. *Id*.

Sawyer does not contest the need to conduct such an individualized dose-response assessment.  To the contrary, he says that in order to show that thorium caused a tumor, one must "demonstrate the presence of the contaminant near or at site [sic] of the malignancy and the contaminant has to be emitting a high enough dose of radiation to cause malignancy." Ex. 3 (Sawyer) at 34-35. Yet Sawyer does not even try to meet these criteria for Baratta. Indeed, his analysis is even more lacking than the expert in *Williams*. Sawyer did not merely fail to put forth a *reliable* dose estimate; he did not put forth *any* estimate of a purported dose of Thorium-230 radiation to Baratta's brain. Ex. 3 (Sawyer) at 35-38. Nor do any of Plaintiff's other experts put forth a purported dose of radiation for Baratta's brain on which Sawyer could rely.[5] This means Sawyer necessarily failed to complete the second dose-response step discussed in *Williams* as well: he did not compare any purported dose to the level of radiation necessary to cause brain cancer. *Id*. Sawyer further did not attempt to establish the "exposure level" for Thorium-230 that would "likely produce, contribute to, or exacerbate" either of Baratta's tumors. *Williams*, 889 F.3d at 1246.

That Sawyer did not conduct a dose-response assessment for Baratta is unsurprising, as Plaintiff lacks any evidence that Baratta's brain absorbed *any* radiation from Thorium-230. Ex. 3 (Sawyer) at 35-38. Sawyer certainly could not extrapolate a meaningful dose from Baratta's environment, as it is undisputed that there is no Thorium-230 contamination at the Featherston property.[6]  Sawyer also has no tissue data suggesting that Baratta's brain received a dose of radiation from Thorium-230. The only radiological data Sawyer has related to Baratta's body is

---

[5] It is telling that Plaintiff expert Bernd Franke did calculate a purported radiological dose—albeit an unreliable one—for related plaintiff Cynthia Santiago, but conducted no such analysis for Baratta. *See* DEs 323-3, 323-6, & 323-7.

[6] Pratt & Whitney's expert established as much, explaining that the Thorium-230 levels at the Featherston home were in line with what one would expect to find naturally. Ex. 17 (3/2/18 Frazier Rpt.) at 33-34. In fact, only a single sample had a Thorium-230 concentration above the expected *mean* concentration of Thorium-230 (1 pCi/g), and just barely so at 1.245 pCi/g. *Id*. at 14; Ex. 18 (12/22/17 Kaltofen Rpt.) at 34; Ex. 19 (Featherston Data) at 2. Plaintiff expert Kaltofen did not even examine whether the Featherstons had radiological contamination on their property. Ex. 20 (4/5/18 Kaltofen Dep.) 244:6-245:24.

from testing on Baratta's cremated remains. Ex. 3 (Sawyer) at 27-28. Even putting aside the obvious problems with that type of sample, Sawyer admits that he cannot determine from testing on Baratta's ashes whether Baratta had an unusually high amount of Thorium-230 in his body. *Id.* at 29 ("[T]he actual emission rates in pCi/g ash cannot be quantitatively compared to the general population due to a lack of published data.").

Plaintiff may respond by claiming that Sawyer can show Baratta absorbed at least some dose of Thorium-230 because Sawyer observed an "unusual," "inverse" ratio of Thorium-230 to Thorium-232 in Baratta's ashes. *Id*. at 28-29, 36-37. But that claim was debunked at Sawyer's deposition. Ex. 11 (Sawyer) 224:17-225:13; 225:22-227:23. Sawyer's source for the "usual" ratio of Thorium-230 to Thorium-232 shows the opposite of what Sawyer asserts. Ex. 3 (Sawyer) at 28-29. It shows, consistent with the testing data from Baratta's ashes, that radiation from Thorium-230 in people's bodies is typically higher than that of Thorium-232. Ex. 21 (Ibrahim article) at 6 (Table 4); Ex. 11 (Sawyer) 226:19-227:23. What is more, Sawyer's article shows that the ratio of Thorium-230 to Thorium-232 in Baratta's ashes was in the normal range of ratios observed in tissue samples from people who *were not* exposed to elevated Thorium-230.[7] And even if Sawyer had not misread his own source, or if Baratta's ashes really had exhibited an "inverse ratio" of Thorium-230 to Thorium-232, Sawyer still does not (and could not) claim that that would somehow prove Baratta's *brain* was exposed to Thorium-230, or that Baratta was exposed to an amount of Thorium-230 that could (much less did) cause brain cancer.

Sawyer did not even try to establish a dose of Thorium-230 radiation to Baratta's brain, much less reliably establish a dose high enough to cause a tumor. And even if he had tried he could not have done so, as Plaintiff has no evidence that Baratta's brain ever received a dose of Thorium-230. Thus, even if Sawyer had claimed that Thorium-230 caused Baratta's tumor, such a claim would have been unreliable, and thus excludable.

---

[7] The article in question compares the ratio of Thorium-230 to Thorium-232 in tissue samples from people who live near a Uranium tailings pile and people who live in Washington, D.C., "where no elevated natural source of thorium is known to exist." Ex. 21 (Ibrahim) at 2, 6. It shows that for people *not* exposed to elevated Thorium-230, the median and mean ratios of Thorium-230 to Thorium-232 in different types of tissue range from 1.2 to 5.8. *Id.* at 6 (Table 4). Sawyer testified that the ratio of Thorium-230 to Thorium-232 in Baratta's ashes is within that normal range, at 1.36. Ex. 11 (Sawyer) 224:17-225:13; 225:22-227:23.

**B.**     **Sawyer Does Not Rule Out, Or Even Consider, Other Potential Causes Of Baratta's Tumor.**

In addition to Sawyer's unfulfilled duty of establishing Thorium-230 as a possible cause of Baratta's tumor, Sawyer, as a "specific causation expert," was obligated to "meaningfully rule out other potential causes" of Baratta's tumor. *Williams*, 889 F.3d at 1248. *See also Chapman*, 766 F.3d at 1311 (affirming exclusion of toxicologist based in part on his failure "to consider obvious alternative causes for" plaintiff's alleged injury). In *Williams*, for instance, the same specific causation expert discussed above was excluded for the separate reason that he merely "made passing references to the purported 'low' probability of . . . other causes," but "never provided the District Court with any scientific basis upon which he relied in concluding that the likelihood that various other potential factors caused [plaintiff's] conditions was low enough to reasonably rule them out." 889 F.3d at 1249.

Unlike the excluded expert in *Williams*, Sawyer does not even pay lip service to other potential causes of Baratta's second tumor.[8] *See* Ex. 3 (Sawyer) at 35-36. This failure to even consider alternative causes, much less rule them out, is particularly problematic here, as there is an obvious alternative cause: the high dose of medical radiation administered directly to the area where Baratta's second tumor developed.[9] Ex. 3 (Sawyer) at 4-5. Sawyer is aware that Baratta's radiation therapy had the potential to cause a secondary tumor because he noted that possibility in his summary of the deposition testimony of Baratta's radiologist. *Id.* at 11-12. Yet Sawyer does not address Baratta's radiation therapy as a potential cause of his second tumor anywhere in the "specific cause" section of his report. *Id.* at 35-36.

In fact, Sawyer's testimony makes clear that if he *had* considered medical radiation as a potential alternative cause of Baratta's second tumor, he inevitably would have concluded that medical radiation was, in fact, the likely cause of that tumor. Sawyer admits that the medical

---

[8] Again, Sawyer admitted that Baratta's first tumor predated Baratta's move to the Acreage—it was diagnosed six weeks after he moved there—and therefore was not caused by exposure to anything in the Acreage.

[9] According to Plaintiff's counsel, there are other potential causes that Sawyer did not consider as well. Plaintiff's counsel claimed in a related case that CT scans can cause brain tumors. DE 344 at 13. Baratta had multiple CT scans, Ex. 22 (Compilation of Records), but Sawyer did not consider whether they could have or did cause Baratta's second brain tumor. Ex. 3 (Sawyer) at 35-36.

radiation Baratta received was high enough to cause Baratta's second tumor.[10] Ex. 11 (Sawyer) 215:25-218:4, 220:18-21. Sawyer also admits that the tumor meets the "Cahan criteria" that medical doctors—like Plaintiff expert Ari Perry—use to establish that a tumor was induced by medical radiation treatment. Ex. 7 (Wen) 28:16-29:18; Ex. 24 (1/11/18 Perry Testimony) 92:25-93:19. As Sawyer acknowledges, a tumor was likely caused by medical radiation therapy if it "differ[s] histologically from the original lesion that was treated" and "[arose] within the irradiation field over a sufficient latency period, typically years." Ex. 11 (Sawyer) 218:18-219:13; Ex. 3 (Sawyer) at 12. Sawyer agreed Baratta's second tumor was histologically different from the first, and appeared in Baratta's field of irradiation. Ex. 11 (Sawyer) 219:17-220:12. And Baratta's second tumor was diagnosed nearly four years after his radiation treatment—far more than the 12-month minimum latency period Sawyer claims for radiation-induced tumors. Ex. 3 (Sawyer) at 3-5, 16. Thus, Sawyer's own testimony shows that Baratta's second tumor meets the Cahan criteria, and thus was likely caused by medical radiation, not his environment.

Sawyer ignored the possibility that Baratta's second tumor was caused by the beams of high-dose radiation directed at the precise spot where that tumor arose, instead investigating the possibility that some unknown source of Thorium-230 in Baratta's environment, for which there is no evidence, caused the tumor. As in *Williams*, this failure to consider an obvious alternative explanation would rendered any specific causation opinion unreliable if Sawyer had, in fact, issued such an opinion.

### C. Sawyer Fails To Take Into Account The Background Risk Of Brain Tumors.

The Eleventh Circuit has further recognized that "[a] reliable [specific causation] methodology should take into account the background risk" of a specific disease, meaning "the risk a plaintiff and other members of the general public have of suffering the disease or injury that plaintiff alleges *without* exposure to the . . . chemical in question." *McClain*, 401 F.3d at 1243 (emphasis in original). Indeed, knowledge of background risks is "indispensable to proving

---

[10] In truth, this is a gross understatement. Baratta had 5,040 rem of radiation directed at his brain to treat his first tumor. Ex. 3 (Sawyer) at 3-4. That is 525 times more than the worst-case Thorium-230 dose (9.6 rem) Plaintiff's expert calculated for a different plaintiff who brought similar claims. Ex. 23 (2/2/17 Franke Rpt.) at 4. And it is more than 16,000 times higher than the total yearly whole-body dose one receives from natural, background radiation (0.311 rem), which is all that was detected in Baratta's environment. *Supra* at 7 n.6; Ex. 17 (Frazier) at 10, 33-34.

the effect of [a toxic] substance." *Williams*, 2016 WL 7175657, at *11 (quoting *Chapman*, 766 F.3d at 1308).

    *Williams*, again, provides an example of the Eleventh Circuit upholding the exclusion of a specific causation expert for failing to take into account the background risk of a particular disease. *Williams*, 889 F.3d at 1249-50 (expert failed to "meaningfully account[] for background risk," as evidenced by the fact that he "failed to address background risk in his report or elsewhere"). And once again, Sawyer's analysis suffers from the same flaw. Sawyer does not even mention the background risk of Baratta's brain tumors, and he certainly does not consider and rule out the possibility that Baratta's tumors are unrelated to exposure to environmental radiation. Ex. 3 (Sawyer) at 35-36.

    Sawyer's failure to consider background risk is particularly problematic in this case given the nature of Baratta's diagnoses. Plaintiff's own expert, Arie Perry, testified that "the overwhelming majority of brain tumors"—indeed, "90 to 95 percent"—are idiopathic, meaning they have no known cause. Ex. 24 (Perry) 80:18-22. This is significant, as "[t]he background risks" that need to be considered "include all those causes of a disease, whether known *or unknown*, excluding the drug or chemical in question." *McClain*, 401 F.3d at 1243 (emphasis added). In other words, an expert must consider the possibility that a disease is idiopathic. *Chapman*, 766 F.3d at 1308. Despite the extremely high rate of idiopathic brain tumors, Sawyer did not even consider the possibility that either of Baratta's tumors were idiopathic.[11] Ex. 3 (Sawyer) at 35-36.

    Sawyer's failure to account for the background risk of Baratta's disease renders his analysis unreliable, especially in light of the high rate of idiopathic brain tumors. Sawyer should therefore be excluded from this case.

---

[11] Any claim by Plaintiff that Sawyer conducted a differential diagnosis vis-à-vis Baratta would not help her avoid this problem with Sawyer's analysis. As the Restatement of Torts explains, "[w]hen the causes of a disease are largely unknown"—that is, when there is a high rate of idiopathy for a disease—"differential etiology is of little assistance." Restatement (Third) of Torts: Phys. & Emot. Harm § 28 (2010).

**CONCLUSION**

Sawyer's opinions are unrelated to this case because he did not issue a specific causation opinion regarding the cause of either of Baratta's tumors. And even if he had issued such an opinion, his analysis does not meet any of the toxicological requirements outlined by the Eleventh Circuit for specific causation opinions. Sawyer's opinions should therefore be excluded.

**REQUEST FOR HEARING**

Pratt & Whitney respectfully requests a hearing on this motion. This motion concerns expert testimony regarding complex medical, physiological, and radiological issues, and is therefore more complex than a typical motion. Pratt & Whitney believes that oral argument will aid this Court in understanding the facts and issues presented in the parties' briefing. Pratt & Whitney estimates that this motion requires 30 minutes of oral argument.

Dated:  December 21, 2018          Respectfully submitted,

GUNSTER, YOAKLEY & STEWART, P.A.
777 South Flagler Drive, Suite 500 East
West Palm Beach, FL 33401
Telephone: 561-655-1980
Facsimile: 561-655-5677
*Attorneys for Defendant United Technologies Corporation (Pratt & Whitney)*

By: /s/ *Gregor J. Schwinghammer, Jr.*
GREGOR J. SCHWINGHAMMER, JR.
Florida Bar No. 090158
gschwinghammer@gunster.com
HEATHER C. COSTANZO
Florida Bar No. 37378
hcostanzo@gunster.com

BARTLIT BECK LLP
54W Hubbard Street, Suite 300
Chicago, IL 60654
Phone: (312)-494-4448
Fax: (312)-494-4440
SEAN W. GALLAGHER
*Pro Hac Vice*
sean.gallagher@bartlit-beck.com
ANDREW C. MACNALLY
*Pro Hac Vice*
andrew.macnally@bartlit-beck.com
DANIEL R. MCELROY
*Pro Hac Vice*
daniel.mcelroy@bartlit-beck.com
ALEX GRODEN
*Pro Hac Vice*
alex.groden@bartlit-beck.com

Pratt & Whitney's Daubert Motion to Exclude the Testimony of William Sawyer
And Incorporated Memorandum of Law

Index to Exhibits

| | |
|---|---|
| Exhibit 1 | Plaintiff's Amended Third Revised Answers to Interrogatories re Complaint Nos. 1-11, July 25, 2013 |
| Exhibit 2 | Deposition of Glenn Morrison, August 26, 2015 |
| Exhibit 3 | Corrected Expert Report of William Sawyer, December 22, 2017 |
| Exhibit 4 | Expert Report of Duane Mitchell, February 20, 2018 |
| Exhibit 5 | Medical Record, February 25, 2005 |
| Exhibit 6 | Medical Report, March 3, 2005 |
| Exhibit 7 | Deposition of B-Chen Wen, July 14, 2015 |
| Exhibit 8 | Medical Record, January 23, 2009 |
| Exhibit 9 | Expert Report of William Sawyer, December 22, 2017 |
| Exhibit 10 | Mara Hatfield Email to Counsel re Sawyer Report, February 9, 2018 |
| Exhibit 11 | Deposition of William Sawyer, April 23, 2018 |
| Exhibit 12 | Rebuttal Expert Report of William Sawyer to Expert Report of Drs. Mitchell and Borch, March 23, 2018 |
| Exhibit 13 | Rebuttal Expert Report of William Sawyer to Expert Report of Drs. Frazier and Borch, March 23, 2018 |
| Exhibit 14 | Errata to Deposition of William Sawyer, April 23, 2018 |
| Exhibit 15 | Mara Hatfield Email to Sean Gallagher, May 15, 2018 |
| Exhibit 16 | Deposition of Bernd Franke, April 16, 2018 |
| Exhibit 17 | Expert Report of John Frazier, March 2, 2018 |
| Exhibit 18 | Expert Report of Marco Kaltofen, December 22, 2017 |
| Exhibit 19 | Featherston Data (Kaltofen Ex. 61) |
| Exhibit 20 | Deposition of Marco Kaltofen, April 5, 2018 |
| Exhibit 21 | *Thorium Concentration in Human Tissues from Two U.S. Populations*, Shawki Ibrahim, et al., 1983 |
| Exhibit 22 | Compilation of Medical Records |
| Exhibit 23 | Expert Report of Bernd Franke, February 2, 2017 |
| Exhibit 24 | Transcript of Hearing on Motion for Class Certification, January 11, 2018 |

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on December 21, 2018, I electronically filed the foregoing with the Clerk of Court using CM/ECF. I also certify that the foregoing document is being served on all counsel of record identified on the below Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to electronically receive Notices of Electronic Filing.

/s/ *Gregor J. Schwinghammer, Jr.*
GREGOR J. SCHWINGHAMMER, JR.

## SERVICE LIST

**Jack Scarola, Esq.**
**Mara Hatfield, Esq.**
Searcy Denney Scarola Barnhart
& Shipley, P.A.
2139 Palm Beach Lakes Boulevard
West Palm Beach, Florida 33409
Telephone: 561-686-6300
Facsimile: 561-383-9451
E-mail: jsx@searcylaw.com,
mrh@searcylaw.com,  dtm@searcylaw.com

**Jeffrey Louis Haberman, Esq.**
**Scott P. Schlesinger, Esq.**
Schlesinger Law Offices, P.A.
1212 SE 3rd Avenue
Fort Lauderdale, FL 33316
Telephone: 954-467-8800
Facsimile: 954-523-4803
Email:
JHaberman@schlesingerlaw.com,
scott@schlesingerlaw.com

**Craig Randall Zobel, Esq.**
Law Offices of Craig R. Zobel, P.A.
Post Office Drawer 32065
Palm Beach Gardens, FL 33420 Telephone:
561-277-1819
Facsimile: 561- 630-9666
Email: czobel@zobellawfirm.com

**Bryan S. Gowdy, Esq.**
Creed & Gowdy, P.A.
865 May Street
Jacksonville, FL 32204
Telephone: 904-350-0075
Facsimile: 904-503-0441
Email: bgowdy@appellate-firm.com